UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FLEMING INTERMEDIATE HOLDINGS LLC,

Plaintiff,

v.

JAMES RIVER GROUP HOLDINGS, LTD. FRANK D'ORAZIO, and SARAH DORAN,

Defendants.

Case No. 1:24-cv-05335-JGK

---

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY
MOTION TO FILE A SUPPLEMENTAL COMPLAINT AND FOR A
<u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................... 1

FACTUAL BACKGROUND ...................................................... 3

    I.     Fleming Agreed to Purchase JRG Re Subject to a Post-Closing True-Up Process. ................................................... 3

    II.    James River Committed Securities Fraud and Breached the Agreement. ............ 5

    III.   Fleming Attempts to Engage James River in the True-Up. .................................. 6

    IV.   James River Breaches the Agreement by Refusing To Engage in the True-Up. .................................................. 9

LEGAL STANDARD ............................................................. 10

ARGUMENT .................................................................... 11

    I.     Plaintiff Should Be Granted Leave to File the Proposed Supplemental Complaint ................................................. 12

    II.    Preliminary Injunctive Relief and a Temporary Restraining Order are Warranted to Compel James River to Participate in the True-Up Required by the Agreement. .................................. 14

        A.   Fleming Is Likely to Succeed on the Merits Because James River's Refusal to Provide Information Breached the Agreement. ...................... 14

        B.   Fleming Will Suffer Irreparable Harm Absent Injunctive Relief Compelling James River to Participate in the True-Up Process. ............ 17

        C.   The Balance of Hardships and Public Interest Favor Fleming ................ 21

CONCLUSION .................................................................. 22

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Benihana Inc. v. Benihana of Tokyo, LLC,*
  784 F.3d 887 (2d Cir. 2015)........................................................................17

*Bornholdt v. Brady,*
  869 F.2d 57 (2d Cir. 1989)..........................................................................10

*Davis v. Supreme Lodge Knights of Honor,*
  165 N.Y. 159 (1900)...................................................................................20

*Espiritu Santo Holdings, L.P. v, L1bero Partners, LP,*
  2019 WL 2240204 (S.D.N.Y. 2019)............................................................22

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.,*
  375 F.3d 168 (2d Cir. 2004).......................................................................14

*Free Country Ltd v. Drennen,*
  235 F. Supp. 3d 559 (S.D.N.Y. 2016).........................................................11

*Gym Door Repairs, Inc. v. Young Equipment Sales, Inc.,*
  2016 WL 6652733 (S.D.N.Y. 2016).............................................................14

*i3 Plastic Cards, LLC v. Mps Dallas Cards, LLC,*
  2019 WL 2027662 (Del. Ch. 2019) .......................................................16, 20

*Interwave Tech., Inc. v. Rockwell Automation, Inc.,*
  2005 WL 3605272 (E.D. Pa. 2005) .............................................................16

*Ivax Corp. v. B. Braun of Am., Inc.,*
  2001 WL 253251 (S.D. Fla. 2001) ..............................................................21

*Kleeberg v. Eber,*
  331 F.R.D. 302 (S.D.N.Y. 2019) .................................................................10

*L.K. Comstock & Co. v. Thales Transp. & Sec., Inc.,*
  2009 WL 2899865 (E.D.N.Y. 2009).............................................................18

*Mason Tenders Dist. Council Welfare Fund v. F.E.S./M&V Contracting Corp.,*
  1996 WL 22972 (S.D.N.Y. 1996).................................................................19

*N. Atl. Instruments, Inc. v. Haber,*
  188 F.3d 38 (2d Cir. 1999)..........................................................................17

*New York v. Actavis PLC,*
  787 F.3d 638 (2d Cir. 2015).......................................................................10

*Nimbus Therapeutics, LLC v. Celgene Corp.,*
  570 F. Supp. 3d 100 (S.D.N.Y. 2021)..........................................................22

# TABLE OF AUTHORITIES
(continued)

Page

*Ortiz v. Orange Cnty.*,
  2024 WL 2798869 (S.D.N.Y. 2024) ........................................................................10

*Quaratino v. Tiffany & Co.*,
  71 F.3d 58 (2d Cir. 1995) ................................................................................10, 13

*Reuters Ltd. v. United Press Int'l, Inc.*,
  903 F.2d 904 (2d Cir. 1990)...................................................................................17

*Rhodes v. Newhall*,
  126 N.Y. 574 (1891) ...............................................................................................19

*Terex Corp. v. Bucyrus International, Inc.*,
  2011 WL 10857755 (Sup. Ct. N.Y. Cnty. 2011) ............................................15, 19

*Terex Corp. v. Bucyrus International, Inc.*,
  94 A.D.3d 548 (1st Dep't 2012) .............................................................................15

*Thales Avionics, Inc. v. L3 Techs., Inc.*,
  --- F. Supp. 3d ---, 2024 WL 815845 (S.D.N.Y. 2024) ...............................17, 20, 21

*TriFound Fin., LLC v. Greenberg*,
  2021 WL 194763 (D.N.J. 2021) .............................................................................18

*Trustees of N.Y.C. Dist. Council of Carpenters v. Access Solutions Group, LLC*,
  2017 WL 5256765 (S.D.N.Y. 2017).......................................................................19

*Wang v. N.Y.C. Dep't of Youth & Cmty. Dev.*,
  2024 WL 1174723 (S.D.N.Y. 2024)..................................................................12, 13

*Witkowich v. Gonzales*,
  541 F. Supp. 2d 572 (S.D.N.Y. 2008).................................................................10, 13

**Rules**

Fed. R. Civ. P. 15 ...................................................................................................2, 10

Fed. R. Civ. P. 65 .........................................................................................................3

## PRELIMINARY STATEMENT

Through this emergency application, Fleming Intermediate Holdings LLC ("Fleming") seeks immediate relief to prevent James River Group Holdings, Ltd.'s ("James River") latest scheme to deprive Fleming of its contractual rights in connection with the fraudulent scheme that James River has already enacted.  James River must be stopped from exacerbating the damages that it has caused and further irreparably harming Fleming by depriving Fleming of information to which it is contractually entitled and which is necessary for Fleming's meaningful participation in a post-closing purchase price true-up process—an alternative dispute resolution process that James River and Fleming agreed upon and are now bound to follow.

As set forth in the parties' Stock Purchase Agreement, Haller Ex. 1 (the "Agreement" or "SPA"), Fleming agreed to buy from James River all of the equity of JRG Reinsurance Company Ltd. ("JRG Re"), a wholly owned subsidiary of James River (the "Transaction").  Following the Transaction's closing on April 16, 2024, Fleming discovered that James River had engaged in securities fraud and repeatedly breached the parties' Agreement.  James River intentionally sold Fleming a lie, having repeatedly violated Bermuda law, rendered JRG Re nearly insolvent, misled Fleming, and breached the Agreement in numerous ways.  Accordingly, on July 15, 2024, Fleming filed this action for securities fraud, common-law fraud, and breach of contract to obtain relief in connection with James River's $300 million fraud.

But James River was not content with just defrauding Fleming.  Since this action was filed, James River has doubled-down on its misconduct through a new scheme to undermine the parties' contractually mandated "Post-Closing Purchase Price True-Up" (the "True-Up").  The parties included the True-Up as trust-but-verify approach to finalize the appropriate amount of money Fleming was to ultimately pay James River for JRG Re.  Fleming paid $152 million to James River

1

at closing, based on *estimates* of various financial metrics, but subject to an agreed-upon post-closing process to determine JRG Re's *actual* net-worth at closing that could result in an adjustment to the purchase price, with an appropriate "true-up" payment to be made by one party to the other. James River concedes that Fleming is entitled to receive some of its money back through the True-Up process, but it still seeks to deprive Fleming of approximately $50 million that Fleming is due (in addition to damages Fleming is also owed in light of James River's fraud and contract claims).

The Agreement provides a clear process for resolving such True-Up disputes, first by requiring the parties to attempt in good faith to negotiate a resolution, and then by submitting the dispute to an "Independent Accounting Firm" for binding determination. Since this case was filed, however, James River has frustrated that process by refusing to honor its contractual obligations. Under the Agreement, the parties are required to provide each other with information and engage in good-faith negotiations concerning their disagreement during a "Resolution Period" from July 15 through July 30, 2024. Rather than provide the requisite information reasonably requested by Fleming, however, James River has instead stonewalled by refusing to provide any information whatsoever. That violates the plain terms of the Agreement.

Because this conduct took place "after the date of" Fleming's complaint, Fleming respectfully requests permission to file a supplemental complaint "setting out" these recent events pursuant to Federal Rule of Civil Procedure 15(d). And because James River's bad-faith obstruction has and is continuing to cause irreparable harm to Fleming by depriving it of its invaluable informational rights—a material part of the parties' bargain as necessary to engage in meaningful negotiations and to address the disputed issues before the Independent Accounting Firm—Fleming further respectfully requests that the Court enter a temporary restraining order and

preliminary injunction pursuant to Federal Rule of Civil Procedure 65 to ensure that Fleming's bargained-for rights are not lost forever.

Accordingly, Fleming respectfully requests the Court allow its proposed Supplemental Complaint to be filed, grant a temporary restraining order staying the True-Up process, and grant a preliminary injunction compelling James River to provide Fleming the information and access requested in its letter of July 18, 2024, and tolling and staying the True-Up, or, in the alternative, tolling and staying it nunc pro tunc as of July 18, 2024, until Fleming has had an opportunity to evaluate that information.

## **FACTUAL BACKGROUND**

### I.    **Fleming Agreed to Purchase JRG Re Subject to a Post-Closing True-Up Process.**

In 2023, James River—a North Carolina-headquartered company that owns and operates several insurance and reinsurance businesses—began soliciting offers for JRG Re, its wholly-owned reinsurance subsidiary.  Haller ¶¶ 3-5.  After months of negotiations, on November 8, 2023, James River and Fleming—a Bermuda-based insurance company—entered into their Stock Purchase Agreement, pursuant to which Fleming would purchase all of JRG Re's equity, Haller ¶ 7.  The Agreement is governed by New York law and provides for disputes concerning the Agreement to be litigated in this Court.  SPA §§ 8.5, 8.7.

Rather than setting a fixed amount of consideration, the Agreement provided that James River was to receive up to approximately $300 million, comprised of (i) a cash payment from Fleming to James River subject to a post-closing "True-Up" process; and (ii) a possible payment of up to $139 million from JRG Re to James River prior to the closing date.  As to the cash component of the deal, the Agreement provides for a "Base Purchase Price" of $138 million, *id.* § 1.2, adjusted by "a good faith estimate" of JRG Re's "Adjusted Net Worth" at the time of closing,

*id.* § 1.3, and further adjusted post-closing through what the Agreement termed the "Post-Closing Purchase Price True-Up," *id.* § 1.4.

The pre-closing adjustment turned entirely on James River's estimates of JRG Re's net worth. Specifically, James River was to estimate JRG Re's net worth and use that to adjust up or down from the $138 million base price to arrive at "a good faith calculation of the Closing Purchase Price." *Id.* § 1.3. The Agreement obligated Fleming to pay the Closing Purchase Price as calculated by James River at the time of closing. *Id.* § 1.2.

Following closing, in the True-Up, Fleming would then undertake its own calculation of JRG Re's net worth and of the proper "Closing Purchase Price" pursuant to the same formula that James River should have used. *Id.* § 1.4(a). Fleming was obligated to provide this analysis, as well as other information, in the form of a "Closing Statement" delivered to James River within 90 days of the closing date. *Id.* James River would then have 45 days to review Fleming's Closing Statement, during which time Fleming was obliged to "cooperate with [James River]" by providing James River with "reasonable access…to all books, records and working papers of [JRG Re] to the extent reasonably related or relevant to preparing and analyzing" Fleming's calculations. *Id.* § 1.4(b). James River could then either agree with Fleming's calculations, in which case payments would be made as necessary to adjust the Closing Purchase Price paid on the date of closing in order to "true up" whichever party had been deprived of money it was due, or James River could send Fleming a "Notice of Disagreement" that would "specify in reasonable detail the nature of any disagreement so asserted." *Id.* § 1.4(b).

If a Notice of Disagreement was sent, then the True-Up would proceed to a fifteen-day "Resolution Period." *Id.* § 1.4(c). During this period, the parties were to "seek in good faith to resolve in writing any differences that they may have" as "specified in the Notice of Disagreement"

and to "cooperate in good faith…to arrive at a final determination of" the purchase price. *Id.* Critically, the Agreement further provides that, during the Resolution Period, "each party shall use its reasonable best efforts to provide to the other party all information and reasonable access to employees as such other party shall reasonably request in connection with review of the Closing Statement or the Notice of Disagreement, as the case may be, including all work papers of the accountants who audited, compiled or reviewed such statements or notices." *Id*.  In addition to those informational rights tied specifically to the True-Up, the Agreement also provides for broader informational rights for six years after closing, requiring the parties to "promptly afford" one another "reasonable access, during normal business hours and upon reasonable prior notice, to books, records and information related to" JRG Re that are in their position, as well as "reasonable access" to "employees and auditors related to" JRG Re, "in each case, to the extent necessary or useful" for  the requesting party "in connection with any audit, investigation, dispute or Action." *Id.* § 4.5(b).

If the parties were unable to resolve the issues raised in James River's Notice of Disagreement, they are to engage an "Independent Accounting Firm" to resolve any such disputed items based on reports submitted by the parties setting forth the basis for their respective positions. *Id.* § 1.4(d).  The Independent Accounting Firm's determination "shall be final, binding and conclusive for all purposes of determining the Purchase Price and shall be an expert determination under applicable Law governing expert determination and appraisal proceedings," *id.*, rendering the determination effectively unappealable and unreviewable except on exceptionally narrow grounds.

## II.    James River Committed Securities Fraud and Breached the Agreement.

The Transaction closed on April 16, 2024, at which time Fleming paid $152 million to James River based on James River's pre-closing calculations.  Haller ¶ 23.  Fleming gained access

to JRG Re's records and employees upon its acquisition of JRG Re and commenced an investigation revealing that it had been defrauded into the Transaction by James River, and that James River had rendered JRG Re borderline insolvent through its violations of Bermuda law and breaches of numerous pre-closing operating covenants in the Agreement before foisting JRG Re off on Fleming.  *Id.* ¶ 18; *see generally* Dkt. 1 (Fleming's operative complaint).  That investigation formed the basis of Fleming's claims in this action for securities fraud, common-law fraud, and breach of contract, filed on July 15, 2024.  Dkt. 1 ¶¶ 385-482.

### III.    Fleming Attempts to Engage James River in the True-Up.

Concurrent with its post-closing investigation, Fleming also engaged in the True-Up process mandated by the Agreement.  Although it paid $152 million to James River upon closing, Fleming calculated that it should have paid only $87 million pursuant to the formula and accounting principles set forth in the Agreement.  Haller ¶ 25.  In other words, Fleming overpaid by approximately $65 million—more than one-third of its cash payment to James River.

As contemplated by the Agreement, Fleming provided its Closing Statement reflecting its calculation of the appropriate purchase price to James River on May 30, 2024.  *Id.* ¶ 25.  On July 14, 2024, James River responded with a Notice of Disagreement disputing seven items set forth on Fleming's Closing Statement and asserting that the correct purchase price should have been $141 million.  *Id.* ¶ 28 & Ex. 4.  Thus, James River has taken the position that it needs to return only $11 million to Fleming, more than $50 million less than the $65 million Fleming believes it is owed.  That Notice of Disagreement triggered the start of the fifteen-day Resolution Period provided for by SPA § 1.4(c).

As part of its efforts to understand James River's position and alternative calculations in the Notice of Disagreement, Fleming attempted to exercise its informational rights under the Agreement on July 18, 2024, just four days after receiving the Notice of Disagreement, when it

wrote to James River requesting specific information relating to the Notice of Disagreement, as well as a meeting with a specific James River employee. Haller ¶ 32 & Ex. 5. Each of Fleming's requests sought information necessary to understand at least one of the seven points of dispute James River set forth in its Notice of Disagreement. Haller ¶¶ 32-44. For example, James River noted that it calculated JRG Re's reserves at $416 million,[1] whereas Fleming had calculated them at $454 million, amounting to a $38 million difference between the parties on just that one item. *Id.* ¶ 33. Given the magnitude of that lone disagreement and seeking to understand James River's analysis, Fleming requested (i) minutes of James River's Reserve Committee meetings where JRG Re's reserves had historically been discussed and determined, (ii) materials distributed to James River's Reserve Committee relating to JRG Re, (iii) materials relating to an adjustment that James River's Reserve Committee made to JRG Re's reserves in response to analysis from Ernst & Young demonstrating that JRG Re's reserves were deficient in early 2024, (iv) James River's actuarial analysis of JRG Re's reserves, and (v) two "rollforwards" of JRG Re's reserves from

---

[1] An insurance company's "reserves" are money set aside to pay future claims by its insureds, which are recorded as liabilities on insurance companies' balance sheets to account for those future claims. Accordingly, reserves are the lifeblood of an insurance company and a key metric of an insurer's financial health. If an insurer has insufficient reserves, that creates a risk to policyholders that the insurance company's assets may not be sufficient to pay their potential claims. Moreover, inappropriately under-reserving can artificially boost an insurer's book-value and apparent profitability in the short-term (by minimizing its liabilities on paper) at the expense of its long-term prospects, allowing for more money to be taken out of the company now even if that money should rightfully be retained and kept available to pay claims later.

prior balance sheets to the closing date balance sheet.  *Id.* ¶ 36.  In addition, Fleming requested a meeting "between Fleming's business professionals and the actuary who prepared James River's…actuarial reports."  Haller Ex. 5.

Fleming also sought information to understand the Notice of Disagreement's inclusion of a $5.8 million adjustment to the purchase price based on James River's "capital contribution of $5,800,000 to [JRG Re] prior to Closing."  Haller ¶ 39.  Setting aside that this capital contribution itself violated SPA § 4.1(h)(B) and was necessary only because of James River's earlier illegal looting of JRG Re's assets, Fleming requested an "equity 'rollforward'" to ascertain and understand how James River had accounted for this purported contribution.  *Id.* ¶ 40.

The Notice of Disagreement also included an approximately $2.7 million disputed item regarding JRG Re's insurance recoverables, which refer to the portion of an insurance company's losses from claims which it can recover from reinsurance companies.  *Id.* ¶ 41.  To understand this, Fleming's July 18 letter requested two "rollforwards" of JRG Re's reinsurance recoverables reflecting different periods of time in order to ensure that Fleming fully understood the basis for the parties' disagreement.  *Id.* ¶ 42.  Finally, the Notice of Disagreement included an approximately $500,000 disputed item relating to three specific pre-closing expenditures because James River "had been paying certain expenses of" JRG Re in connection with which James River further claimed that it had "prepaid certain annual fees—ultimately for the benefit of" Fleming.  Haller Ex. 4.  Fleming has no ability to verify those purported expenditures because James River claims that they were incurred by James River rather than JRG Re, and thus proof of these expenses would not be found among JRG Re's business records.  Haller ¶ 44.  Accordingly, Fleming's July 18 Letter requested "any contracts, invoices, and/or proofs of payment" associated with these specific items.  Haller Ex. 5.

**IV.    James River Breaches the Agreement by Refusing To Engage in the True-Up.**

After squandering five of the fifteen days in the Resolution Period, SPA § 1.4(c), James

River responded on July 23, 2024, by refusing to provide *anything* in response to Fleming's July

18 letter.  Haller ¶ 46 & Ex. 6.  James River claimed that Fleming's July 18 requests were "not

'reasonable'" because (i) James River had already "provided substantial information to Fleming

in connection with the Estimated Closing Statement" provided at the time of the closing;

(ii) "Fleming has had full access to the books and records of JRG Re" since the closing,

(iii) Fleming had requested information "without [making] any counterproposal" to James River's

Notice of Disagreement or providing an "explanation of which disputed items Fleming believes

can be resolved" during the contractually mandated Resolution Period, and (iv) James River did

"not anticipate discussions" with Fleming during the Resolution Period "being fruitful."  Haller

Ex. 6.

Fleming wrote back to James River later that same day.  Haller ¶ 53.  Fleming explained

that the Agreement obligates James River to provide the requested information because it "would

enable [Fleming] to better understand the position taken by James River in the Notice of

Disagreement" so that it could engage in the good-faith negotiation process that the Agreement

required.  Haller Ex. 7.  Fleming further explained that, even if the contractually required exchange

of information "does not lead to a consensual resolution of any disputed items," the information is

still necessary for Fleming to "meaningfully engage in the Independent Accounting Firm

resolution process."  *Id*.  Because the Independent Accounting Firm will ultimately make its

determination based on "reports submitted by the [parties] and the basis for [their] respective

positions," SPA § 1.4(d), Fleming needs to fully understand James River's analysis in order to

adequately explain to the Independent Accounting Firm why James River is wrong.  James River's

refusal to provide any information underlying its analysis will, if not rectified, leave Fleming with

no choice but to accept at face value James River's *post hoc* explanations, rather than allowing exploration of the contemporaneous, underlying factual evidence, and will force Fleming to stab about blindly in the dark in challenging James River's analysis.  As Fleming explained to James River, that "is a breach of…obligations under Section 1.4(c) of the [Agreement]."  Haller Ex. 7.  As of 9 a.m. on July 29, 2024, six days later, James River had not responded.  Brodsky ¶ 9; *accord* Haller ¶ 54.  Absent judicial relief, moreover, the Resolution Period contemplated by the Agreement but frustrated by James River will terminate on July 29, 2024, Haller ¶ 54, the same date on which Fleming has filed the instant motion.

## LEGAL STANDARD

"A supplemental pleading is designed to cover matters that occur subsequent to the filing of the complaint, but pertain to the original pleadings."  *Ortiz v. Orange Cnty.*, 2024 WL 2798869, at *4 (S.D.N.Y. 2024).  Accordingly, parties may "serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented," Fed. R. Civ. P. 15(d), so long as the new allegations therein are "connected to the original pleading," *Kleeberg v. Eber*, 331 F.R.D. 302, 315 (S.D.N.Y. 2019).  Rule 15(d) "reflects a liberal policy favoring a merit-based resolution of the entire controversy between the parties."  *Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 590 (S.D.N.Y. 2008).  Motions to supplement pleadings are subject to "the exercise of [the Court's] discretion" but "should be freely granted" absent "undue delay, bad faith, dilatory tactics, undue prejudice to the party to be served with the proposed pleading, or futility."  *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995); *accord Bornholdt v. Brady*, 869 F.2d 57, 68 (2d Cir. 1989).

"A party seeking a preliminary injunction must ordinarily establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to

the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015). "The standard for an entry of a [temporary restraining order] is essentially the same as for a preliminary injunction." *Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016).

## **ARGUMENT**

The Court should allow Fleming to supplement its pleadings in light of these recent—in fact, ongoing—events and enter a temporary restraining order and preliminary injunction compelling James River to provide information as the Agreement requires for the True-Up, and staying and tolling the True-Up until James River has done so. Absent such relief, the parties' contracted-for process will be a dead letter. James River should not be allowed to deprive Fleming of the informational rights that the parties agreed upon as part of the True-Up, particularly where doing so would set the stage for James River to press its informational advantage in the "final, binding and conclusive" alternative dispute resolution process that is to be overseen by an independent accounting firm if the parties are unable to resolve their differences. SPA § 1.4(d). The parties must have a level playing field before that resolution process begins.

The Agreement requires the parties to "seek in good faith to resolve…any differences that they may have with respect to the matters specified in the Notice of Disagreement" and, to that end, it obligates James River to provide Fleming with "all information and reasonable access to employees as [Fleming] shall reasonably request in connection with [Fleming's] review of" the Notice of Disagreement. SPA § 1.4(c); *see also id.* § 4.5(b) ("[f]rom and after the Closing until the sixth (6th) anniversary of the Closing, each party…shall promptly afford the other party…reasonable access…to books, records and information related to [JRG Re]…in its

possession…and employees…related to [JRG Re]…to the extent necessary or useful for such requesting party…in connection with any audit, investigation, dispute or Action.").  If the parties cannot resolve their purchase price-related disputes after obtaining relevant information from one another, then an "Independent Accounting Firm" will resolve them by considering the parties' reports "and the basis for [their] respective positions."  *Id.* § 1.4(d).

Without access to the information James River is withholding, Fleming will neither be able to understand the basis for James River's positions nor seek meaningful resolution or narrowing of the parties' differences.  And it will be at a severe disadvantage in the dispute resolution process because it will lack insight into the bases for James River's position.  Put simply, Fleming cannot adequately address and rebut James River's analysis without access to its underlying evidence and reasoning.  The Court should not allow James River to stonewall Fleming, impeding the exercise of its contractual right and frustrating the True-Up.  James River agreed in two separate provisions of the Agreement to provide this information to Fleming, and it further agreed to an alternative dispute resolution process predicated on Fleming first having access to information that it reasonably requests.  James River should be held to the terms of its bargain.

## I.    Plaintiff Should Be Granted Leave to File the Proposed Supplemental Complaint.

In light of "the liberal standards of Rule 15(d)," Fleming "should be permitted to supplement the claims raised in [its] initial pleading[] with new factual allegations concerning events that occurred subsequent to the filing of the original complaint but stem from the same conduct as the events in the original complaint."  *Wang v. N.Y.C. Dep't of Youth & Cmty. Dev.*, 2024 WL 1174723, at *5 (S.D.N.Y. 2024).

Fleming's operative complaint pleads claims for securities fraud, common-law fraud and breach of contract against James River in connection with Fleming's acquisition from James River of JRG Re, which James River rendered borderline insolvent and operated in violation of Bermuda

law before the $300 million Transaction closed in April.  *See generally* Dkt. 1.  The supplemental

allegations plead James River's further misconduct since the Complaint was filed on July 15, 2024

in section IX of the proposed supplemental complaint ("James River Frustrates the Post-Closing

Purchase Price True-Up Process after this Litigation Commenced"), and add two new causes of

action, Counts VIII and IX, for James River's breach of SPA §§ 1.4 and 4.5, respectively.

    As part of the post-closing True-Up's "Resolution Period," on July 18, 2024, Fleming

requested that James River provide information in connection with its Notice of Disagreement so

that Fleming could better understand James River's position.  Haller Ex. 5.  On July 23, 2024,

however, James River flatly refused to provide any information to Fleming.  Haller Ex. 6.  When

Fleming pressed further on that same date, Haller Ex. 7, James River simply ignored Fleming's

request.  Haller ¶ 54.  Each of those events occurred after Fleming's Complaint was filed on July

15, 2024.  *See* Dkt. 1.

Moreover, each of those events "stem from the same conduct as the events in the original

complaint," *Wang*, 2024 WL 1174723, at *5, because they constitute further breaches of the same

Agreement that James River was already alleged to have breached and because they each relate to

the same Transaction between Fleming and James River that is at the heart of Fleming's operative

pleadings.  Because the "new allegations are closely related to those raised in the Complaint and

throughout the litigation thus far," they involve "the same subject matter" in that they also relate

to Fleming's acquisition of JRG Re from James River, and they "took place shortly" after the

earlier events, Rule 15(d) supplementation should be granted.  *Witkowich*, 541 F. Supp. 2d at 590.

There is no plausible argument of "undue delay, bad faith," or "futility" concerning the

proposed supplemental complaint's new allegations.  *Quaratino*, 71 F.3d at 66.  The Agreement

sets forth clear requirements for the True-Up, James River has only recently begun to breach them

by stonewalling Fleming's good faith attempts to engage in the True-Up, and Fleming pleads these further allegations just days after the events at issue transpired. "Supplementing the [Complaint] at this juncture would not be dilatory or in bad faith, and no determination could be made that such supplementation is futile." *Gym Door Repairs, Inc. v. Young Equipment Sales, Inc.*, 2016 WL 6652733, at *4 (S.D.N.Y. 2016) (Koeltl, J.) (allowing supplemental pleadings). Accordingly, Fleming's motion to file a supplemental complaint should be granted.

## II.   Preliminary Injunctive Relief and a Temporary Restraining Order are Warranted to Compel James River to Participate in the True-Up Required by the Agreement.

### A.   Fleming Is Likely to Succeed on the Merits Because James River's Refusal to Provide Information Breached the Agreement.

The Agreement is governed by New York law, SPA § 8.7, under which the elements of a claim for breach of contract are "(1) the existence of an agreement, (2) adequate performance…by the plaintiff, (3) breach of contract by the defendant, and (4) damages," *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). Fleming is likely to succeed in satisfying each of these elements in connection with its proposed supplemental claims.

The Agreement is a valid and binding contract in connection with which James River has already succeeded in obtaining specific performance, and Fleming has performed all of its obligations thereunder—including closing the Transaction. Haller ¶¶ 7-8, 14-17. The parties thereafter began to engage in the True-Up contemplated by SPA § 1.4, pursuant to which Fleming provided a Closing Statement to James River on May 30, 2024, and James River provided a Notice of Disagreement to Fleming on July 14, 2024. Haller ¶¶ 25, 28 & Ex. 4. When Fleming requested information necessary to understand and evaluate the Notice of Disagreement on July 18, 2024, however, James River breached the Agreement by refusing to provide any information whatsoever, without any legitimate excuse for doing so. Haller ¶¶ 32-52 & Exs. 5-6. Impeding Fleming's

requests violated the plain language of SPA § 1.4(c), which obligated James River to "use its reasonable best efforts to provide [Fleming] all information and reasonable access to employees" sought "in connection with [Fleming's] review of…the Notice of Disagreement" specifically, as well as SPA § 4.5(b), which more broadly obligates James River to "promptly afford [Fleming] reasonable access…to books, records and information related to" JRG Re "to the extent necessary or useful for [Fleming] in connection with any audit, investigation, dispute or Action."  And, as discussed below, those breaches risk causing imminent irreparable harm absent emergency relief from this Court.  *See infra* Pt. II.B.

*Terex Corp. v. Bucyrus International, Inc.* is instructive.  2011 WL 10857755 (Sup. Ct. N.Y. Cnty. 2011).  There, Bucyrus purchased assets from Terex under an agreement that provided informational rights that Terex sought to exercise in connection with a post-closing purchase-price adjustment process similar to the True-Up here.  When Bucyrus refused to provide the requested information, Justice Schweitzer interpreted the parties' contract as entitling Terex to it because the contract allowed Terex to obtain information "to the extent useful in connection with any dispute, litigation or other matter requiring [it] for any reasonable business purpose," including the purchase-price adjustment.  *Id.* at *9.  Furthermore, he explained that Terex could not "effectively protect its interests in pre-dispute resolution matters without such access."  *Id.*  Accordingly, withholding information would "result in the process being less efficient," which "undercuts the rationale for having the procedures in place at all, and cannot have been the parties' intent."  *Id.*  As a result, he ordered Bucyrus to provide "immediate access" to the records and personnel Terex

had requested, and Terex was granted 30 days to review those materials and hold such meetings, before the purchase-price adjustment process resumed.  *Id.*[2]

Likewise, *i3 Plastic Cards, LLC v. Mps Dallas Cards, LLC* involved allegations that a purchaser "fail[ed] to provide documents and information the Seller requested" where the parties' contract entitled the seller to "reasonable access to Buyer's books and records…for purposes of reviewing" documents relating to post-closing earn-out payments.  2019 WL 2027662, *1, *3 (Del. Ch. 2019).  The buyer's motion to dismiss was denied in *i3 Plastic Cards*, with Vice Chancellor Laster recognizing the need to determine "whether the Seller can obtain additional information under the Agreement" *before* an alternative dispute resolution process overseen by a valuation firm could commence because resolving the seller's informational rights was "necessary to determine what information [would] be presented to the Valuation Firm."  *Id.* at *4; *see also Interwave Tech., Inc. v. Rockwell Automation, Inc.*, 2005 WL 3605272, at *6, *9 (E.D. Pa. 2005) (denying dismissal where defendant "denied access to all but one of the requested personnel and provided only very

---

[2] The Appellate Division modified *Terex* on appeal, finding Bucyrus's "obligation to provide books and records [was] triggered by the submission of the dispute to [a] CPA firm" under the purchase-price adjustment provisions such that Terex could not rely on "general inspection provisions" elsewhere in the contract to demand information earlier.  94 A.D.3d 548, 550 (1st Dep't 2012).  The distinction between *Terex*'s two information-rights provisions has no bearing here because Fleming timely requested information during the Resolution Period pursuant to SPA §1.4(c), such that there is no similar conflict between its True-Up informational rights and its broader SPA §4.5(b) informational rights.  Both provisions entitle Fleming to information now.

limited access to the books and records requested by Interwave in order to properly prepare its Notice of Disagreement" in earn-out dispute).

Here, too, Fleming "is entitled to additional information" and "it should receive that information *before* the proceedings before [an Independent Accounting Firm] take place."  *i3 Plastic Cards*, 2019 WL 2027662, at *4.  Accordingly, Fleming's informational requests should be honored pursuant to SPA §§ 1.4(c) and 4.5(b).  And, to ensure that James River does not benefit from its undue delay, Fleming should be given time to evaluate the information received before the True-Up resumes and submissions are made to an Independent Accounting Firm pursuant to SPA § 1.4(d).

## B.    Fleming Will Suffer Irreparable Harm Absent Injunctive Relief Compelling James River to Participate in the True-Up Process.

Demonstrating "probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990).  That requirement is easily satisfied here, however, because James River has already expressly "acknowledge[d] and agree[d] that [its] breach of th[e] Agreement may cause irreparable damage" to Fleming, which therefore does "not have an adequate remedy at law."  SPA § 8.4.  Accordingly, James River has also "waive[d] the defense…that there is an adequate remedy at law" for its violations of the parties' contract.  *Id.*  That "irreparable harm provision in the parties' agreement, while not controlling, is relevant evidence that can…support a finding of irreparable injury."  *Benihana Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 896 (2d Cir. 2015) (affirming finding of irreparable harm); *accord N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (same, "[i]n light of…the 'irreparable injury' clause").

Moreover, this Court has recently observed that "the loss of the right to have a dispute decided" pursuant to an "agreed upon means of resolution is itself an irreparable injury."  *Thales*

*Avionics, Inc. v. L3 Techs., Inc.*, --- F. Supp. 3d ---, 2024 WL 815845, at *7 (S.D.N.Y. 2024) (Koeltl, J.). That is precisely what James River's obstruction is meant to accomplish. The parties negotiated for a True-Up that includes the right for Fleming to receive information and speak to pertinent James River employees in order to understand and evaluate James River's Notice of Disagreement during the Resolution Period under SPA § 1.4(c), which is to take place before any remaining disputes are submitted for a "final, binding and conclusive" determination by an Independent Accounting Firm pursuant to SPA § 1.4(d). The Agreement thus contemplated that Fleming would request and James River would provide such information as was requested in Fleming's July 18 letter, Haller Ex. 5, before that resolution process begins. James River nevertheless responded by refusing to provide *anything* in response to Fleming's request, Haller Ex. 6, and then ignoring Fleming's follow-up, Haller ¶ 54.

Because the information sought by Fleming is critical to understanding what basis James River has (if any) for disputing that Fleming is owed $65 million in the True-Up, Haller ¶¶ 26, 32–44, James River's blanket refusal to provide any information "deprive[s]" Fleming "of a meaningful opportunity to resolve the dispute" through either SPA § 1.4(c)'s Resolution Period negotiations or SPA § 1.4(d)'s submission of the dispute to an Independent Accounting Firm. *L.K. Comstock & Co. v. Thales Transp. & Sec., Inc.*, 2009 WL 2899865, at *2 (E.D.N.Y. 2009) (finding irreparable harm where requested "preliminary relief [was] intended to preserve the efficacy of [an] arbitration process").

Fleming is currently operating under an information asymmetry because it has no insight into James River's analysis beyond the cursory explanation provided in the Notice of Disagreement. Critically, Fleming cannot look to JRG Re's records for the information sought. Haller ¶ 49. James River determined JRG Re's reserves prior to closing and provided JRG Re

with minimal transparency into that process, *id.* ¶ 34-35, only James River is aware of how it accounted for its withdrawal and contributions of capital to JRG Re notwithstanding that the Agreement prohibited such contributions, *id.* ¶¶ 39-40, Fleming has no insight into the basis for the parties' disagreement concerning reinsurance recoverables, *id.* ¶ 42, and James River is the only party with supposed evidence that might support its claims to have paid various expenses on behalf of JRG Re, *id.* ¶ 44.  Denying Fleming its rightful access to information over which James River has complete control constitutes irreparable harm.  *See, e.g.*, *TriFound Fin., LLC v. Greenberg*, 2021 WL 194763, at *5 (D.N.J. 2021) (finding irreparable harm where plaintiff's "inability to access" information was "interfering with its ability to conduct [its] business"); *Trustees of N.Y.C. Dist. Council of Carpenters v. Access Solutions Group, LLC*, 2017 WL 5256765, at *3 (S.D.N.Y. 2017) (granting injunction to prevent "irreparable harm [plaintiff] would suffer if…deprived of auditing Access's books and records"); *Mason Tenders Dist. Council Welfare Fund v. F.E.S./M&V Contracting Corp.*, 1996 WL 22972, at *2 (S.D.N.Y. 1996) (ordering "inspect[ion] and audit" of defendant's "books and records" pursuant parties' contract).

"Receipt of the information requested" by Fleming "is a necessary predicate for determining whether there is a way to bridge the gap between the parties," Haller ¶ 51, which SPA § 1.4(c) obligated the parties to attempt in good faith.  Without this information, negotiation during the True-Up's mandatory Resolution Period is a pointless exercise.  Worse still, James River's stonewalling leaves Fleming ill-equipped to contest James River's analysis in submissions to an Independent Accounting Firm pursuant to SPA § 1.4(d).  "Fleming needs the information requested in its July 18 Letter in order to meaningfully engage in SPA § 1.4(d)'s alternative dispute resolution process because it cannot adequately address and rebut James River's Notice of Disagreement in its submissions to the Independent Accounting Firm if it does not understand the

reasoning, analysis, and facts behind the items disputed by James River." Haller ¶ 60. "The argument that [Fleming] can effectively protect its interests…without such access simply does not pass muster," serving only to "undercut[] the rationale for having the procedures in place at all." *Terex*, 2011 WL 10857755, at *9.

"A primary rule of construction requires a contract to be so construed as to give some meaning and effect to all of the language," rather than adopting an interpretation that "would render the language meaningless and inoperative." *Rhodes v. Newhall*, 126 N.Y. 574, 578 (1891). In light of that black-letter law, SPA §§ 1.4(c) and 4.5(b) cannot be understood to allow James River to deny Fleming access to all information it might seek. Moreover, it is equally well established that contracts must be construed "in such a way that they will operate reasonably, and so as not to produce absurd results." *Davis v. Supreme Lodge Knights of Honor*, 165 N.Y. 159, 170 (1900). Because Fleming is entitled to information about JRG Re "in connection with [its] review of…the Notice of Disagreement," SPA § 1.4(c), and "to the extent necessary or useful…in connection with any…dispute," SPA § 4.5(b), James River is not entitled to withhold such information so long as it has practical use to Fleming.

"If [Fleming] is entitled to additional information, then it should receive that information before the proceedings before the [Independent Accounting Firm] take place" in order for that information to provide any value to Fleming. *i3 Plastic Cards*, 2019 WL 2027662, at *4. Accordingly, allowing the True-Up process to continue while Fleming is wrongfully deprived of information necessary to meaningfully partake in that process is, in effect, "the loss of the right to have a dispute decided by…the agreed upon means of resolution." *Thales Avionics*, 2024 WL 815845, at *7. As this Court recently recognized, that "is itself an irreparable injury." *Id.* And, absent judicial relief, that irreparable harm will begin to take hold imminently because the date of

this filing is the last day of the Resolution Period as set forth in the Agreement.  Haller ¶ 54.  A temporary restraining order is therefore appropriate to ensure that James River is not allowed to simply run out the clock while ignoring Fleming's reasonable requests for information.

### C.    The Balance of Hardships and Public Interest Favor Fleming

Balancing "competing claims of injury" and considering "the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction" makes clear that "the balance of equities tips in [Fleming's] favor" and that "granting the preliminary injunction would be in the public interest." *Thales Avionics*, 2024 WL 815845, at *9.

Granting a temporary restraining order and an injunction merely preserves the status quo by pausing the True-Up process until Fleming has obtained the information to which it is entitled, rather than requiring Fleming to move ahead with a process that James River has manipulated to ensure that Fleming is unprepared.  Absent injunctive relief, "there is a realistic danger that [Fleming] will lose its contractual right" because James River's obstruction will "render[] meaningless the parties' agreement to" resolve the dispute via a True-Up process predicated on the parties having access to necessary information.  *Id.*  Fleming is at a severe disadvantage given the information asymmetry between the parties as to any refutable bases—or even any legitimate grounds—for James River's Notice of Disagreement.  It should not be forced to move forward with an alternative dispute resolution process "absent information necessary to meaningfully engage in that process."  Haller ¶ 61.  James River will not be harmed, by contrast, because holding it to the terms of its bargain as set forth in the Agreement will deprive it of nothing more than an illegitimate and improper informational advantage.  *See Ivax Corp. v. B. Braun of Am., Inc.*, 2001 WL 253251, at *6 (S.D. Fla. 2001) (finding harm from denial of access to information outweighed harm from allowing access where party "had the right to examine…books and records in accord

with the terms of the Agreement").  Moreover, by its own admission, James River is already holding at least $11 million more than it is entitled to according to its own post-closing calculation of the purchase price as reflected in its Notice of Disagreement.  Haller Ex. 4.  Hence, a modest delay in the True-Up process will not harm James River; if anything, delay in the process harms Fleming by depriving it of the $65 million true-up payment due to it, at least $11 million of which is undisputed.  That Fleming is willing to endure further delay only underscores the critical importance of the information requested from James River.

Moreover, "there is a well-recognized public interest in enforcing contracts and upholding the rule of law," particularly "where, as here, the contract involves sophisticated counterparties who engaged in actual negotiation over the provisions at issue."  *Nimbus Therapeutics, LLC v. Celgene Corp.*, 570 F. Supp. 3d 100, 127 (S.D.N.Y. 2021).  The "strong public interest in enforcing the parties' bargained-for agreement" weighs heavily in favor of granting injunctive relief.  *Espiritu Santo Holdings, LP v. L1bero Partners, LP*, 2019 WL 2240204, at *26 (S.D.N.Y. 2019).

## <u>CONCLUSION</u>

Fleming respectfully requests the Court allow its proposed Supplemental Complaint to be filed, grant a temporary restraining order staying the True-Up process, and grant a preliminary injunction compelling James River to provide Fleming the information and access requested in its letter of July 18, 2024, and tolling and staying the True-Up, or, in the alternative, tolling and staying it nunc pro tunc as of July 18, 2024, until Fleming has had an opportunity to evaluate that information.

Dated:  New York, New York
        July 29, 2024

                                Respectfully submitted,

                                GIBSON, DUNN & CRUTCHER LLP

                                By:  */s/ Reed Brodsky*

                                    Reed Brodsky
                                    Akiva Shapiro
                                    Michael Nadler
                                    200 Park Avenue
                                    New York, New York 10166
                                    Tel:  (212) 351-4000
                                    RBrodsky@gibsondunn.com
                                    AShapiro@gibsondunn.com
                                    MNadler@gibsondunn.com

                                    *Attorneys for Plaintiff Fleming*
                                    *Intermediate Holdings LLC*

**ATTORNEY CERTIFICATION PURSUANT TO**
**THE INDIVIDUAL PRACTICES OF JUDGE KOELTL**

I, Reed Brodsky, an attorney duly admitted to practice law before this Court, hereby certify that this memorandum of law complies with the word limit set forth in Your Honor's Individual Practices because it contains 6,987 words, excluding the parts of the motion exempted from the word limit by Your Honor's Individual Practices.  In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

Dated: New York, New York
       July 29, 2024

                                                    */s Reed Brodsky*
                                                    Reed Brodsky