# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FLEMING INTERMEDIATE HOLDINGS LLC,<br><br>               Plaintiff,<br><br>     v.<br><br>JAMES RIVER GROUP HOLDINGS, LTD. FRANK D'ORAZIO, and SARAH DORAN,<br><br>         Defendants. | Case No. 1:24 Civ. 5335-cv-05335-JGK<br><br>**SUPPLEMENTAL COMPLAINT** |

Plaintiff Fleming Intermediate Holdings LLC ("Fleming"), by and through its undersigned counsel, alleges as follows:

## INTRODUCTION

1.      In November 2023 Fleming agreed to purchase the equity of a Bermudian reinsurance company, JRG Reinsurance Company Ltd. ("JRG Re"), from its then-parent James River Group Holdings, Ltd. ("James River") in a $300 million transaction, pursuant to the terms of a stock purchase agreement (the "Agreement" or "SPA").

2.      After the transaction closed and Fleming gained access to JRG Re's records and personnel, Fleming discovered that it had been defrauded by James River.  Specifically, the evidence it uncovered—detailed herein—revealed that the SPA was replete with misrepresentations made by James River to induce Fleming into acquiring JRG Re.  JRG Re's shares are securities under federal securities laws and this $300 million fraud blatantly violated those laws.  Once that Agreement was signed, moreover, and unbeknownst to Fleming at the time, James River immediately began depriving JRG Re's leadership of critical information about their own company and looting JRG Re's assets to ensure that Fleming would not receive the full value of the company it had bargained for.

3.      As a result of James River's misconduct, at acquisition JRG Re was borderline insolvent and operating in violation of Bermuda law.  That was not what Fleming reasonably expected in consummating the sale or what the parties had agreed to.  But upon closing, this became Fleming's problem rather than James River's.

4.      In hindsight, James River rushed to finalize the sale because it had fundamentally transformed JRG Re into a shell of its former self following the signing of the Agreement. Regulatory approval was nevertheless slower than expected, delaying the earliest possible closing date from year-end 2023 into 2024.  But James River continued to push for a fast closing.  It is now apparent that James River wanted to offload JRG Re before Fleming could learn what James River had been up to.

5.      James River's rush to close peaked when James River purported to host a farcical closing call on March 1, 2024, notwithstanding that Fleming had informed James River the day before that it would not attend the "closing" in light of disturbing revelations concerning James River's violations of the Agreement's covenants governing the pre-closing operation of JRG Re. Moreover, an express condition to closing under the SPA—the parties' agreement on and execution of an ancillary contract—remained unfulfilled.

6.      Recognizing that its scheme to defraud Fleming was unravelling, James River rushed into state court in New York on March 10, 2024, and, based on a lone affidavit from James River's chief executive officer, it sought a pre-discovery, mandatory preliminary injunction compelling Fleming to purchase JRG Re.  That gambit paid off when the preliminary injunction was granted and Fleming was ordered to close the transaction on ten days' notice such that Fleming had no opportunity to substantively challenge that ruling on appeal.  As a result, Fleming was forced to purchase 100% of the shares of JRG Re on April 16, 2024.

7.      Fleming immediately launched an investigation into what it had been sold.  That investigation revealed that James River had breached numerous covenants contained in the parties' Stock Purchase Agreement, which also contained myriad false and misleading material misstatements upon which Fleming had reasonably relied.

8.      Fleming therefore brings this action for securities fraud, common-law fraud, and breach of contract to recover the enormous damages caused by James River's egregious wrongdoing in connection with this $300 million transaction.

## THE PARTIES

9.      Plaintiff Fleming is a limited liability company registered under the laws of the Cayman Islands.  Fleming's principal place of business is Crawford House, 23 Church Street, Hamilton HM 11, Bermuda.

10.      Defendant James River is a limited liability company incorporated under the laws of Bermuda.  James River's principal place of business is Chapel Hill, North Carolina.  James River conducts business in the Southern District of New York, including through its employment in New York of Seema Wadhwa, who provided actuarial services to JRG Re on behalf of James River.

11.      Defendant Frank D'Orazio is the chief executive officer and director of James River.  Mr. D'Orazio is a resident of, and primarily works in, New Jersey.  In addition, Mr. D'Orazio maintains a home in North Carolina and an office at James River's North Carolina headquarters.  Mr. D'Orazio also oversees James River's operations in New York, including its employment in New York of Ms. Wadhwa.

12.      Defendant Sarah Doran is the chief financial officer of James River.  Ms. Doran works and resides in North Carolina.  Ms. Doran also oversees James River's operations in New York, including its employment in New York of Ms. Wadhwa.

## JURISDICTION AND VENUE

13.     The federal courts (including this Court) have exclusive subject-matter jurisdiction over Fleming's securities fraud claims under 28 U.S.C. § 1331.  This Court has subject-matter jurisdiction over Fleming's contract and common-law fraud claims under 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over the parties pursuant to SPA § 8.5(a), whereby the parties agreed to submit to the "jurisdiction of the United States District Court for the Southern District of New York . . . for purposes of all Actions arising out of or relating to th[e] Agreement, or the transactions contemplated by th[e] Agreement," and because defendants transacted business in this district.

15.     Venue is proper in this district under 28 U.S.C. § 1391(b) and because the parties agreed in SPA § 8.5(a) to waive any objection to venue in this Court.

## FACTUAL ALLEGATIONS

### I.      FLEMING AND JAMES RIVER NEGOTIATE AND ENTER THE STOCK PURCHASE AGREEMENT WITHIN THE UNITED STATES.

16.     Fleming is a Bermuda-based insurance company that is majority-owned by Altamont Capital Partners ("Altamont"), a California-based private equity firm.

17.     James River is a NASDAQ-traded holding company that owns and operates several insurance and reinsurance subsidiaries.

18.     In or about early 2023 James River decided to exit the reinsurance business and began soliciting offers for JRG Re, its wholly owned reinsurance subsidiary.

19.     James River was desperate for cash because, among other reasons, it had been embroiled for several years in a significant securities fraud class action concerning a "series of fraudulent statements regarding [James River's] financial position" and "systemic policy of under-reserving," *i.e.*, failing to set aside adequate funds to pay future claims by its insureds.  That earlier

fraud came to light after James River suffered over $200 million in losses in connection with its insurance of Uber Technologies, which was James River's single largest account at the time. *In re James River Group Holdings Ltd. Sec. Litig.*, 2023 WL 5538218, at *1, *5 (E.D. Va. Aug. 28, 2023) (declining to dismiss second amended complaint).

20.     Frank D'Orazio and Sarah Doran were personally named as defendants in that securities fraud action in light of their central roles in James River's financial misconduct.

21.     As revealed in that litigation, James River's employees "described the corporate culture as 'incredible,' because [they had] 'never worked in an environment where [they] bent the truth'" as at James River, where there was "'no methodology for calculating reserves'" which instead were set "'willy-nilly' and generally based on a 'gut feeling'" as employees simply "'would guess'" at how much money the insurance company might need to set aside for expected claims in a process "'predicated entirely on keeping reserves artificially low.'" *Id.* at *3-4.[1]

22.     James River eventually settled those securities fraud claims in December 2023, agreeing to pay investors tens of millions of dollars just weeks after it entered into the November 2023 Agreement at the heart of this case and around the same time at which it initially hoped to close on the sale of JRG Re to Fleming in exchange for approximately $300 million. *See In re James River Group Holdings, Ltd. Sec. Litig.*, No. 21 Civ. 444, Dkt. 114-1 (E.D. Va. Dec. 22, 2023) (settlement).

---

[1] Based on interviews with fifteen James River employees and discovery proceedings, the Second Amended Complaint filed in the *In re James River Group Holdings, Ltd. Sec. Litig.* matter contains nearly thirty pages of additional detailed descriptions of James River's utter lack of internal controls as well as the absence of appropriate policies and procedures to ensure adequate financial reporting and reserving for expected claims. *See In re James River Group Holdings, Ltd. Sec. Litig.*, No. 21 Civ. 444, Dkt. 69 ¶¶ 75-161 (E.D. Va. Sept. 9, 2022) (Second Amended Complaint).

23.    James River, Frank D'Orazio and Sarah Doran are also currently defending themselves against a separate securities fraud class action concerning various accounting improprieties and internal control failures that were publicly disclosed after the close of business on November 7, 2023—less than twelve hours before the signing of the November 2023 Agreement at issue herein.  That matter is currently pending before Judge Lewis Liman of this Court.  *See Glantz v. James River Group Holdings, Ltd.*, No. 23 Civ. 10000 (S.D.N.Y.).

24.    JRG Re was an attractive option for James River to sell in 2023 because it had hundreds of millions of dollars in illiquid and encumbered assets (*i.e.*, assets owned by JRG Re but which were subject to claims by certain of JRG Re's contractual counterparties and thus not freely available to JRG Re) notwithstanding that it had lost over $100 million over the prior two years.

25.    While formally a separate entity, JRG Re was fully controlled by James River, and by Frank D'Orazio and Sarah Doran specifically.

26.    JRG Re had a four-person board of directors, none of whom were independent of James River.  In particular, JRG Re's directors included two senior James River executives: Gareth Tavares, James River's head of financial planning and analysis, and Michael Hoffman, James River's chief underwriting officer.  Both Mr. Tavares and Mr. Hoffman reported to Mr. D'Orazio and Ms. Doran.

27.    The third member of JRG Re's board was JRG Re's president and chief executive officer, Daniel Heinlein.  Mr. Heinlein also reported solely and directly to Frank D'Orazio, the chief executive officer of James River.  Mr. Heinlein and Mr. D'Orazio spoke about JRG Re at least weekly, and often more frequently.

28.     The final member of JRG Re's board was its chief financial officer, Allan Defante, who reported directly to the chief financial officer of James River, Sarah Doran.  Mr. Defante also held the title of vice president at James River, in which capacity he had additional duties to James River unrelated to his work at JRG Re.  Mr. Defante and Ms. Doran met at least twice per month about JRG Re, and often spoke more frequently on an *ad hoc* basis.  In addition, Mr. Defante also met with Mr. D'Orazio at least once per month.

29.     In short, each of JRG Re's directors and JRG Re's two senior-most executives took direction from Mr. D'Orazio and Ms. Doran, who had ultimate control over the day-to-day operations of both James River and JRG Re.  Indeed, Mr. D'Orazio has submitted a sworn affidavit elsewhere attesting that he was "a member of [James River's] leadership team responsible for overseeing [James River's] management of JRG Re" with "personal knowledge" of how JRG Re's finances were managed.  *James River Grp. Holdings, Ltd. v. Fleming Intermediate Holdings*, Index No. 651281/2024, NYSCEF Doc. 24 ¶ 14 (Sup. Ct. N.Y. Cnty. Mar. 13, 2024).

30.     Mr. D'Orazio and Ms. Doran created a culture of fear and acquiescence within JRG Re, regularly rebuking employees for raising issues and challenging their directions, or for asking questions during meetings that Mr. D'Orazio and/or Ms. Doran did not want to address.

31.     As just one example, on January 11, 2024, Ms. Doran wrote to the chief financial officer of JRG Re that his efforts to prepare for closing on the sale of JRG Re to Fleming were "completely unprofessional" and "creating more work than" he was "assisting with."

**To:**      Allan Defante[Allan.Defante@jrgre.bm]
**From:**   Sarah Doran[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=0ADF6F1CF21C42568310F131CD3A946F-DORAN, SARA]
**Sent:**   Thur 1/11/2024 12:01:35 AM (UTC)
**Subject:** RE: Confirmation of reductions as of today

Allan, please stop w the constant barrage of follow up emails. We have a ton on going and we know you need to hear. This is at this point completely unprofessional. You are creating more work than you are assisting with. This is just simply not an emergency.

32.     As set forth in a follow-up email that JRG Re's chief financial officer sent to a human-resources professional, the following day he had a one-on-one meeting with Ms. Doran in which he "was continually attacked" and experienced severe "abuse and bullying that need[ed] to be corrected."

From: Allan Defante <Allan.Defante@jrgre.bm>
Sent: Tuesday, January 30, 2024 5:54 PM
To: Jessica Miller <Jessica.Miller@fallslakeins.com>
Subject: Fwd: Confirmation of reductions as of today
Jessica, as discussed earlier, reading this email **REDACTED FOR PERSONALLY SENSITIVE INFORMATION**

██████ The next day during our 1:1, I was continually attacked and that is really stemmed from being on PTO while we supposed Jaguar at 12/31. **REDACTED FOR PERSONALLY SENSITIVE INFORMATION**

I am sharing this because to correct something. There is an abuse and bullying that need to be corrected.
We have DEI initiatives in our company to develop and maintain compassion and respect among employees, regardless of their ranks and position.

33.     That human resources professional confirmed that Ms. Doran's treatment was "very concerning" and promised to escalate the issue to Angela Burnett, James River's chief human resources officer.

To:        Allan Defante[Allan.Defante@jrgre.bm]
From:      Jessica Miller[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=3FD074FF97094AE1B66AF32083B94C84-JESSICA MIL]
Sent:      Thur 2/1/2024 3:28:39 PM (UTC)
Subject:   RE: Confirmation of reductions as of today

Allan,
Just wanted to send a note acknowledging your follow up email with your commentary below.
This is very concerning and I will need to escalate and speak to Angie as a next step.
As there may be follow—up, I will reach out to you and advise.
Thank you,
Jessica

34.     Indeed, James River's toxic work environment caused JRG Re employees to literally lose sleep due to the stress and anxiety they suffered after being berated by Ms. Doran.  In short, James River did not foster an atmosphere that welcomed open dialogue as necessary for good corporate governance and stewardship.

35.    Mr. D'Orazio and Ms. Doran made clear that James River wanted to minimize the amount of money reserved to pay claims submitted by JRG Re's insurance counterparties, known as "cedents."  Inappropriately suppressing reserves could artificially boost James River's (and JRG Re's) book-value and apparent profitability in the short-term at the expense of its long-term prospects because it would allow more money to be taken out of the company now but could result in insufficient funds being available to pay claims later—*i.e.*, precisely what James River, Mr. D'Orazio and Ms. Doran were accused of in the earlier class action securities fraud matter.

36.    These discussions are not reflected in correspondence, however, because Mr. D'Orazio and Ms. Doran were familiar with the need to avoid spoliation and the risks presented by discovery in light of their other litigation experience, including the securities fraud class action filed against them and James River in 2021, discussed above.  Accordingly, they instructed JRG Re's leadership to be cautious concerning what they memorialized in written records.  Ms. Doran, in particular, would call JRG Re's executives and instruct them not to put certain matters in writing if she received an email whose substance made her uncomfortable.

37.    In sum, the corporate culture imposed upon JRG Re by James River was one of burying problems and refusing to address them, while studiously attempting to avoid creating a paper trail of having done so.

38.    Unaware of these issues that would only become clear in retrospect, Fleming submitted an offer to purchase JRG Re on or about June 16, 2023.

39.    Thereafter, the parties entered into several months of comprehensive negotiations regarding the specific terms on which Fleming might purchase JRG Re.

40.    For Fleming, the negotiations were led by its chief executive officer, its head of mergers-and-acquisitions, and several of its directors.  The participating directors are employees of Altamont who participated in those negotiations from California.

41.    For James River, the negotiations were led by Mr. D'Orazio, who participated from his home state of New Jersey and/or from James River's headquarters in North Carolina, and by Ms. Doran, a former mergers-and-acquisitions investment banker who participated from North Carolina.

42.    Although James River and Fleming are each incorporated in Bermuda, both parties retained United States-based lawyers to represent them in their negotiations.  Specifically, James River was represented by counsel from the New York office of Debevoise & Plimpton LLP, while Fleming was represented by counsel from the Chicago and Dallas offices of Sidley Austin LLP.  Counsel for both parties conducted their negotiations while located within the United States.

43.    The negotiations also involved United States-based entities that would provide the financing for Fleming's purchase of JRG Re.  In particular, Fleming entered into a debt commitment letter with bankers based in New York to provide debt financing for a portion of JRG Re's purchase price.  In addition, Fleming entered into an equity commitment letter with Altamont to provide additional financing for a portion of JRG Re's purchase price.  Those financing commitments from United States-based individuals and entities formed a material part of the deal struck between Fleming and James River, as reflected in their Agreement.

44.    After five months of negotiations held among and between (i) United States-based attorneys, (ii) Altamont business persons in the United States, (iii) James River executives in the United States, (iv) bankers in the United States, and (v) Fleming executives in Bermuda, Fleming and James River executed their Stock Purchase Agreement on November 8, 2023, pursuant to

which Fleming agreed to purchase all shares of JRG Re from James River (the "Transaction"), with the closing to be held at the offices of Debevoise & Plimpton LLP in New York City.

45.     Rather than sign the Agreement at an in-person meeting, the Agreement was entered into upon the electronic exchange of signature pages transmitted by counsel for the parties. Those signature pages—including a signature page executed by Frank D'Orazio on behalf of James River—were exchanged by and between counsel located in the United States at the time of their transmission.

46.     The Agreement provided that it would be "governed by and construed in accordance with the Laws of the State of New York," and it further provided that the parties "irrevocably and unconditionally submit[ted] to the exclusive jurisdiction" of this Court and state courts sitting in Manhattan "for purposes of all Actions arising out of or relating to th[e] Agreement, or the transactions contemplated by th[e] Agreement."

47.     Moreover, as will be discussed further below, New York state court proceedings played an integral role in the closing of the Transaction.

48.     Fleming's acquisition of JRG Re also involved several domestic financial transactions as part of its closing mechanics.  In particular, (i) Altamont transferred funds to Fleming's account with First Republic Bank in San Francisco, (ii) Fleming's bankers providing debt financing likewise transferred funds to Fleming's account with First Republic Bank in San Francisco, (iii) Fleming drew down a letter of credit and provided the drawn down funds to Fleming's account with First Republic Bank in San Francisco, and (iv) Fleming then transferred the accumulated funds to James River's account with Bank of New York Mellon in Manhattan as consideration for JRG Re's shares.

49.     The Transaction thus constitutes a domestic securities transaction because it was negotiated and irrevocable liability was incurred in the United States, it involves several United States businesses who invested funds necessary to provide Fleming capital for its purchase of JRG Re's shares from North Carolina-based James River, all payments as part of the Transaction took place in the United States, the Transaction was governed by New York law and New York courts played an integral role in its closing, and the Agreement provided for the Transaction's closing to take place in the United States.

## II.    THE PARTIES AGREED TO CLOSE THE TRANSACTION UPON SATISFACTION OF CONDITIONS PRECEDENT.

50.     Fleming and James River agreed that they had until the "Outside Date" of June 3, 2024, to close the Transaction, or else either party could terminate the Agreement.  Within that timeframe, the closing was to take place on the first business day of the month following the satisfaction or waiver of all conditions precedent to closing, which conditions were set forth in Article VI of the Agreement, or at a time otherwise agreed upon by the parties.

51.     Under SPA § 6.1, Fleming's obligations to close the Transaction were made contingent on, among other conditions precedent, (i) James River having "performed in all material respects its obligations, covenants and agreements under" the SPA, (ii) the Agreement's representations and warranties being true "as of the date of th[e] Agreement and as of the Closing Date as if made on the Closing Date," and (iii) the execution of a "side letter to be negotiated by the parties in good faith prior to Closing setting forth certain rights of Fleming . . . with respect to certain reinsurance transactions involving" a particular James River affiliate (the "Side Letter") for which James River was required to "have delivered to the Buyer [*i.e.*, JRG Re] a signature page" once the Side Letter was "in a form mutually acceptable to the parties."

52.     None of those conditions were satisfied as of March 1, 2024.

A.    **The Contemplated Side Letter Was a Material Part of the Transaction.**

53.    The Side Letter condition precedent was a material part of the bargain struck by the parties, as the rights that were to be codified therein were economically significant for Fleming and served as an incentive for Fleming to enter into the Agreement.  Indeed, those rights were worth millions of dollars to Fleming.

54.    Schedule 8.1(B)(2) to the Agreement provided certain "Key Terms" for the contemplated Side Letter, including that it would provide Fleming "a right of first refusal to reinsure up to 20%" of the insurance written or reinsured by James River's affiliate, but the details of that arrangement were not yet finalized before the parties' execution of the Agreement.

55.    Although the parties initially hoped to execute the Side Letter alongside the Agreement, on the eve of signing James River stated that it had unresolved concerns and proposed instead to conclude their negotiations following execution of the Agreement.  Because the Side Letter was of material importance to Fleming, the parties agreed that completion and execution of the Side Letter would be an express condition precedent to closing the Transaction.

56.    As discussed further below, that condition precedent was not satisfied until on or about April 15, 2024.

B.    **No Specific Purchase Price Was Agreed Upon.**

57.    The Agreement does not set forth a definitive purchase price for JRG Re.

58.    In consideration for its sale of JRG Re's equity, James River was to receive _up to_ approximately $300 million.  That consideration had two components: (i) a cash payment from Fleming to James River of $138 million, which was subject to a post-closing "true-up" process pursuant to SPA §§ 1.3 and 1.4 that could result in Fleming eventually having to pay a greater or lesser amount based on formulae set forth in the Agreement; and (ii) _up to_ $139 million that was to be paid by JRG Re to James River prior to the closing date pursuant to SPA § 4.12.

59.    As to the cash payment from Fleming to James River, in relevant part SPA § 1.3 provided that the actual amount paid by Fleming would vary depending on JRG Re's net worth as of the closing date.

60.    JRG Re's net worth is directly impacted by the amount of reserves it has set aside to pay future claims.  As discussed further below, after signing the Agreement James River deviated from its ordinary course of business in calculating JRG Re's reserves in order to reduce them to an inadequate level, which had the effect of improperly and artificially increasing JRG Re's net worth as of the closing date—and thus improperly and artificially increasing the cash component of the purchase price.

61.    As to the payment from JRG Re to James River, in relevant part SPA § 4.12 provided that James River would "use reasonable best efforts (including making any Governmental Filings) to cause the Company [*i.e.*, JRG Re] to declare and pay, at least three (3) Business Days prior to the Closing Date, a payment (whether as a dividend or return of capital or surplus, in accordance with applicable Law) to the Seller," *i.e.*, James River, "in an amount equal to the Pre-Closing Dividend Amount," which was defined elsewhere in the Agreement to mean $139 million.

62.    Critically, the Agreement does not say that James River "will" or "shall" cause JRG Re to pay it $139 million.  Indeed, SPA § 4.12's "reasonable best efforts" formulation stands in sharp contrast to SPA § 1.2, which provided that the payment made "by the Buyer [*i.e.*, Fleming] to the Seller [*i.e.*, James River] *shall be* an amount equal to $138,000,000," subject to the post-closing "true-up" process set forth in SPA §§ 1.3 and 1.4.

63.    That distinction is no accident.  Rather, the wording of SPA § 4.12 was heavily negotiated by the parties, who exchanged several separate drafts of that specific provision because

the parties recognized and acknowledged that JRG Re might instead pay some lesser amount to James River if it could not pay the full $139 million.

64.    The parties used different phrasing in SPA §§ 1.2 ("shall be") and 4.12 ("shall use reasonable best efforts") precisely because they acknowledged and agreed that the actual amount paid by JRG Re to James River pursuant to Section 4.12 might have to be a lesser sum in light of "applicable Law."  As used in Section 4.12, that was a reference to (i) Bermuda's Insurance Act 1978, which places a cap on the size of a dividend or return of capital that can be paid out by Bermudian insurance companies such as JRG Re, and (ii) Bermuda's Companies Act 1981, which prevents any Bermudian company such as JRG Re from rendering itself insolvent.

65.    Moreover, the parties also considered and rejected an alternative formulation that would have allowed JRG Re to break up the single agreed-upon $139 million payment into separate components that would have made it easier to maximize the amount paid out to James River by JRG Re.  Specifically, on October 29, 2023, the parties considered a draft of the Agreement that would have provided for using reasonable best efforts to pay "a dividend and/or return of capital" of up to $139 million, but on November 2, 2023, they instead opted to require the use of reasonable best efforts to pay "a payment (whether as a dividend or return of capital or surplus, in accordance with applicable Law)."

66.    As shown in the redline exchanged on November 2, excerpted below, the parties negotiated for a single payment compliant with Bermudian law that could be comprised of either a dividend, or a return of capital, or a return of surplus—but not a combination thereof.

4.12   _Pre-Closing Dividend._  The Seller shall use reasonable best efforts (including making any Governmental Filings) to cause the Company to declare and pay, at least [three (3)] Business Days prior to the Closing Date, a payment (whether as a dividend and/or return of capital or surplus, in accordance with applicable Law) to the Seller in cash or in specie (or both) (the "Pre-Closing Dividend") in an amount equal to the Pre-Closing Dividend Amount; _provided_, that any assets included in the Pre-Closing Dividend that are not unrestricted cash shall consist of (a) assets selected by the Seller from the assets set forth on Schedule 4.12¹⁴¹⁰ hereto and (b) any other assets as may be mutually agreed by the Buyer and the Seller prior to effecting the Pre-Closing Dividend (provided that the parties shall cooperate in good faith and act reasonably in agreeing on any such assets contemplated by this clause (b)).

67.    Likewise, that the amount of this payment was not set in stone but was instead limited by "applicable Law" is further reflected in Schedule 8.1(b)(1) of the Agreement, which contained Accounting Principles to be used in a post-closing "true-up" process.  In particular, the Agreement's Accounting Principles recognize and discuss the possibility that the amount "actually paid pursuant to Section 4.12 of the Agreement" might be less than "the Pre-Closing Dividend Amount" of $139 million.

68.    Finally, the parties' mutual understanding of SPA § 4.12 is also reflected in James River's Form 10-Q, filed with the Securities and Exchange Commission on November 14, 2023. Specifically, James River's 10-Q discloses that "a portion of the consideration pursuant to the Transaction is comprised of a $139 million dividend or return of capital or surplus by JRG Re to [James River] . . . , which dividend or return of capital or surplus is subject to the availability of unencumbered assets at JRG Re on the closing date," which could be impacted by a "number of factors."

69.    The SEC filing thus makes clear that the parties contemplated a _single_ payment of _either_ a dividend _or_ a return of capital _or_ surplus, and that the amount of that single payment would not necessarily be $139 million as it was contingent on various unspecified factors.

70.    Moreover, the parties further agreed that James River would bear the risk that JRG Re might not be able to pay the contemplated $139 million.  In other words, the amount paid by Fleming would not increase in the event that JRG Re's payment to James River fell short.

71.    Indeed, in October 2023 the parties considered an alternative draft of SPA § 4.12 that would have provided that if JRG Re were "unable to" pay the full $139 million "despite the exercise of reasonable best efforts by" James River, then "following the Closing, [Fleming] shall pay" the remaining portion of the contemplated $139 million to James River.  That language does not appear in the final version of the Agreement because that was not the deal ultimately struck by the parties.  Indeed, it was taken out in a revised draft of the Agreement circulated just days after it was first inserted.

(b) If, despite the exercise of reasonable best efforts by the Seller, the Company is unable to obtain all Governmental Approvals that are required in order to declare and pay the Pre-Closing Dividend, in full, in accordance with applicable Law ("Required Dividend Regulatory Approvals") at or prior to the Closing pursuant to Section 4.12(a), any portion of the Pre-Closing Dividend, the applicable portion of the Pre-Closing Dividend shall be retained by the Company, and, following the Closing, the Buyer shall pay (or cause to be paid), as promptly as possible following the Closing, to the Seller (or its designees), in one or more installments, an aggregate amount equal to the retained portion of the Pre-Closing Dividend. In furtherance of the foregoing, the Buyer shall, and following the Closing, shall cause the Company to, (i) use their respective reasonable best efforts to obtain all Required Dividend Regulatory Approvals and take all other actions necessary to cause the payment of the retained portion of the Pre-Closing Dividend by the Company to the Seller (or its designees) as promptly as practicable following the Closing (including (A) preparing and filing all documentation necessary to effect all Required Dividend Regulatory Approvals, (B) obtaining all necessary actions or nonactions, waivers, consents, clearances, or approvals from third parties and (C) executing and delivering any additional agreements, documents, or instruments necessary, proper, or advisable to consummate the payment of the retained portion of the Pre-Closing Dividend), and (ii) not take any action that would, or would reasonably be expected to, delay, impede or prevent the full payment of the retained portion of the Pre-Closing Dividend by the Company to the Seller (or its designees) as promptly as practicable following the Closing; provided, however, that the Seller shall reimburse the Buyer for all reasonable costs and expenses incurred by the Buyer and its Affiliates (including the Company) in connection with the foregoing.[21]

72.    On November 22, 2023, the parties applied for approval of the Transaction to the Bermuda Monetary Authority (sometimes referred to as the "BMA"), the primary regulator of both Fleming and JRG Re.  Although the submission was formally submitted by Fleming, the parties

prepared it together.  In particular, Ms. Doran provided inserts for that regulatory submission and provided comments on the specific language to be included therein.

73.    The parties' regulatory submission confirms that they understood the amount to be paid by JRG Re to James River might fall short of the $139 million targeted, as the parties informed the Bermuda Monetary Authority that "[t]he risk associated with the pre-acquisition [payment] lies with the Seller."  In other words, James River bore the risk of receiving less consideration if JRG Re could not pay the full amount contemplated, rather than Fleming bearing the risk of having to pay more in cash.

74.    That was critical information for the Bermuda Monetary Authority because it is responsible for ensuring the financial health of both Fleming and JRG Re.  Accordingly, that representation was intended to provide the Bermuda Monetary Authority with comfort that the contingent nature of the payment of _up to_ $139 million from JRG Re to James River would not endanger either JRG Re (because it would not be required to pay more if it could not do so) nor Fleming (because it would not be required to pay more if JRG Re paid less).

75.    The SPA thus expresses the parties' intent that the pre-closing payment from JRG Re to James River might be less than the targeted amount of $139 million.  Specifically, and "in accordance with applicable Law," any payment taken by James River could not imperil JRG Re's solvency under Bermuda's Companies Act 1981, nor violate caps on such a payment imposed by Bermuda's Insurance Act 1978.

## III.    JAMES RIVER RUSHES TO CLOSE THE TRANSACTION TO AVOID DISCOVERY OF ITS FRAUD AND BREACHES OF THE AGREEMENT.

76.    After the Agreement was signed on November 8, 2023, the parties began to work toward closing.  While Fleming at all times worked diligently to ensure that the deal would be

completed ahead of the Outside Date of June 3, 2024, that the parties had agreed to, James River instead rushed to close by year-end 2023.

77.    James River (including through its then-subsidiary JRG Re) had been engaged in a series of communications with the Bermuda Monetary Authority concerning the Transaction even before the Agreement was signed because the regulator's approval of the Transaction was an express condition precedent for closing.

78.    Once the Agreement was executed, moreover, James River lobbied the Bermuda Monetary Authority to provide prompt approval for the Transaction so that it might close on or before December 31, 2023.

79.    The reason for James River's rush to close would only become clear later:  It hoped that the Transaction would be completed before Fleming had an opportunity to discover James River's flagrant violations of the parties' Agreement and the misrepresentations that James River had made in the Agreement itself, which would result in Fleming purchasing JRG Re at a vastly inflated price.

80.    James River was well aware that, had Fleming known the truth in November 2023, Fleming would not at that time have agreed to purchase JRG Re in a $300 million transaction, or possibly purchase JRG Re at all.

81.    In addition, prompt closing of the Transaction would have allowed James River to use consideration received for the sale of JRG Re to pay out tens of millions of dollars owed to investors in connection with its December 2023 settlement of earlier securities fraud claims brought against James River, Mr. D'Orazio and Ms. Doran, as well as to pay down debts that James River owed to others with respect to which James River was already in default.

82.     Notwithstanding James River's lobbying and its efforts to minimize regulatory scrutiny, the Bermuda Monetary Authority did not provide its approval for the Transaction until February 2, 2024.

**IV.    JAMES RIVER BREACHED MYRIAD COVENANTS IN THE AGREEMENT, WHICH WAS ALSO REPLETE WITH JAMES RIVER'S MATERIAL MISREPRESENTATIONS.**

83.     Article IV of the Agreement contains a number of covenants between James River and Fleming, many of which governed James River's ongoing operation of JRG Re between the Agreement's execution on November 8, 2023, and the contemplated closing of the Transaction that would follow at a then-indeterminate time.

84.     As referenced above, the Agreement made Fleming's obligation to close the Transaction contingent on James River's compliance with its obligations thereunder.  Specifically, SPA § 6.1(c)(i) made it an express closing condition that "The Seller [*i.e.*, James River] shall have performed in all material respects its obligations, covenants and agreements under th[e] Agreement required to be performed by it at or prior to the Closing."

85.     That closing condition was not satisfied because, as set forth below, James River violated several express covenants set forth in the Agreement.

86.     In addition, the Agreement also made Fleming's obligation to close the Transaction contingent on the accuracy of representations and warranties made by the Seller in the Agreement as of both the signing of the Agreement in November 2023, as well as at the time of closing.

87.     In relevant part, SPA § 6.1(c)(ii)(A) made it an express closing condition that the Seller's representation that "there has not been any event, occurrence or condition of any character that has had, or that would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect" would "be true and correct in all respects as of the date of th[e] Agreement and as of the Closing Date as if made on the Closing Date."

88.    And SPA § 6.1(c)(ii)(B) made it an express closing condition that "the other representations and warranties of the Seller contained in Article II of th[e] Agreement shall be true and correct . . . as of the date of th[e] Agreement and as of the Closing Date as if made on the Closing Date" unless "the failure of such representations and warranties to be so true and correct has not had or would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect."[2]

89.    Those further closing conditions were not satisfied because, as set forth below, several of the representations and warranties made by James River were not true and correct as of either the signing of the Agreement on November 8, 2023, the closing of the Transaction on April 16, 2024, or both, which had a material adverse effect on JRG Re.

90.    On March 13, 2024, in connection with state court litigation proceedings discussed further below, Frank D'Orazio nevertheless represented in a sworn statement that the "conditions to closing" required under the Agreement "ha[d] been or [would] be satisfied at closing." *James River Group Holdings, Ltd. v. Fleming Intermediate Holdings LLC*, Index No. 651281/2024, NYSCEF Doc. No. 24 ¶ 9 (Sup. Ct. N.Y. Cnty. Mar. 13, 2024).

91.    Because that representation incorporated by reference the closing conditions in SPA § 6.1(c)(ii), Mr. D'Orazio was affirmatively stating that James River's representations and warranties would be "true and correct . . . as of the Closing Date as if made on the Closing Date."

---

[2] In relevant part, the Agreement defines a "Material Adverse Effect" as "any fact, occurrence, event, change, or effect that (a) materially impedes or materially delays the ability of the Seller [*i.e.*, James River] or any of its Affiliates to perform their respective material obligations under th[e] Agreement and the Ancillary Agreements, taken as a whole, including consummation of the transactions contemplated hereby or thereby or (b) that has a material adverse effect on the assets, liabilities, financial condition, business or results of operations of the Company [*i.e.*, JRG Re], taken as a whole."

92.    Further, in connection with the closing on April 16, 2024, Mr. D'Orazio signed a "Closing Certificate" acting "solely in . . . his capacity as a duly authorized officer of the Seller," *i.e.*, James River, in which he represented that "Section 2.15(b) of the Agreement"—which specifies that "there has not been any event, occurrence or condition of any character that has had, or that would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect"—was "true and correct in all respects as of the date of the Agreement" and remained "true and correct as of the Closing Date as if made on the Closing Date."

93.    Mr. D'Orazio and James River also represented in the Closing Certificate that "[t]he other representations and warranties of the Seller [*i.e.*, James River] contained in Article II of the Agreement were true and correct . . . as of the date of the Agreement" and remained "true and correct . . . as of the Closing Date as if made on the Closing Date . . . except where the failure of such representations and warranties to be so true and correct has not had or would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect."

94.    As further set forth below, Fleming was compelled to rely on the purported truthfulness of James River's representations and warranties when closing the Transaction and acquiring the shares of JRG Re because it was preliminarily enjoined to close the Transaction on April 16, 2024.

95.    As further set forth below, Mr. D'Orazio's statement that those representations and warranties would be "true and correct . . . as of the [April 16, 2024] Closing Date as if made on the [April 16, 2024] Closing Date" was false and misleading.

96.    Moreover, as further set forth below, Mr. D'Orazio knew, or was reckless in not knowing, that his representation was false and misleading.

A. **James River Looted $20 Million from JRG Re in December 2023.**

97. Pursuant to a longstanding practice, JRG Re would often pay various expenses on James River's behalf over the course of each year, or provide James River with money to pay those expenses, in exchange for an "IOU." These debts owed to JRG Re by James River were recorded on both companies' books as an "intercompany receivable" from James River to JRG Re.

98. Prior to the companies' closing of their books at year-end, however, the outstanding amount of the intercompany receivable owed by James River to JRG Re would typically be paid down to just under $20 million. In other words, James River typically owed JRG Re approximately $20 million at the end of each year.

99. Fleming and James River entered into the Agreement on November 8, 2023, as part of which James River covenanted "to operate [JRG Re] in the ordinary course of business" in SPA § 4.1(x), which SPA § 8.1(a)(xv) further defines to mean "the ordinary course of business of [JRG Re] consistent with past practice."

100. James River further covenanted that it would "cause [JRG Re] not to . . . make any material loans, advances or capital contributions" in SPA § 4.1(h).

101. James River breached both of those covenants in December 2023.

102. As of November 30, 2023, the intercompany receivable owed by James River to JRG Re stood at approximately $111 million and JRG Re had approximately $28 million in unencumbered assets. In the ordinary course, James River would have paid that receivable down to approximately $20 million over the following month—just as it had routinely done in years prior.

103. Instead, however, in December 2023 James River caused JRG Re to advance an additional $20 million in cash to James River in exchange for no consideration, notwithstanding that JRG Re had only approximately $28 million in liquid assets at the start of that month. That

transfer of nearly 70% of JRG Re's unencumbered assets was booked simply and innocuously as a $20 million increase in the intercompany receivable—*i.e.*, money owed to JRG Re by James River. That constituted an impermissible loan under SPA § 4.1(h).

104.    Moreover, that loan was anything but in the ordinary course consistent with JRG Re's past practice and thus violated SPA § 4.1(x) as well. While JRG Re had a longstanding practice of advancing funds on James River's behalf to pay legitimate expenses for James River as they came due, there were no such legitimate expenses necessitating a $20 million increase in the intercompany receivable in December 2023.

105.    Rather, James River caused those funds to be transferred solely for the purpose of taking nearly 70% of JRG Re's liquid assets out of JRG Re before JRG Re was turned over to Fleming upon the closing of the Transaction and maximizing the "intercompany receivable," *i.e.*, the amount that James River owed to JRG Re. That gratuitous looting of JRG Re was not consistent with James River's and JRG Re's past practice prior to signing the Agreement.

106.    Indeed, James River had begun contemplating this exact plan months before the Agreement had even been signed. On July 29, 2023, for instance, Sarah Doran wrote to James River's chief accounting officer, James River's controller, and JRG Re's chief financial officer asking whether anything would preclude James River "from moving assets out of JRG Re now" and thereby "increasing the [intercompany] receivable," notwithstanding James River and JRG Re's historic "focus[] on the size of the [intercompany] receivable at YE," *i.e.*, year end, which James River now "had less of a focus on."

107.    In raising that question, however, Ms. Doran noted that James River would need "to think through the BMA/JRG Re cedent/EY reaction to that action." In other words, she was concerned that taking assets out of JRG Re in exchange for an increase in the intercompany

receivable—precisely what James River would eventually do in December 2023—could raise issues with any of (i) JRG Re's regulators at the Bermuda Monetary Authority, (ii) JRG Re's reinsurance counterparties, known as "cedents" because in their reinsurance transactions they have ceded risks to JRG Re, and/or (iii) James River's auditors at Ernst and Young, any of whom might react adversely to this proposed course.

108.    James River's controller, Todd Hierman, responded that it would be premature to do so in the summer of 2023 because of the need "to ensure sufficient funds in [Bermuda] for operating needs . . . until the close" of the Transaction.  Notably, Mr. Hierman's response nevertheless left open the possibility of enacting Ms. Doran's scheme months later as the closing date approached.

**From:** Todd Hierman <Todd.Hierman@james-river-group.com>
**Sent:** Sunday, July 30, 2023 7:59:31 AM
**To:** Sarah Doran <Sarah.Doran@james-river-group.com>
**Cc:** Mike Crow <Mike.Crow@james-river-group.com>; Allan Defante <Allan.Defante@jrgre.bm>; Jeanette Miller <Jeanette.Miller@james-river-group.com>
**Subject:** Re: [EXTERNAL] FW: Jaguar - SPA

Hi, Sarah. For EY, I think we could just convey the strategy for moving assets now and how the larger receivable ultimately gets settled. Would the assets move to JRGH, or to the U.S.? We'd want to ensure sufficient funds in BDA for operating needs of Re and hold co until the close.

Sent from my iPhone

On Jul 29, 2023, at 11:20 PM, Sarah Doran <Sarah.Doran@james-river-group.com> wrote:

Mike, Todd, Allan
A question regarding the size of the intercompany receivable.
Is there anything to prevent us from moving assets out of JRG Re now (effectively increasing the receivable now, and then settling a larger receivable at the close of Jaguar – which would mean less in the form of a PIK dividend). I think the way to answer this question is to think through the BMA/ JRG Re cedent/ EY reaction to that action – if you could put forth a view that would be helpful.
I know in prior years we have focused on the size of the receivable at YE but had less of a focus on that of late (after further, more recent, review). We could close in the New Year – that's very unclear as of now.
If we did this, then we have less to manage through the Jaguar process, potentially – ie if we are effectively doing this movement/ transfer ourselves.
The offset is that we would reduce unencumbered assets in the near term – also a consideration
Thoughts appreciated
Thanks
Sarah

109.    In the ordinary course, *i.e.*, as would have happened "in prior years" as referred to in Ms. Doran's email, the intercompany receivable should have been paid down to approximately $20 million in December 2023.

110.    For instance, JRG Re's audited financial statements provide that it had a $19.8 million receivable from James River as of December 31, 2021; a $19.4 million receivable from James River as of December 31, 2020; and an $18.8 million receivable from James River as of December 31, 2019.

111.    In December 2023 James River instead acted on Ms. Doran's earlier plans and caused the intercompany receivable to increase by $20 million by taking money out of JRG Re, in exchange for nothing more than an "IOU" from James River to JRG Re.  That constituted an impermissible loan under SPA § 4.1(h).

112.    Moreover, James River did so without paying the intercompany receivable down at year end.  As a result, the intercompany receivable stood at approximately $130 million as of December 31, 2023—more than six times its typical $20 million year-end value.  Doing so breached James River's covenant pursuant to SPA § 4.1(x) to "operate the Company [*i.e.*, JRG Re] in the ordinary course of business" because it was not "consistent with [JRG Re's] past practice."

113.    Indeed, internal James River correspondence makes clear that this was a deviation from its past practice.  After receiving an instruction to transfer a portion of the $20 million to James River on December 13, 2023, an accountant at JRG Re noted that "at year end we always move the balance" in a particular bank account from James River to JRG Re, which helps pay down the receivable as of December 31st, asking "is this something we need to do this year?"

**From:** Sonia Franco <Sonia.Franco@jrgre.bm>
**Sent:** Wednesday, December 13, 2023 1:01 PM
**To:** Allan Defante <Allan.Defante@jrgre.bm>; Joyce De Guzman Placedes <jdeguzmanplacedes@jrgre.bm>
**Subject:** RE: Hold Co Cash Forecast Dec23 - Mar 24
Hi Allan –
Any specific date for the transfer of the $6M or can we do this now?
Also, at year end we always move the balance form JRGH to JRG Re leaving $1,000 or less in the account is this something we need
to do this year?
Thanks,
Sonia Franco
**JRG Reinsurance Company, Ltd.**

114.    In response, she was told by JRG Re's chief financial officer (who also copied in
James River's controller, senior vice president for investments, and chief accounting officer) that
the historic practice was "no longer applicable," notwithstanding James River's covenant to
continue operating JRG Re in the ordinary course, because James River was instead seeking to
maximize the intercompany receivable by taking JRG Re's liquid assets out of the company prior
to closing the Transaction.

**From:** Allan Defante <Allan.Defante@jrgre.bm>
**Sent:** Wednesday, December 13, 2023 1:07 PM
**To:** Sonia Franco <Sonia.Franco@jrgre.bm>; Joyce De Guzman Placedes <jdeguzmanplacedes@jrgre.bm>
**Cc:** Todd Hierman <Todd.Hierman@james-river-group.com>; Brett Shirreffs <Brett.Shirreffs@james-river-group.com>; Mike Crow
<Mike.Crow@james-river-group.com>
**Subject:** RE: Hold Co Cash Forecast Dec23 - Mar 24
We can do the $6M now – the $1K is no longer applicable as we need to have the interco at $139M or close to that amount by YE
for pre-closing dividend. Thanks!

115.    James River's controller was confused by the correspondence, which prompted
JRG Re's chief financial officer to reiterate that James River and JRG Re were deviating from
their historic year-end financial practices "since we are trying to get the interco at $139M," *i.e.*,
because they were attempting to maximize the intercompany receivable by moving assets from
JRG Re to James River in advance of closing.

**From:** Allan Defante <Allan.Defante@jrgre.bm>
**Sent:** Wednesday, December 13, 2023 1:40 PM
**To:** Todd Hierman <Todd.Hierman@james-river-group.com>
**Subject:** 139M.RE: Hold Co Cash Forecast Dec23 - Mar 24
Yes. I was telling Sonia that we don't need to make the BNTB JRGH to $1,000 at 12/31. In past, this was done to the bank balance at 12/31. Told Sonia we are not doing that anymore since we are trying to get the interco at $139M.
Currently, we are moving $6M or you want the whole $14M?

**From:** Todd Hierman <Todd.Hierman@james-river-group.com>
**Sent:** Wednesday, December 13, 2023 2:34 PM
**To:** Allan Defante <Allan.Defante@jrgre.bm>
**Subject:** RE: Hold Co Cash Forecast Dec23 - Mar 24
I'm confused. We're moving $14M from JRG Re to JRGH and $6M from JRGH to JRG U.S., right?

116.    Nor did James River timely disclose the unprecedented transfer of this $20 million

to Fleming.  At the time, James River still hoped that the Transaction would close in December

2023.  If the Bermuda Monetary Authority had acted faster in granting regulatory approval and

James River's anticipated timeline had held, Fleming would have discovered that this $20 million

had been pilfered only after acquiring JRG Re and noticing an unexplained $20 million shortfall

on its balance sheet.

117.    Instead, the Bermuda Monetary Authority did not grant regulatory approval for the

Transaction until February 2024. As a result of that unexpected delay, Fleming had the

unanticipated opportunity to first learn of the $20 million transfer weeks after the transactions had

already taken place, on or about January 29, 2024.

118.    Fleming immediately asked James River to explain what was "driving the increase

in intercompany receivables from 11/30/23 to 12/31/23" because it had only just learned that

nearly three-quarters of JRG Re's cash had been moved to James River.

119.    On February 6, 2024, James River responded "Mainly the $20.5 total intercompany

advances a part of ordinary business to funding Holding's operational cash needs and dividends."

120.    That borderline-incoherent statement is the only explanation that James River

purported to provide prior to the Transaction's closing.  Moreover, it was also dishonest because

there was nothing "ordinary" about James River's looting of JRG Re in advance of the closing,

nor its related decision to deviate from its ordinary course of business by not paying down the intercompany receivable at year-end.

B.    **James River Improperly Takes $139 Million from JRG Re in February 2024.**

121.    As previously discussed, § 4.12 of the Agreement provided that, prior to closing, James River would "use reasonable best efforts (including making any Governmental Filing)" to cause JRG Re to make "a payment (whether as a dividend or return of capital or surplus, in accordance with applicable Law)" to James River in an amount *up to* $139 million.

122.    That provision was not a license for James River to drain JRG Re's assets to the point of insolvency, however.  Indeed, the parties recognized that the actual payment from JRG Re to James River might be smaller in light of restrictions imposed by Bermudian law, which is precisely why Fleming insisted that James River would be required to "mak[e] any Governmental Filings" that might be necessary and that the payment from JRG Re to James River were required to be "in accordance with applicable Law."

123.    And, as the parties told the Bermuda Monetary Authority, "The risk associated with the pre-acquisition [payment] lies with the Seller," *i.e.*, James River bore the risk that it might only be entitled to a smaller pre-closing payment from JRG Re.  As James River further confirmed in its 2023 10-K filing, JRG Re's ability to pay James River the full amount was contingent on "the availability of unencumbered assets" that JRG Re could transfer to its then-parent, among other issues.

124.    On February 23, 2024, James River nevertheless caused JRG Re's board of directors—all four members of which reported directly to Mr. D'Orazio or Ms. Doran—to approve two separate payments from JRG Re to James River: a purported $90 million dividend and a $49 million distribution of JRG Re's capital.  Those two payments totaling $139 million were made from JRG Re to James River on or about February 26, 2024.

125.    At the time they approved these payments, JRG Re's chief executive officer and chief financial officer—both of whom served on JRG Re's Board of Directors—were not aware that the Agreement contemplated, and the parties had expressly discussed the possibility, that the amount paid by JRG Re to James River might be less than $139 million.  Rather, over the course of several months, they had been repeatedly informed by James River executives that JRG Re was obligated to pay $139 million to James River.

126.    Because JRG Re's chief executive officer and chief financial officer reported directly to Mr. D'Orazio and Ms. Doran, moreover, they each understood that they had no discretion in the matter.

127.    Acting under the misconception that the amount was fixed, as had been represented to them by their superiors at James River, JRG Re's chief executive officer and chief financial officer endeavored to find a way to pay $139 million to James River.

128.    Moreover, JRG Re's chief executive officer and chief financial officer did so without the benefit of independent legal counsel who might advise them about the obligations imposed by the Agreement or by Bermuda law in connection with such payments.

129.    In addition, James River incentivized JRG Re's chief executive officer and chief financial officer to go along with James River's wrongdoing through its potential award of lucrative bonuses shortly after the payments were made from JRG Re to James River in February 2023.

130.    Both JRG Re executives' employment agreements specified that they were eligible for annual bonuses that could be awarded each spring at the discretion of James River's board of directors, which could include both cash and equity in James River as part of James River's Long-Term Incentive Plan for senior executives of its subsidiaries, including JRG Re.

131.    James River initially took the position that it would not pay their 2024 bonuses because it would soon sell JRG Re to Fleming.

132.    Realizing that their acquiescence was needed to loot JRG Re of its assets, however, James River eventually awarded JRG Re's chief executive officer a pre-closing bonus in excess of $250,000 and JRG Re's chief financial officer a pre-closing bonus in excess of $100,000.

133.    Notably, those bonuses were paid out by James River in March 2024—shortly after the executives each voted in their capacity as directors of JRG Re to approve improper and illegal payments from JRG Re to James River on February 23, 2024.[3]

134.    Moreover, JRG Re's chief financial officer expressly discussed his 2024 bonus with Ms. Doran, noting that he was "so happy and extremely thankful" for his bonus because it "would greatly help with his finances" as he contemplated a temporary leave after the Transaction closed.

| | |
|---|---|
| **To:** | Sarah Doran[Sarah.Doran@james-river-group.com] |
| **From:** | Allan Defante[Allan.Defante@jrgre.bm] |
| **Sent:** | Fri 4/12/2024 7:30:40 PM (UTC) |

Hi Sarah, just checking the status of the cash retention that we were discussing. I remembered you mentioned that HR is correcting some error. Thank you!

| | |
|---|---|
| **To:** | Sarah Doran[Sarah.Doran@james-river-group.com] |
| **From:** | Allan Defante[Allan.Defante@jrgre.bm] |
| **Sent:** | Fri 4/12/2024 7:37:03 PM (UTC) |

And you're the only one I am telling this - I will help in the Jaguar transition once the sale is completed and plan to take a full break. REDACTED FOR PERSONALLY SENSITIVE INFORMATION So if ever, that cash retention would greatly help with my finances. Hence when you mentioned about it - I was so happy and extremely thankful.

---

[3] It is not presently known whether JRG Re's two other directors, Mr. Hoffman and Mr. Tavares, were similarly (i) kept in the dark concerning the terms of the Agreement, (ii) deprived of legal counsel, and/or (iii) received bonuses shortly after approving these payments from JRG Re to James River.

135.    Making these two payments from JRG Re to James River totaling $139 million breached the SPA, violated Bermuda law, and rendered several material representations that James River made therein false and misleading as of the Transaction's closing date.

1.    **James River Breached the Plain Language of SPA § 4.12.**

136.    The language of SPA § 4.12 could not be more clear: JRG Re was permitted to make "a payment (whether as a dividend or return of capital or surplus, in accordance with applicable Law)" to James River.  In other words, the SPA provided for a *single* transaction that could take the form of *either* a dividend, or a return of capital, or a return of surplus, but it did not provide for multiple payments comprised of a combination thereof.

137.    Rather than making a single payment, however, James River instead opted to have JRG Re make *two* separate payments that took the form of a $90 million purported dividend *and* a $49 million return of capital.  That simply is not what SPA § 4.12 allowed.

138.    These twin-payments were all the more egregious because the parties had expressly considered and rejected language that would have allowed for that very possibility.  On October 29, 2023, during the parties' negotiation of the Agreement, James River proposed that SPA § 4.12 allow JRG Re to "declare and pay . . . a dividend and/or return of capital" to James River.  But that formulation was rejected just days later in favor of the language appearing in the final version of SPA § 4.12 allowing for "a payment"—singular—"in accordance with applicable Law."

> 4.12    Pre-Closing Dividend.  The Seller shall use reasonable best efforts (including making any Governmental Filings) to cause the Company to declare and pay, at least [three (3)] Business Days prior to the Closing Date, a payment (whether as a dividend ~~and/~~or return of capital or surplus, in accordance with applicable Law) to the Seller in cash or in specie (or both) (the "Pre-Closing Dividend") in an amount equal to the Pre-Closing Dividend Amount; provided, that any assets included in the Pre-Closing Dividend that are not unrestricted cash shall consist of (a) assets selected by the Seller from the assets set forth on Schedule 4.12 hereto and (b) any other assets as may be mutually agreed by the Buyer and the Seller prior to effecting the Pre-Closing Dividend (provided that the parties shall cooperate in good faith and act reasonably in agreeing on any such assets contemplated by this clause (b)).

139.    James River has no excuse for ignoring the agreed-upon language and instead acting as if its behavior was governed by an earlier draft of the SPA that the parties had rejected.

2.    **Bermuda Law Did Not Permit JRG Re's Combined $139 Million Payments to James River.**

140.    Separate and apart from the impropriety of making multiple payments instead of "a payment," the Agreement was also breached because the payments were not made "in accordance with applicable Law."

141.    As a Bermuda insurance company, JRG Re's ability to make payments to James River was governed by Bermuda Law.

142.    Section 31B of Bermuda's Insurance Act 1978 prohibits a Bermuda insurance company like JRG Re from "pay[ing] dividends which would exceed 25% of its total statutory capital and surplus" in any given financial year without first submitting an application to the Bermuda Monetary Authority.

143.    Moreover, Section 31C of Bermuda's Insurance Act 1978 prohibits a Bermuda insurance company like JRG Re from "reducing by 15% or more its total statutory capital" in any given year without first receiving authorization from the Bermuda Monetary Authority.

144.    Read together, and absent application to or approval from the Bermuda Monetary Authority, Section 31C thus limits Bermudian insurance companies from making payments that would reduce their statutory capital by 15% or more in any given year, unless they also have "surplus" (*i.e.*, profits) from which they can make a further payment in the form of a dividend up to the higher 25% limit imposed by Section 31B.

145.    Absent "surplus" (*i.e.*, profits), however, a company cannot make a payment of 15% or more of its statutory capital because any reading of the two provisions together that would

allow an insurance company to reduce its statutory capital "by 15% or more" without the Bermuda Monetary Authority's approval would conflict with the plain language of Section 31C.

146.    Stated otherwise, allowing an unprofitable insurance company like JRG Re to pay a dividend of up to 25% of "total statutory capital and surplus" when it has no "surplus" would render Section 31C a nullity by allowing such a company to reduce its statutory capital by more than 15%.

147.    As of December 31, 2023, JRG Re's total statutory capital was approximately $323 million.  Moreover, it lacked any surplus, and in fact had a retained deficit instead of retained earnings from earlier years, because it had not been profitable since in or about 2018.

148.    Accordingly, in February 2024 JRG Re could not make total payments of more than approximately $48 million (*i.e.*, 15% of $323 million) without advance approval from the Bermuda Monetary Authority, as doing so would otherwise impermissibly "reduc[e] by 15% or more its statutory capital" in violation of Section 31C of the Insurance Act.

149.    On February 23, 2024, James River nevertheless caused JRG Re to make two payments totaling $139 million, which reduced JRG Re's statutory capital of $323 million by approximately 43% (*i.e.*, $139,000,000/$323,000,000), without first obtaining the permission of its regulator.

150.    The combined payments of $139 million from JRG Re to James River were therefore illegal under Bermuda law.

151.    As a result, they also breached SPA § 4.12, which allowed only "a payment . . . in accordance with applicable Law."

3.  **Bermuda Insurance Law Did Not Permit Either of JRG Re's Individual Payments.**

152.    Setting aside that the combined payments were illegally excessive under Bermuda law, Bermuda's Insurance Act also did not allow either of JRG Re's purported $90 million dividend or $49 million return of capital to James River.

153.    First, JRG Re purported to distribute $49 million of its capital to James River.  But 31C of the Insurance Act placed a ceiling of approximately $48 million on any such reduction in JRG Re's capital.  Standing alone, the $49 million reduction in capital was therefore illegal.

154.    Second, the $90 million payment from JRG Re to James River also violated the plain language of Section 31C of the Insurance Act because that payment alone likewise "reduc[ed] by 15% or more [JRG Re's] total statutory capital."  Under Section 31C of the Insurance Act, James River was permitted to reduce its $323 million of statutory capital by no more than $48 million.  Incorrectly categorizing its $90 million payment to James River as a "dividend" does nothing to avoid the mathematical reality that $90 million is greater than $48 million, and thus an excessive reduction in capital under Section 31C.

155.    Third, by definition, a dividend must be paid out of earnings or profits because that is simply what it means for a payment to be a dividend.  Because JRG Re lacked any earnings or profits, however, it could not declare a dividend of any amount.  The $90 million payment from JRG Re to James River was not properly characterized as a dividend and thus could not be paid out pursuant to Section 31B of the Insurance Act.

156.    Fourth, even assuming *arguendo* that Section 31B of the Insurance Act allowed JRG Re to declare a dividend of up to 25% of its statutory capital and surplus notwithstanding the absence of any earnings or profits (though it does not), it would still be the case that the $90 million dividend to James River was excessive.  At most, that misreading of Section 31B would provide

for a dividend of approximately $81 million (*i.e.*, 25% of JRG Re's $323 million in statutory capital because it had no surplus). But JRG Re's purported dividend exceeded that statutory cap by approximately $9 million without first obtaining authorization from the Bermuda Monetary Authority.

157.    Accordingly, each of the individual payments made by JRG Re to James River were not "in accordance with applicable Law" and thus breached SPA § 4.12.

### 4.    **The Payments Violated Bermuda Law by Rendering JRG Re Insolvent.**

158.    Finally, as a Bermuda Company, JRG Re is also governed by Bermuda's Companies Act 1981, Section 54 of which prohibits companies from paying dividends or distributing capital if there are "reasonable grounds for believing that" after doing so the company would be "unable to pay its liabilities as they become due." In other words, Bermuda companies are forbidden from making payments to their shareholders that would render them insolvent.

159.    The combined $139 million in payments that James River caused JRG Re to make violated Section 54 of the Companies Act because they rendered JRG Re unable to pay its liabilities as they came due thereafter.

160.    Moreover, James River was well aware of this fact months before it caused JRG Re to pay it $139 million that JRG Re could not afford.

161.    On December 19, 2023, for example, an internal James River email acknowledged that after the contemplated payments JRG RE would "be left with roughly $9M" in liquid assets, which would not be "sufficient to pay [JRG Re's] monthly claims/opex [*i.e.*, operating expenses] of $12M." Accordingly, James River recognized that Fleming would "need[] to do a capital contribution or provide an interco[mpany] loan to JRG Re" after closing in order to "service [JRG Re's] cash needs" if the payments went forward as planned.

**From:** Allan Defante <Allan.Defante@jrgre.bm>
**Sent:** Tuesday, December 19, 2023 9:12 AM
**To:** Daniel Heinlein <Daniel.Heinlein@jrgre.bm>
**Subject:** Capital Contribution/Interco Loan - Q1 2023
Hi Daniel,

Last month, we did a collateral step up for SN trusts of $58M which nearly exhausted our unencumbered account. Currently we have roughly $20M++ in our unencumbered account, $11M of which will be used to fund the pre-closing dividend of $139M as the projected interco will not be sufficient. After this, we will be left with roughly $9M which not sufficient to pay our monthly claims/opex of $12M, just for Jan.

So we would be out of cash/assets - the right sizing of trusts happens post QE so timing of funding is an issue.

So in this regard, once the deal closes, Fleming needs to do a capital contribution or provide an interco loan to JRG Re so we can service our cash needs.

I suggest to let Eric knows this as this is very critical to continue pay the bdx.

162.    James River emails on December 22, 2023, likewise reflect internal recognition that it would be "critical to have either [a] capital infusion or [an] interco[mpany] loan with Fleming soon[] after close" because JRG Re's liquid "cash/assets [would] be exhausted" at that time.

**To:**      Daniel Heinlein[Daniel.Heinlein@jrgre.bm]
**Cc:**      Joyce De Guzman Placedes[jdeguzmanplacedes@jrgre.bm]
**From:**    Allan Defante[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4BAE9EC93D124C848EDA39BBF97C105F-ALLAN DEFAN]
**Sent:**    Fri 12/22/2023 1:39:19 AM (UTC)
**Subject:** Fwd: BNTB Cash Account Analysis

Daniel seemed that the cash/assets will be exhausted sooner than expected hence it is critical to have either capital infusion or interco loan with Fleming sooner after close. Thanks!

163.    Notwithstanding James River's internal correspondence recognizing these issues more than two months before James River took $139 million from JRG Re, and the December 19, 2023, email's conclusion that "Eric," *i.e.*, Fleming's chief executive officer Eric Haller, should be made aware of this fact as it was "very critical" for JRG Re's continued operations, neither Mr. Haller nor anyone else at Fleming were made aware of these anticipated problems in or around December 2023.

164.    In light of these financial constraints, Sarah Doran personally began exercising increased control over JRG Re's operations and expenditures.  Although JRG Re had historically paid out insurance claims and incurred operating expenses without direct involvement from James River's senior leadership, in January 2024 James River began requiring JRG Re to seek Ms. Doran's personal approval before making any such payments in an effort to conserve the company's scarce remaining resources.

165.    On January 18, 2024, for instance, JRG Re's chief financial officer wrote to Ms. Doran with a "funding request" seeking approval to pay claims submitted to JRG Re and for JRG Re's "payroll," further noting that certain other payments had been "divert[ed] . . . to prioritize cash calls" submitted by insurance claimants "once approval is received" from Ms. Doran.

To:       Sarah Doran[Sarah.Doran@james-river-group.com]
Cc:       Brett Shirreffs[Brett.Shirreffs@james-river-group.com]
From:     Allan Defante[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4BAE9EC93D124C848EDA39BBF97C105F-ALLAN DEFAN]
Sent:     Thur 1/18/2024 8:03:02 PM (UTC)
Subject:  Cash Request - Jan 18
          Cash Analysis - 2024 for sending.xlsx

Hi Sarah,
In line with the cash call review/approval sent by Daniel, here are the cash funding request for items not included in the last funding request. We are diverting some bordereaux payments previously requested for funding to prioritize cash calls so we can pay them once approval is received. We are also requesting funding for payroll due to be paid on Jan 25th.

166.    This new oversight and approval process foisted on JRG Re was itself a violation of SPA § 4.1 because it was yet another way in which James River was not operating JRG Re "in the ordinary course of business" as "consistent with [JRG Re's] past practice."

167.    Moreover, it was made necessary by James River taking $20 million in cash from JRG Re in December 2023.  At that time, James River expected the Transaction to close by year end such that JRG Re's liquidity crisis and violations of Bermuda law would soon become Fleming's problem.  If James River had simply allowed JRG Re to hold onto that money instead of giving it to James River, however, there would have been no such cash-crunch.

168. Although James River succeeded in postponing JRG Re's day of reckoning into 2024 through belt-tightening efforts and Ms. Doran's active oversight when the transaction failed to close by year-end, the underlying problem did not go away.  On February 2, 2024, internal James River emails once again made clear that JRG Re's "cash [was] going to be exhausted in a week or two" and projected that JRG Re would be short approximately $75 million by July 2024.

**To:** Daniel Heinlein[Daniel.Heinlein@jrgre.bm]
**Cc:** Joyce De Guzman Placedes[jdeguzmanplacedes@jrgre.bm]
**From:** Allan Defante[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4BAE9EC93D124C848EDA39BBF97C105F-ALLAN DEFAN]
**Sent:** Fri 2/2/2024 3:59:22 PM (UTC)
**Subject:** Cash Need - JRG Re
JRG Re Unencumbered Forecast - 1.31.24.xlsx

Hi Daniel,
As mentioned, our cash is going to be exhausted in a week or two.
Below is the cash forecast of our needs for the next 6 months, without considering any right-sizing from LOCs and trusts.

| $ in thousands<br>As of 1/31/24 | JRG Re Expected Cash Flow | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | February | March | April | May | June | July |
| Beginning of Period | | | | | | |
| Unencumbered Balance: | $4,644 | ($11,924) | ($23,924) | ($36,624) | ($48,624) | ($60,624) |
| BNTB Balance | $8,097 | | | | | |
| | $12,741 | ($11,924) | ($23,924) | ($36,624) | ($48,624) | ($60,624) |
| | | | | | | |
| Estimated Operating / Claim Needs | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 |
| Fortitude Re Funds Held Interest | $0 | $0 | $700 | $0 | $0 | $650 |
| Clearblue Collateral | $915 | | | | | |
| Bankers Fee | $4,750 | | | | | |
| Pre-Closing Dividend | $7,000 | $0 | $0 | $0 | $0 | $0 |
| Total Monthly Cash Needs | $24,665 | $12,000 | $12,700 | $12,000 | $12,000 | $12,650 |
| | | | | | | |
| End of Period | ($11,924) | ($23,924) | ($36,624) | ($48,624) | ($60,624) | ($73,274) |
| | | | | | | |
| Interco Loan or Capital Injection | $15,000 | | $40,000 | | | $75,000 |

Thanks
Allan Defante
Chief Financial Officer
JRG Reinsurance Company Ltd.

169. Eventually, the continued delay in closing the Transaction forced James River to consider reversing some of the payments it had taken and refunding money to JRG Re to allow its subsidiary to continue operating.

170.    In March 20, 2024, email correspondence concerning JRG Re's cash forecasts, for instance, Ms. Doran wrote that James River was "not yet confirmed to return" money to JRG Re but that she had "been asking [JRG Re's chief financial officer] if that was needed for March."

---

From: Sarah Doran <Sarah.Doran@james-river-group.com>
Sent: Wednesday, March 20, 2024 12:31 PM
To: Allan Defante <Allan.Defante@jrgre.bm>; Todd Hierman <Todd.Hierman@james-river-group.com>
Cc: Mike Crow <Mike.Crow@james-river-group.com>; Brett Shirreffs <Brett.Shirreffs@james-river-group.com>
Subject: RE: Updated Cash Forecast

Thank you for the quick work.

A few things:

- As discussed for these last few days, we are not yet confirmed to return the cash portion of the pre closing dividend to JRG Re. I need to see this not including that. Said differently, I have been asking Allan (yesterday) if that was needed for March. I cannot tell if it is, pls clarify
- I think it would be helpful to see a step or two of more detail on the SNC and CB assumptions. Here, I think its probably an estimate of claims off set by an estimate of withdrawn collateral – just want to see the specific amounts assumed (as much as they net out)

Sarah

---

171.    In response, Ms. Doran was informed that James River would need to refund at least a portion of JRG Re's pre-closing payment "sometime in April/May to satisfy [JRG Re's] forecasted cash needs" because JRG Re's expenses were expected to exceed its income by millions of dollars every month going forward.

---

To:        Sarah Doran[Sarah.Doran@james-river-group.com]; Todd Hierman[Todd.Hierman@james-river-group.com]
Cc:        Mike Crow[Mike.Crow@james-river-group.com]; Brett Shirreffs[Brett.Shirreffs@james-river-group.com]
Sent:      Wed 3/20/2024 3:48:40 PM (UTC)
Subject:   RE: Updated Cash Forecast

See below:

- As discussed for these last few days, we are not yet confirmed to return the cash portion of the pre closing dividend to JRG Re. I need to see this not including that. Said differently, I have been asking Allan (yesterday) if that was needed for March. I cannot tell if it is, pls clarify

For March, I think we will not need it given the expected inflows from SN and CB. However we may need it sometime in April/May to satisfy the forecasted cash needs.

---

172.    In other words, just weeks after the February 2024 payments, James River recognized internally that JRG Re was unable to pay its bills on a going-forward basis because its cash and liquid assets had been stripped by James River.

173.    James River continued to press for a prompt closing because it hoped to avoid putting money back into JRG Re, as closing the Transaction would make JRG Re's imminent inability to pay its bills Fleming's problem.

174.    Ultimately, however, James River was unable to run out the clock.  As a result, in April 2024 James River provided JRG Re with approximately $6 million to fund JRG Re's operating expenses and allow JRG Re to pay out pending insurance claims.

175.    This payment was also a violation of the Agreement, as SPA § 4.1(h)(B) prohibited James River from "mak[ing] any . . . capital contributions to, or investments in, any other Person" between its execution of the Agreement in November 2023 and the closing of the Transaction.

176.    Ironically, there would have been no need for James River to breach this pre-closing covenant through its capital contribution to JRG Re if James River had not previously breached other pre-closing covenants by taking excessive funds out of JRG Re in the first place.  This last-minute stop-gap measure was nevertheless intended to paper over that earlier looting of JRG Re's assets and disguise James River's earlier misconduct until after the Transaction closed.

177.    Fleming contributed millions more to JRG Re after the Transaction closed because James River's $6 million pre-closing refund was only a fraction of the amount needed to plug the gaping chasm that James River left in JRG Re's balance sheet.

178.    That JRG Re needed money from James River, and later from Fleming, is definitive proof that James River had caused JRG Re to violate Bermuda law by stripping JRG Re of its assets and rendering JRG Re unable to pay its liabilities as they came due.

179.     That James River did so by taking an inordinate amount of JRG Re's assets is particularly egregious because JRG Re's regulatory filings address this very issue. As is discussed further below, every year Sarah Doran reviewed and JRG Re submitted to the Bermuda Monetary Authority a "Risk Register" disclosing various risks that might impact the company. One such disclosed risk is "Liquidity Risk," which JRG Re defines as the risk of it having "[i]nsufficient cash to pay claims and liabilities as they fall due."

180.     JRG Re's Risk Register expressly recognizes that one way in which this "Liquidity Risk" might manifest is if JRG Re's "[d]istribution of profits [to James River] creat[es] liquidity strain" at JRG Re.

181.     Which, of course, is precisely what happened as a result of JRG Re's illegal pre-closing payments to its then-parent.

5.     **JRG Re Was In Default Under Material Reinsurance Agreements, Which James River Caused JRG Re to Further Breach.**

182.     SPA § 2.17(c)(ii) provided a representation from James River to Fleming that James River was not "in default or breach in any material respect under the terms of" certain reinsurance agreements and that, "to the Knowledge of the Seller [*i.e.*, James River], no event or circumstance ha[d] occurred that . . . would constitute an event of default thereunder or result in a termination thereof or would cause or permit the acceleration of or other changes of or to any right or obligation or the loss of any benefit thereunder."

183.     That representation was not true at the time the parties entered into the Agreement. Moreover, James River's illegal looting of JRG Re's assets caused JRG Re to further breach its reinsurance agreements before the Transaction closed.

184.     In particular, certain of JRG Re's reinsurance agreements with a significant counterparty (the "Cedent") included covenants requiring JRG Re to post collateral upon the

occurrence of various enumerated events in order to provide the Cedent with confidence that JRG Re actually had sufficient assets to pay out insurance claims under their contracts.

185.    Specifically, the reinsurance agreements at issue provided that before the end of each calendar quarter the Cedent was to provide JRG Re "with a good faith estimate of the expected sum" of collateral that was to be posted.  Thereafter, they further provided that JRG Re "shall, within two business days prior to the commencement of [the] forthcoming calendar quarter, fund/obtain a security fund or letter of credit in an amount equivalent to 100% of" the collateral owed to the Cedent.

186.    Furthermore, the reinsurance agreements provided that "each time thereafter that [JRG Re's] AM Best rating is at any time reduced or [JRG Re's] capital and policyholder surplus reduces ten percent (10%) or more during any rolling twelve (12) month period," the collateral due to the Cedent "shall increase by 25% (i.e., the first time [it] shall increase to 125% . . . , the second time [it] shall increase to 150% . . . , etc.)."

187.    As denoted by the verb "shall," these increases were to take place automatically upon being triggered.  Indeed, James River expressly recognized as much and disclosed that fact to various advisors during the due diligence process relating to its sale of JRG Re.

188.    For instance, on February 28, 2023, an investment banker inquired "Is there an 'automatic' collateral increase or does [the Cedent] simply have the right to call additional collateral?"  In response, JRG Re's chief financial officer informed the banker that "The contract does not present the collateral increase as optional."

**To:**      Nicholas Celli[Nick.Celli@howdentiger.com]; Sarah Doran[Sarah.Doran@james-river-group.com]; Hickes, Ben [ben.hickes@citi.com]
**Cc:**      Duncan Harvey[Duncan.Harvey@howdentiger.com]; Daniel Heinlein[Daniel.Heinlein@jrgre.bm]; Jeanette Miller[Jeanette.Miller@james-river-group.com]; John Stamatis[John.Stamatis@howdentiger.com]; Talcott, Robert [robert.talcott@citi.com]; Lipsher, Catherine [catherine.lipsher@citi.com]; Horan, Katherine [katherine.horan@citi.com]
**From:**    Allan Defante[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4BAE9EC93D124C848EDA39BBF97C105F-ALLAN DEFAN]
**Sent:**    Tue 2/28/2023 11:19:29 PM (UTC)
**Subject:** RE: [EXTERNAL] Project Jaguar - Diligence Requests
<u>Funds Held - Interest Calc.xlsx</u>

Hi Nick,
See below the further/updated responses in green highlight.

\*\*\*

3.  **Related to VDR file 2.3 Collateral Step Up: should we interpret this file to mean that if JRG Re were to lose its rating that, for example, an additional 25% (~$70mm) would need to be held for** REDACTED**?** Yes, if JRG Re were to lose its AM Best rating, an additional 25% of collateral could be requested. The REDACTED wording is specific to each time the Reinsurer is downgraded. The wording is event based and does not address a multiple rating level downgrade at one time. Multiple downgrade events could potentially trigger an additional 25% of the original estimate each time AM Best takes negative action on the rating. Below is the excerpt from the contract. **[Is there an "automatic" collateral increase or does** REDACTED **simply have the right to call additional collateral? Also, is there any nuance related to if there's a rating** <u>downgrade</u> **by AM Best, versus a voluntary** <u>withdrawal</u> **by the company (e.g., in connection with a sale)?]**

"in the event that the Subscribing Reinsurer posts collateral pursuant to this Contract, each time thereafter that the Subscribing Reinsurer's A.M. Best rating is at any time reduced"
The contract does not present the collateral increase as optional. In practice, REDACTED did not require additional collateral when JRG Re was downgraded from A to A-. We cannot predict how REDACTED would react to future triggering events.

189.    JRG Re's capital decreased by more than 10% between year-end 2021 and year-end 2022, which triggered JRG Re's obligation to post tens of millions of dollars in collateral in early 2023.

190.    As reflected in March 6, 2023, correspondence between Frank D'Orazio and JRG Re's chief executive officer, James River was aware that at year-end 2022 JRG Re had "breach[ed] the 10% reduction" threshold but hoped to avoid being held to its obligations by the Cedent if JRG Re "approach[ed] them in a timely manner" to discuss the situation.

**To:**       Frank D'Orazio[Frank.DOrazio@james-river-group.com]
**From:**     Daniel Heinlein[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C6432492B4674EA2BBB2530435E69A12-DANIEL HEIN]
**Sent:**     Mon 3/6/2023 11:57:23 PM (UTC)
**Subject:**  RE: Q1 Board Update Call - Cas Re

***

REDACTED has not come back with anything regarding announcement but we need to approach them on breaching the 10% reduction in surplus threshold before we post our entity level financials with the BMA. I don't anticipate them trigger a collateral step up for the 10% if we approach them in a timely manner give the capital adequacy of JRG Re.

Regards,
Daniel J. Heinlein

191.    JRG Re's chief executive officer subsequently wrote to the Cedent, acknowledging "we breached the 10% surplus reduction clause in the funding article of our contracts" and requesting from the Cedent "a waiver of the increased collateral charge."

**To:**       REDACTED
**Cc:**       Allan Defante[Allan.Defante@jrgre.bm]
**From:**     Daniel Heinlein[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C6432492B4674EA2BBB2530435E69A12-DANIEL HEIN]
**Sent:**     Mon 6/12/2023 3:34:25 PM (UTC)
**Subject:**  RE: [EXTERNAL] YE 2022 Financials

 and REDACTED,
Further to the YE 2022 financials, we wanted to provide some additional notes and context for your review. At year end we breached the 10% surplus reduction clause in the funding article of our contracts. We are requesting a waiver of the increased collateral charge associated with a surplus reduction. Our current agreements include the following language.

> *Additionally, in the event that the Subscribing Reinsurer posts collateral pursuant to Section 3 of this Contract, each time thereafter that:............(iii) the Subscribing Reinsurer's capital and policyholder surplus reduces ten percent (10%) or more during any rolling twelve (12) month period, the components of the Estimate shall increase by 25% (i.e. the first time the Estimate shall increase to 125% of the Company's ceded outstanding Unearned Premium and Loss Reserves as of the end of the forthcoming calendar quarter, the second time the Estimate shall increase to 150% of the Company's ceded outstanding Unearned Premium and Loss Reserves as of the end of the forthcoming calendar quarter, etc.).*

- JRG Reinsurance Company Ltd. Shareholder Equity reduced by 16.1% from 12/31/21 to 12/31/22 but has since rebounded:
  - At 12/31/21: $447.6M
  - At 12/31/22: $375.5M
  - At 3/31/23: $384.7M

192.    No such waiver was granted, although the Cedent chose not to enforce its rights immediately. Accordingly, JRG Re was in default under its reinsurance agreements with the Cedent prior to signing the Agreement in light of its failure to satisfy its contractual obligations to the Cedent.

193.    That default was not yet cured when the parties entered into the Agreement on November 8, 2023, nor was it disclosed in the Agreement or the schedules thereto, which rendered James River's representation in SPA § 2.17(c)(ii) false as of the date on which it was made.

194.    The Cedent chose to enforce its rights on November 10, 2023—two days after the Agreement was entered into between James River and Fleming.  As the Cedent explained, JRG Re's year-end 2022 decrease in capital had "constitute[d] a default event under the parties' applicable agreements" such that the Cedent was now acting upon that earlier "policyholder surplus covenant breach."

195.    Because of that pre-existing default, JRG Re was obligated to post nearly $60 million in collateral for the Cedent's benefit in November 2023, causing a drastic decrease in JRG Re's unencumbered assets that could be used for any other purpose.

196.    Moreover, the same November 10, 2023, communication from the Cedent enforcing its rights in connection with JRG Re's year-end 2022 default further noted that the Cedent "anticipate[d]" that "once JRG's pending transaction closes" it "may require [that] additional collateral be posted" and that it was "not waiving and expressly reserv[ing] all rights to enforce any default events, including any previous or future default events."  In particular, the Cedent recognized that a sufficiently large payment from JRG Re to James River as part of the Transaction could further reduce JRG Re's capital by an additional 10% or more, which would obligate JRG Re to post additional collateral for the Cedent's benefit.

197.    Approximately one month later, on December 20, 2023, the credit ratings agency AM Best downgraded JRG Re's financial strength rating "to B++ (Good) from A- (Excellent)" and it downgraded JRG Re's long-term issuer credit rating "to 'bbb+' (Good) from 'a-' (Excellent)."  AM Best, *AM Best Revises Outlook to Negative for James River Group Holdings*

*and Most Subs; Downgrades Credit Ratings of JRG Re Co, Ltd.* (Dec. 20, 2023), https://news.ambest.com/PR/PressContent.aspx?altsrc=3&RefNum=34249&URatingId=-1.

198.    That December 2023 credit ratings downgrade triggered JRG Re's obligations to post approximately $63 million in additional collateral to certain of its reinsurance counterparties, with nearly $62 million of that collateral due to the Cedent specifically.

199.    JRG Re nevertheless did not post that collateral as required under its reinsurance agreements because it lacked sufficient assets to do so—including, in part, because James River had improperly taken $20 million from JRG Re in December 2023—placing it in back in default under the terms of its reinsurance agreements.

200.    Moreover, James River was also aware of this when it nevertheless caused JRG Re to reduce its capital by more than 10% through the $139 million payments from JRG Re to James River in February 2024.  Further, James River was aware that JRG Re lacked sufficient assets to satisfy the Cedent's anticipated collateral calls, which had already been triggered by the December 2023 downgrade in its AM Best ratings and which would be further triggered by JRG Re's February 2024 payments to James River because those payments exceeded 10% of JRG Re's statutory capital.

201.    Thereafter, on March 5, 2024, Sarah Doran requested an analysis reflecting "what the potential collateral requests outstanding are at this moment" and noted that, if necessary, James River could "reverse," *i.e.*, pay back, the $139 million it had improperly taken from JRG Re.

202.    Among other James River executives, Frank D'Orazio was included on Ms. Doran's email.

From: Sarah Doran <Sarah.Doran@james-river-group.com>
Sent: Tuesday, March 5, 2024 10:11 AM
To: Daniel Heinlein <Daniel.Heinlein@jrgre.bm>; Frank D'Orazio <Frank.Dorazio@james-river-group.com>; Mike Hoffmann <Mike.Hoffmann@james-river-group.com>; Jeanette Miller <Jeanette.Miller@james-river-group.com>
Cc: Allan Defante <Allan.Defante@jrgre.bm>
Subject: RE: Discuss Jaguar

Daniel

We are working through a few issues to close Jaguar – in the meantime, I was hoping to ask for your help this morning.  As you know, we removed the pre closing dividend last week in anticipation of close.

Can you refresh the attached sheet to update us on the potential collateral requests that this could trigger (unless we reverse it, which Id imagine we could do).  This sheet predates the additional ~$57 MM of collateral we posted to SNC in the fall, so ideally it is updated as of YE and for the latest collateral on hand.  Most central question for this morning is what the potential collateral requests outstanding are at this moment, post the pre closing dividend.

Im also copying Allan for assistance – let me know if it would be helpful to speak

Thanks

Sarah

203.    That same day, Ms. Doran and Mr. D'Orazio were informed that "due to [the] Preclose Dividend" that JRG Re paid to James River in February 2024, JRG Re was contractually obligated to post approximately $62 million in collateral to two reinsurance counterparties, which JRG Re had not done.

204.    In addition, they were also reminded that the December 2023 AM Best ratings downgrade obligated JRG Re to post an additional $63 million in collateral to three reinsurance counterparties, which JRG Re also had not done.

To:     Sarah Doran[Sarah.Doran@james-river-group.com]; Frank D'Orazio[Frank.Dorazio@james-river-group.com]; Mike
Hoffmann[Mike.Hoffmann@james-river-group.com]; Jeanette Miller[Jeanette.Miller@james-river-group.com]
Cc:     Allan Defante[Allan.Defante@jrgre.bm]
From:   Daniel Heinlein[Daniel.Heinlein@jrgre.bm]
Sent:   Tue 3/5/2024 3:03:46 PM (UTC)
Subject:   RE: Discuss Jaguar

Sarah,

Below are the step up amounts for the surplus reduction due to the pre close dividend.  For information purposes, I also included
the downgrade to B++ which was breached but not triggered by any of the cedents.  The collateral requirements are as of the
12/31/23 requests and do not reflect the actual trust balances which could change due to fluctuations in asset values.

| | Current Collateral Requirement at 12/31/23 | Surplus Reduction due to Preclose Dividend | AMB Downgrade to B++ |
|---|---|---|---|
| REDACTED | 315,558,511 | 61,884,561 | 61,884,561 |
| | 46,504,090 | - | 974,031 |
| | 551,882 | 55,188 | 55,188 |
| | 362,614,483 | 61,939,749 | 62,913,781 |

205.    In total, Mr. D'Orazio and Ms. Doran were informed that JRG Re owed its
counterparties approximately $125 million in collateral—nearly all of which was due to the Cedent
specifically.

206.    But JRG Re did not satisfy its contractual obligations for a very simple reason: JRG
Re had nowhere near enough unencumbered assets available to post an additional $125 million in
collateral at the same time that it was already running out of money.

207.    JRG Re's inability to post the required collateral constituted an additional breach
of its reinsurance agreements (which Fleming has been working to address post-closing with JRG
Re's pertinent counterparties), rendering James River's representations in SPA § 2.17(c)(ii) that it
was not in default under or in breach of any of its material reinsurance agreements to be false as
of the closing date.

208.    In addition, JRG Re's failure to post the required $125 million in collateral also
breached SPA § 4.1(x), which required James River to "operate [JRG Re] in the ordinary course

49

of business, and use reasonable best efforts to preserve substantially intact the current material business relationships and material goodwill of [JRG Re] with its policyholders and other customers."

209.    Indeed, in the state court litigation that is discussed further below, James River has taken the position that it "could not disregard the [C]edent's request" of November 10, 2023, that JRG Re post collateral in light of JRG Re's year-end 2022 breach of its reinsurance agreements with the Cedent "because, *inter alia*, as part of its obligation to operate JRG Re in the ordinary course of business, [James River] was required to 'use reasonable best efforts to preserve substantially intact the current material business relationships' of JRG Re, including with regards to JRG Re's 'policyholders and other customers.'" *James River Group Holdings, Ltd. v. Fleming Intermediate Holdings LLC*, Index No. 651281/2024, NYSCEF Doc. No. 23 at 11-12 (Sup. Ct. N.Y. Cnty. Mar. 13, 2024) (quoting SPA § 4.1(x)).

210.    That same rationale applies with equal force to the subsequent collateral increases to which the Cedent was entitled under its reinsurance agreements upon JRG Re's December 2023 ratings downgrade by AM Best and its February 2024 payments to James River totaling $139 million.  Once the downgrade and those payments triggered JRG Re's obligation to post collateral for the Cedent's benefit, it was likewise a breach of SPA § 4.1(x) for JRG Re not to post the collateral that it owed to the Cedent.  James River and JRG Re nevertheless did not do so.

211.    On March 14, 2024, the Cedent informed JRG Re that its obligation to post additional collateral for the Cedent's benefit had been triggered.  Although the Cedent specified that it was not yet seeking to enforce its rights to such additional collateral, JRG Re was automatically required to post such collateral under the terms of its reinsurance agreements between the Cedent and JRG Re and was therefore in default of its obligations at that time.

212.    Moreover, the Cedent made clear that it would not provide JRG Re with money that the Cedent would have otherwise owed to JRG Re because JRG Re was in default of its obligations under their reinsurance agreements.

213.    That same day, Frank D'Orazio was informed of the Cedent's communications. Specifically, he was told that the Cedent had "recognize[d] and calculate[d]" the increased collateral that JRG Re was obligated to provide, but that the Cedent was not enforcing its rights concerning those "additional funds" at this time.  Nevertheless, in light of JRG Re's breach of its reinsurance agreements, Mr. D'Orazio was further informed that the Cedent would not "releas[e] any funds" to JRG Re, which referred to approximately $13 million that the Cedent would otherwise have provided to JRG Re but for JRG Re's breach.

**To:**    Frank D'Orazio[Frank.DOrazio@james-river-group.com]
**From:**    Daniel Heinlein[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C6432492B4674EA2BBB2530435E69A12-DANIEL HEIN]
**Sent:**    Thur 3/14/2024 9:05:10 PM (UTC)
**Subject:**    FW: [EXTERNAL] 1Q 2024 JRG Collateral Calculation
1Q 2024 JRG Re Collateral Calc 03-14-24.xls

Frank,

REDACTED provided the attached Q1 collateral calculation.  They recognize and calculate the collateral need for the ratings downgrade, but are not requiring the additional funds to be posted at this time.  This also means that they are not releasing any funds.  The action essentially lets them build to the 150% requirement over time on those treaties with the provision.

Let me know if you would like to discuss.

Daniel J. Heinlein
JRG Reinsurance Company Ltd.

214.    Likewise, Ms. Doran was also informed on March 14, 2024, that the Cedent would not "refund" that same $13 million to JRG Re "as they [were] enforcing" JRG Re's breach of the parties' agreement, notwithstanding that they were "not requiring" JRG Re to post additional collateral at that time.

To:      Sarah Doran[Sarah.Doran@james-river-group.com]
Cc:      Brett Shirreffs[Brett.Shirreffs@james-river-group.com]
From:    Allan Defante[/o=ExchangeLabs/ou=Exchange Administrative Group
(FYDIBOHF23SPDLT)/cn=Recipients/cn=4bae9ec93d124c848eda39bbf97c105f-Allan Defan]
Sent:    Thur 3/14/2024 8:34:32 PM (UTC)
Subject: Fwd: [EXTERNAL] 1Q 2024 JRG Collateral Calculation
1Q 2024 JRG Re Collateral Calc 03-14-24.xls

FYI - Unfortunately no refund as they are enforcing the rating downgrade covenant though not requiring us to fund.

215.    Notwithstanding that James River had breached SPA § 4.1(x) by failing to operate JRG Re "in the ordinary course of business and use reasonable best efforts to preserve substantially intact [its] material business relationships and material goodwill . . . with its policyholders and other customers," and notwithstanding that in SPA § 2.17(c)(ii) it had represented and warranted that JRG Re was not "in default or breach in any material respect under the terms of" its material reinsurance agreements, Fleming nevertheless was not made aware of these March 2024 developments involving the Cedent until after the Transaction closed more than one month later.

C.    **James River Intentionally and Wrongfully Deprived JRG Re of Necessary Information Concerning JRG Re's Finances.**

216.    Reserves are the lifeblood of an insurance company. They are the funds from which policyholder claims are paid and are therefore a key metric of an insurer's financial health. Reserves are recorded as liabilities on insurance companies' balance sheets to account for payments that the insurance company expects to make on future claims. The importance of adequate reserves is obvious: insufficient reserving creates a risk to policyholders that the insurance company's assets may not be sufficient to pay claims, which is also a concern for any insurer's regulator. The financial health of the insurance market depends on adequate, honest reserving.

217.    The amount that JRG Re would set aside as reserves was formally determined by James River's Reserve Committee, which included Frank D'Orazio and Sarah Doran.

218.    Since at least 2019 James River has retained the insurance services company Willis Towers Watson to provide an independent analysis of JRG Re's reserves as of the third and fourth quarter of each year to ensure that sufficient funds have been set aside to pay future claims.

219.    That is not simply a convenient business service for JRG Re's benefit. Rather, Bermuda's Insurance Act 1978 requires insurance companies to have a "loss reserve specialist" opine on the adequacy of their reserves. A Willis Tower Watson actuary served as JRG Re's loss reserve specialist and their opinions concerning the adequacy of JRG Re's reserves are submitted annually to the Bermuda Monetary Authority as mandated by Bermuda law.

220.    In addition, JRG Re's Governance and Risk Management framework (the "Framework")—a formal document that JRG Re submits annually to the Bermuda Monetary Authority, as discussed further below—references the critical role played by Willis Towers Watson in stating that JRG Re's reserves were "certified by an independent actuary on an annual basis." And, elsewhere, JRG Re's Framework more expressly notes that "[a]n independent review of [James River's] reserving analysis is conducted by Willis Towers Watson annually."

221.    Likewise, JRG Re's Risk Register—another document submitted annually to the Bermuda Monetary Authority by JRG Re—provided that Willis Towers Watson's analysis was reviewed "to ensure consistency with [JRG Re's] analysis."

222.    Accordingly, Willis Towers Watson's analysis was critical because Willis Towers Watson's opinion was submitted to and relied upon by JRG Re's regulator, and it was expressly understood that JRG Re's reserves would be "consisten[t] with" Willis Towers Watson's recommendations.

223.    Willis Towers Watson's analysis could not simply be set aside or ignored if James River or JRG Re disagreed with it. For that very reason, at year-end James River's Reserve

Committee always required JRG Re to maintain reserves approximately in-line with those viewed as necessary by Willis Towers Watson.

224.    For instance, at year-end 2019 JRG Re's reserves stood at 99.76% of those indicated by Willis Towers Watson.  At year-end 2020 JRG Re's reserves stood at 103.86% of those indicated by Willis Towers Watson.  At year-end 2021 JRG Re's reserves stood at 105.42% of those indicated by Willis Towers Watson.  And at year-end 2022 JRG Re's reserves stood at 97% of those indicated by Willis Towers Watson.

225.    Moreover, James River's Reserve Committee would historically rely on Willis Towers Watson's analysis of JRG Re's reserves as of the third quarter of each year and intervening discussions with Willis Towers Watson to ensure that JRG Re's reserves were in-line with Willis Tower's Watson's views by year-end.  In other words, Willis Towers Watson's third-quarter analysis was historically viewed by James River as an early warning and an opportunity to course-correct if it deviated significantly from the amount that had actually been set aside from JRG Re.

226.    In 2020, for instance, Willis Towers Watson concluded that JRG Re's reserves were approximately $20 million too low as of September 30, 2020.  As a result of subsequent discussions with Willis Towers Watson and further corrections by James River's Reserve Committee, however, by year-end 2020 JRG Re's reserves were within approximately $1 million of the amount that Willis Towers Watson has determined was appropriate.

227.    Likewise, in 2021 Willis Towers Watson concluded that JRG Re's reserves were approximately $53 million too low as of September 30, 2021.  This once again kicked off a series of further discussions and corrective actions by James River, such that by year-end 2021 JRG Re's reserves were in excess of those deemed necessary by Willis Towers Watson.

228.    Given the critical role played by Willis Towers Watson, its analysis concerning JRG Re's reserves as of the third and fourth quarter of each year were routinely shared with both James River's senior leadership—including Mr. D'Orazio and Ms. Doran—as well as JRG Re's senior leadership—including JRG Re's chief executive officer and chief financial officer.

229.    On December 28, 2023, Willis Towers Watson provided its "September 30, 2023 Loss Reserve Analysis" for JRG Re to Sarah Doran, with the memo listing on its "CC" line that it was also to be distributed to Frank D'Orazio, as well as to JRG Re's chief executive officer and chief financial officer, among others.

230.    That did not happen, however.  In a break from normal practice, Willis Towers Watson's analysis was never provided to the JRG Re executives because James River expressly instructed Willis Towers Watson not to do so in light of the anticipated Transaction.  That failure to distribute the Willis Towers Watson Report was itself a violation of SPA § 4.1(x)'s requirement that JRG Re be operated "in the ordinary course of business" because it was not "consistent with past practice."

231.    Moreover, the substance of Willis Towers Watson's December 28, 2023, report was troubling because it revealed that James River's Reserve Committee (including Mr. D'Orazio and Ms. Doran) had set aside approximately $185 million in reserves for JRG Re as of September 30, 2023, but JRG Re actually needed reserves of approximately $205 million as of that date in light of the claims it would be expected to pay out going forward.  Stated otherwise, JRG Re's reserves were short by approximately $20 million as compared to where they needed to be.  That 11% shortfall was a significant problem for several reasons.

232.    In the ordinary course, this would have prompted two reactions.  First, James River and JRG Re would normally have commenced discussions with Willis Towers Watson to identify

any flaws in Willis Towers Watson's analysis that might result in Willis Towers Watson reducing its view as to the reserves that JRG Re would need.  And, second, James River's Reserve Committee would have increased JRG Re's reserves to bring them in line with Willis Towers Watson's analysis.

233.    In a sharp deviation from past practice, however, Willis Towers Watson's third-quarter report was instead kept hidden from JRG Re's leadership, which was therefore deprived of the opportunity to engage with Willis Towers Watson, to demand that James River's Reserve Committee set aside additional reserves, or to otherwise raise questions in connection with the anticipated pre-closing payments that JRG Re was to make to James River.

234.    As a result, James River breached SPA § 4.1(x)'s requirement that it operate JRG Re "in the ordinary course of business," as well as SPA § 4.1(f)'s prohibition against making any changes to JRG Re's "actuarial, . . . risk retention, risk management, [or] reserving . . . policies, practices or principles" because this was a sharp deviation from JRG Re's normal actuarial, risk retention, risk management, and reserving practices.

235.    Moreover, this troubling pattern of James River withholding material information concerning JRG Re's finances from JRG Re's leadership would repeat itself again just a few weeks later.

236.    On February 20, 2024, Willis Towers Watson provided its "December 31, 2023 Loss Reserve Analysis" for JRG Re to Sarah Doran, once again listing on its "CC" line that it was also to be distributed to Frank D'Orazio, as well as JRG Re's chief executive officer and chief financial officer, among others.

237.    Once again, however, that did not happen as James River intentionally withheld this second Willis Towers Watson report from JRG Re's executives, as Sarah Doran instructed

Willis Towers Watson not to provide the report to JRG Re's leadership while simultaneously representing to Willis Towers Watson that James River would send the analysis to JRG Re.

238.    That failure to distribute the Willis Towers Watson Report was again a violation of SPA § 4.1(x)'s requirement that JRG Re be operated "in the ordinary course of business" because it was not "consistent with [JRG Re's] past practice" pursuant to which JRG Re's leadership had always promptly received Willis Towers Watson's analysis.  As well, it again violated SPA § 4.1(f)'s prohibition against making any changes to JRG Re's "actuarial, . . . risk retention, risk management, [or] reserving . . . policies, practices or principles."

239.    This iteration of Willis Towers Watson's analysis revealed that JRG Re's reserves were short by approximately $26 million, 11% below the amount needed, as of year-end 2023.

240.    That meant that James River had breached SPA §§ 4.1(x) and 4.1(f) by deviating from its historic practice of booking reserves approximately in line with the amount found necessary by Willis Towers Watson at year-end, as needed to ensure that Willis Towers Watson would provide JRG Re with a bill of good health when submitting its annual opinion to the Bermuda Monetary Authority.

241.    In addition, this deviation from historic practice also resulted in an artificial inflation of JRG Re's book-value as of the closing date.  That is because understating reserves by $26 million resulted in an on-paper reduction in JRG Re's liabilities by $26 million, and an increase in JRG Re's book-value by $32 million (once certain reinsurance arrangements entered into by JRG Re as part of a loss portfolio transfer transaction are accounted for).  Accordingly, through these deviations from the ordinary course of business, James River attempted to manipulate the cash-component of the purchase price that it would be paid by Fleming under SPA

§ 1.3, improperly and artificially inflating the amount purportedly owed by Fleming by that same $32 million.

242.    Moreover, James River's withholding of this February 20, 2024, report from JRG Re's leadership also meant that JRG Re's chief executive officer and chief financial officer could not hope to correctly calculate the pre-closing payment that JRG Re was to make to James River just a few days later.

243.    As previously discussed, JRG Re's board approved two payments to James River totaling $139 million on February 23, 2024—three days after Frank D'Orazio and Sarah Doran received this second Willis Towers Watson Report on February 20 that was not distributed to JRG Re's leadership.

244.    As also previously discussed, Bermuda's Insurance Act 1978 limits the permissible amount that can be paid out as a dividend to 25% of total statutory capital and surplus, and it further prohibits payments that would reduce a company's total statutory capital by 15% or more.

245.    JRG Re's chief executive officer and chief financial officer—both of whom should have received the Willis Towers Watson reports in the ordinary course and both of whom served as directors of JRG Re—could not hope to properly apply those limits because they were intentionally kept in the dark as to the true state of JRG Re's finances by James River's withholding the Willis Towers Watson Report from them.   Indeed, JRG Re's chief executive officer and chief financial officer—who both served on JRG Re's Board—would not learn about the withheld Willis Towers Watson report until after the Transaction closed.

246.    Specifically, Willis Towers Watson's analysis demonstrated that JRG Re's reserves were short by approximately $26 million as of December 31, 2023.   Correcting this required booking a $26 million increase JRG Re's liabilities, which also results in a concomitant decrease

in JRG Re's statutory capital of $32 million (once certain reinsurance arrangements entered into by JRG Re as part of a loss portfolio transfer transaction are accounted for).

247.    Properly booking JRG Re's reserves in line with Willis Towers Watson's analysis at year-end 2023 would have resulted in a decrease in JRG Re's statutory capital of more than 10% between year-end 2022 and year-end 2023, immediately triggering JRG Re's obligations to post tens of millions of dollars in collateral for the Cedent's benefit even before that same obligation was triggered by its payment of $139 million to James River in February 2024.  It was only by burying the Willis Towers Watson report, suppressing its reserves, and improperly manipulating its balance sheet that James River avoided having to post that collateral prior to its receipt of the $139 million from JRG Re.

248.    Moreover, assuming *arguendo* that JRG Re was capable of paying dividends in 2024 (though it was not), this $32 million decrease in its statutory capital would have led to an $8 million decrease in the maximum allowable dividend under 31B of the Insurance Act (*i.e.*, 25% of $32 million).

249.    Likewise, this $32 million decrease in statutory capital would have led to a $4.8 million decrease in the maximum allowable reduction in JRG Re's capital under 31C of the Insurance Act (*i.e.*, 15% of $32 million).

250.    Accordingly, JRG Re's directors were fundamentally mistaken as to the company's statutory capital—and thus how much could permissibly be paid out under "applicable Law" in Bermuda—when they approved payments of $139 million to James River on February 23, 2024, because James River withheld Willis Towers Watson's February 20, 2024, report from them.

251.    As previously discussed, the $139 million payments from JRG Re to James River violated Bermuda law.  Because JRG Re's board was misled as to the company's statutory capital

and thus based its calculations on incorrect information, however, the extent to which those payments violated Bermuda law was even greater than JRG Re's directors could possibly have appreciated at the time.

252.    In addition, the withholding of the Willis Towers Watson reports from JRG Re's chief financial officer caused yet another problem for JRG Re. Specifically, JRG Re's chief financial officer is designated as the company's "principal representative" for purposes of its interactions with the Bermuda Monetary Authority, which requires that he provide notice to its regulator upon the occurrence of certain events, including if he were to conclude that JRG Re might become incapable of paying claims to its insureds or if other statutorily enumerated conditions are triggered.

253.    As explained in JRG Re's Framework filed with the Bermuda Monetary Authority, JRG Re's principal representative was to have "full access to all relevant records of" JRG Re such that he would be "able to undertake all duties" required by the Bermuda Monetary Authority.

254.    JRG Re's chief financial officer was rendered incapable of performing his duties as the company's principal representative to the Bermuda Monetary Authority because James River deprived him of material information concerning JRG Re's finances by withholding the Willis Towers Watson reports.

255.    In particular, had he been aware of Willis Towers Watson's February 20, 2024, analysis, JRG Re's chief financial officer would have promptly reported the results of that analysis to the Bermuda Monetary Authority and informed the regulator that much of JRG Re's financial reporting would need to be redone.  Furthermore, he would have informed James River that JRG Re's reserves needed to be increased.  He was nevertheless prevented from doing so by James River's intentional withholding of the report from him.

256.    Instead, JRG Re only learned of Willis Towers Watson's analysis on April 18, 2024—two days after the Transaction closed—when it was informed that Willis Towers Watson was issuing "a deficient opinion" that Willis Towers Watson was prepared to present to the Bermuda Monetary Authority.

257.    As Willis Towers Watson had been previewing to James River for months—but unbeknownst to JRG Re—Willis Towers Watson had now formally concluded that JRG Re did "not make a reasonable provision" of reserves given "the terms of its insurance contracts and agreements."

258.    This opinion caused immense harm to JRG Re as it required a significant increase to the company's reserves and threw into chaos the process for finalizing its annual regulatory filings to the Bermuda Monetary Authority, which were due by April 30, 2024—less than two weeks after receipt of Willis Towers Watson's deficiency opinion on April 18, 2024.

259.    Just as James River had hoped, however, that chaos was now Fleming's problem because Willis Towers Watson's opinion issued days after the Transaction had closed and ownership of JRG Re had already transferred.

D.    **With James River's Knowledge and Under Its Direction, JRG Re Submitted False and Misleading Annual Filings to the Bermuda Monetary Authority and Knowingly Failed to Correct Them.**

260.    As a Bermuda-based insurance company, JRG Re is required to comply with the Insurance Code of Conduct (the "Bermuda Insurance Code") promulgated by the Bermuda Monetary Authority pursuant to Bermuda's Insurance Act 1978.

261.    Section 5 of the Bermuda Insurance Code requires Bermudian insurance companies like JRG Re to "adopt an effective risk management and internal controls framework" that are consistent with "international best practices on risk management and internal controls."

262.    In addition, Section 6A of Bermuda's Insurance Act 1978 empowers the Bermuda Monetary Authority to prescribe rules concerning insurer's capital and solvency returns.

263.    For Class 3B insurers in particular—a category that includes JRG Re—the Bermuda Monetary Authority has further specified that their annual capital and solvency return filings must include a "Schedule of Risk Management" that addresses "the insurer's risk management structure" including various components such as a "Risk Register" disclosing to the regulator "the insurer's material risks," the "impact and probability of the risk," a "summary of the risk mitigation/controls" that the insurer has "in place and an assessment of their effectiveness," and an "overall assessment of the impact and probability of the residual risk" once the company's controls are accounted for.  Bermuda Monetary Authority, *The Bermuda Capital and Solvency Return 2024 (Interim) Instruction Handbook for Class 4, 3B and 3A Insurers* § C16.2p.

264.    The Bermuda Monetary Authority provides a template for insurer's regulatory filings, Schedule V of which requires insurers to upload a "Description of the insurer's risk management program" and their "Risk register," among other items, as shown in items (p) and (q) in the below excerpt:

| | | | | BMA [logo] |
|---|---|---|---|---|
| | | | | Return to Index |

**SCHEDULE OF RISK MANAGEMENT**

Enter Compang Name

For the year ending **31 December 2024**    Note if an insurer does not have any entities to consolidate, enter **EBS Valuation** information    **SCHEDULE V**

expressed in ['000s]    **United States Dollar** only

| | | | Unconsolidated SFS | EBS Valuation |
|---|---|---|---|---|
| **(a)** | Governance and group structure | | | Refer to Schedule V(a) |
| **(b)** | Intra-group transactions that the insurer is a party to and the insurer's risk concentrations | | | Refer to Schedule V(c) |
| **(d)** | Effective duration of assets | | | 0.00 |
| **(e)** | Effective duration of liabilities | | | 0.00 |
| | | | | **Document Name & Page Number** |
| **(f)** | Description of the effective duration of assets and liabilities calculations and key assumptic | Attach file | | |
| **(g)** | Gross probable maximum loss | | - | - |
| **(h)** | Net probable maximum loss | | - | - |
| **(i)** | Average annual loss (excluding property catastrophe) | | | - |
| **(j)** | Actual attritional losses and large claims losses - relevant year | | | - |
| **(k)** | Arrangements with respect to property catastrophe recoverables | | | |
| | (i) Collateral | | | - |
| | (ii) Catastrophe bonds | | | - |
| | (iii) Special purpose insurer (indemnity basis) | | | - |
| | (iv) Special purpose insurer (other basis) | | | - |
| | (v) Total | | | - |
| | | | | **Document Name & Page Number** |
| **(l)** | Mutual fund disclosures | Attach file | | |
| **(m)** | Summary of projected performance - | | | |
| | (i) The insurer's latest estimate of annual net premiums written | | | - |
| | (ii) The estimated underwriting profit or loss | | | - |
| | (iii) The estimated net income or loss for the insurer or on a group basis with disclosure of the estimated percentage of the insurer's contribution relative to the group | | | - |
| | | | | **Document Name & Page Number** |
| | (iv) A qualitative description of the insurer's business and underwriting strategy to achieve the above estimates | Attach file | | |
| **(n)** | Financial impact and description of stress & scenario tests | | | Refer to Schedule V(e) |
| | | | | **Document Name & Page Number** |
| **(o)** | Investments and derivatives strategies and policy | Attach file | | |
| | | | | **Document Name & Page Number** |
| **(p)** | Description of the insurer's risk management program | Attach file | | |
| | | | | **Document Name & Page Number** |
| **(q)** | Risk register | Attach file | | |
| **(r)** | List of statutory lines and statutory territories that have catastrophe exposures | | | Refer to Schedule X(d) |
| **(s)** | Reconciliation from Form 1SFS to Form 1EBS | | | Refer to Schedule V(g) |
| **(v)** | Details of deposit assets and liabilities | | | Refer to Schedule V(k) |
| **(x)** | Details of segregated accounts | | | Refer to Schedule V(l) |

265.    In relevant part, JRG Re thus sought to satisfy its disclosure obligations through its maintenance and annual submission to the Bermuda Monetary Authority of its Risk Register and a "Governance and Risk Management" Framework.

266.    According to JRG Re's Framework, it was intended to "provide[] management the necessary environment for [JRG Re] to achieve organizational goals and objectives" and "include[d] the internal mechanisms used to monitor and control key risks" facing JRG Re. Indeed, the Framework explains that it is "embedded within [JRG Re's] business strategy and business plans, and is a key element of the daily management of JRG Re's operations," as

"[m]anagement recognizes the importance of a robust and efficient control structure and considers strong controls a core business practice."

267.    In the Framework JRG Re claimed that "[c]ompliance with policies, processes and procedures is a cultural imperative" because "[n]on-compliance can have material consequences, leading to needless cost and increased risk."

268.    JRG Re failed to comply with the Bermuda Insurance Code, however, because its Framework and Register were each both false and woefully outdated, as a result of which the company lacked an effective risk management and internal controls framework.

269.    For instance, the very first page of the Framework provides that "[t]he risk policies set out in th[at] document are updated annually at minimum."  Moreover, responsibility for those annual updates also fell on James River because the Framework explained that "[a]t least annually, the U.S. Holding Company [*i.e.*, James River] employees review and update the documented JRG Re internal controls with the JRG Re CFO and process owners."

270.    Likewise, JRG Re's Register provided that it would be updated annually.

271.    But the last non-substantive update to JRG Re's Framework and Register as submitted to the Bermuda Monetary Authority took place in March 2022, more than two years before the closing of the Transaction in April 2024.

272.    Moreover, the last substantive update to these documents was years earlier than that.  Indeed, JRG Re's current leadership are unaware of when that substantive update might have happened, who might have participated, or the basis for substantive decisions made in that years-ago drafting process, because it predates their time in the company's leadership

273.    Accordingly, it simply was not true that this process takes place annually, as JRG Re affirmatively represented to the Bermuda Monetary Authority in its submissions.

274.    Furthermore, April 2022 was the last time that JRG Re submitted a Risk Register and Framework to the Bermuda Monetary Authority.  At that time, the Risk Register and Framework submitted were already woefully outdated and inaccurate.  That problem has only grown worse in the intervening years, though an updated Framework and Risk Register have not been provided to the regulator.

275.    For instance, the Framework submitted in April 2022 provides that JRG Re employed a "Chief Pricing Actuary [who] reports to the President of JRG Re" and whose "pricing recommendations are approved by the President."  In addition, it informed the Bermuda Monetary Authority that JRG Re's "actuarial function" is "staffed appropriately given the nature, scale and complexity of the risks inherent in the integrated operations of JRG Re" and "managed by a Fellow of the Casualty Actuarial Society" with "in-depth knowledge of actuarial and financial mathematics."

ACTUARIAL FUNCTION

The Actuarial function for JRG Re is responsible for:

- Performing reserve estimates, including assessing the quality of underlying data;
- Assisting in the execution of the risk management framework;
- Assisting with the underwriting process, including those surrounding pricing and writing of underwriting contracts and risk transfer mechanisms (e.g., ceding reinsurance, derivative instruments, etc.); and
- Providing support of financial information to multiple internal and external stakeholders including regulatory bodies and rating agencies.

The actuarial function is managed by a Fellow of the Casualty Actuarial Society (FCAS) with in-depth knowledge of actuarial and financial mathematics. The function is staffed appropriately given the nature, scale and complexity of the risks inherent in the integrated operations of JRG Re.

****

ACTUARIAL POLICY

The Company maintains an effective Actuarial function commensurate with the nature, scale, complexity and profile of the risks to which it is exposed. The Chief Pricing Actuary reports to the President of JRG Re and performs actuarial pricing. The actuary's pricing recommendations are approved by the President. The Group Chief Actuary performs reserving and reports to the JRGH COO.  All reserving recommendations are approved by the Reserve Committee.

Both the Group Chief Actuary and the Chief Pricing Actuary are Fellows of the Casualty Actuarial Society (FCAS).

276.    Likewise, as of April 2022 the Register contained several references to the role played by JRG Re's "Chief Pricing Actuary" in mitigating a variety of risks.  Indeed, the role of the Chief Pricing Actuary is described as one of JRG Re's key controls to address (i) the risk of "Financial loss arising from inappropriate underwriting" of insurance policies, (ii) the risk of "Financial Loss arising from inappropriate claims handling" upon the submission of claims by JRG Re's insureds, and (iii) the risk of "Financial loss arising from inappropriate reserve setting." In the excerpts of the Risk Register below, each of the columns on the left reflect JRG Re's "Control" to mitigate risks, each of the middle columns reflect the "Owner" of that "Control," and each of the columns on the right reflect the "Description of [the] Control."

| Chief Actuary | President | The Group Chief Actuary performs actuarial reserving and the Chief Pricing Actuary performs actuarial pricing. The Chief Pricing Actuary reports to the President of JRG Re and the Group Chief Actuary. The actuary's pricing recommendations are approved by the President and all reserving recommendations are approved by the Reserve Committee. The President signs each reinsurance contract, denoting his agreement with the contract's terms and conditions. |

****

| Claims management | Claims Manager | Reports detailing reported claims are presented to Senior Management. TIRS Underwriting System alerts notify the President, Group Chief Actuary, Chief Pricing Actuary and CFO of unusual items that may require additional review, such as payments and reserve changes over a certain dollar amount. |

****

| Consulting Actuary reserve recommendations | President | The Group Chief Actuary performs actuarial reserving. The Chief Pricing Actuary performs actuarial pricing. The actuary's pricing recommendations are approved by the President. |

****

| Chief Actuary reserve recommendations | President | The Group Chief Actuary performs actuarial reserving and the Chief Pricing Actuary performs actuarial pricing. The actuary's pricing recommendations are approved by the President and all reserving recommendations are approved by the Reserve Committee. |
| Qtrly Review of Reserves | Reserve Committee | Each quarter, the Reserve Committee (Group Chief Actuary, CFO, CAO, COO & CEO of James River Group Holdings, Ltd., and Chief Pricing Actuary, CFO and President of JRG Re) analyze the reserving analysis provided by the Group Chief Actuary. |

****

| Review of Qtrly Claims Report | President | The Group Chief Actuary, Chief Pricing Actuary, CFO and President review the Quarterly Claims Report prepared by the Claims Manager. |

277.    According to the Register's "Risk Scoring Criteria," moreover, each of these risks supposedly controlled in part through the role of JRG Re's Chief Pricing Actuary posed "High" risks to the company.

278.    But JRG Re had last employed its own actuary in December 2021—five months before the amended Framework and Register were submitted to the Bermuda Monetary Authority in April 2022, nearly two years before James River entered into the Agreement in November 2023, and more than two years before the Transaction closed in April 2024.  In other words, it has been years since these controls were in place or since these representations made by JRG Re to the Bermuda Monetary Authority concerning its pricing actuary were last accurate.

279.    Likewise, the Framework provided that the "Chief Financial Officer of JRG Re is in continual contact with [JRG Re's] in-house General Counsel . . . on compliance, legal and regulatory matters."  In reality, however, JRG Re lacked any in-house legal counsel with whom the Chief Financial Officer could consult concerning compliance, legal or regulatory issues.

- The Chief Financial Officer of JRG Re is in continual contact with the Company's in-house General Counsel and outsourced General Counsel (Conyers, Dill and Pearman), as well as Ernst & Young on compliance, legal and regulatory matters.  In addition, all issues are reported to the Chief Financial Officer of JRGH.

280.    More broadly, the Framework represented to the Bermuda Monetary Authority that "JRG Re executes day-to-day operations on a stand-alone basis, which includes systems and controls to support their business" and that "[a]ll key processes are managed by JRG Re rather than relying on [James River's] group systems and/or processes."

- JRG Re executes day-to-day operations on a stand-alone basis, which includes systems and controls to support their business.  The underwriting and accounting systems and the interface between these systems are independent of the Group.  All key processes are managed by JRG Re rather than relying on group systems and/or processes.  Ongoing communication, both formal and informal, is maintained between key Group stakeholders and all members of Senior Management.

281.   That, too, was false.  As discussed, for years JRG Re lacked in-house counsel or actuaries and instead relied on James River personnel to fill those critical roles.

282.   There are also glaring inconsistencies between JRG Re's Bermuda regulatory filings and James River's United States securities filings.  In particular, JRG Re informed its Bermuda regulator that JRG Re's reserves were analyzed quarterly by a Reserve Committee comprised of eight individuals: (i) James River's chief financial officer, (ii) James River's chief accounting officer, (iii) James River's chief executive officer, (iv) James River's chief operating officer, (v) JRG Re's chief financial officer, (vi) JRG Re's chief pricing actuary, (vii) JRG Re's president, and (viii) James River's group chief actuary.

> An independent review of the reserving analysis is conducted by Willis Towers Watson annually.  Each quarter, the Reserve Committee (CFO, CAO, CEO, COO of JRGH; CFO, Chief Pricing Actuary and President of JRG Re and Group Chief Actuary) analyze the reserving analysis provided by the Group Chief Actuary.  The Group Chief Actuary reviews the annual Willis Towers Watson analysis to ensure consistency with the Company's analysis.

283.   But James River's annual filings with the United States Securities Exchange Commission disclose that the Reserve Committee is comprised of only four individuals—James River's Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, and Chief Actuary—who meet with the president and chief financial officer of JRG Re (and other James River subsidiaries) on an as-needed basis.

> Our Reserve Committee consists of our Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, and Chief Actuary. Additionally, the presidents, chief financial officers and segment actuaries of each of our insurance segments participate in the Reserve Committee meetings for their respective segments. The Reserve Committee meets quarterly to review the actuarial recommendations made by each segment actuary and use their best judgment to determine the best estimate to be recorded for the reserve for losses and loss adjustment expenses on our balance sheet.

284.   Consistent with James River's United States securities filings, and notwithstanding JRG Re's inconsistent representations to the Bermuda Monetary Authority, JRG Re's leadership are *not* members of James River's Reserve Committee.  JRG Re's leaders can make requests to

James River's Reserve Committee in connection with JRG Re's reserves, but JRG Re's leadership *does not* have any actual decision-making authority over the setting of reserves for JRG Re.

285.    As previously discussed, JRG Re had not had a chief pricing actuary since 2021. Likewise, James River also had not had a chief operating officer since 2021 when its prior chief operating officer, Bob Myron, resigned.  JRG Re's contrary representations to the Bermuda Monetary Authority in 2022 concerning the roles of those non-existent employees on a Reserve Committee of which they had never been members were simply not true.

286.    James River cannot claim ignorance of these misstatements in JRG Re's regulatory filing because the already-inaccurate and outdated Framework and Register were circulated to Sarah Doran and to Mike Crow, James River's chief accounting officer, in March 2022—weeks before they were submitted to the Bermuda Regulatory Authority.

| | |
|---|---|
| To: | Mike Crow[Mike.Crow@james-river-group.com]; Daniel Heinlein[Daniel.Heinlein@jrgre.bm] |
| Cc: | Sarah Doran[Sarah.Doran@james-river-group.com]; Harry Mack[Harry.Mack@jrgre.bm] |
| From: | Allan Defante[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4BAE9EC93D124C848EDA39BBF97C105F-ALLAN DEFAN] |
| Sent: | Tue 3/15/2022 5:07:35 PM (UTC) |
| Subject: | 2021 Risk Registers/Risk Mgt Plans |

Carolina Re Ltd Risk Register 2021.xlsx
Carolina Re - Governance and Risk Management 2021 Track Changes.docx
JRG Re Risk Register 2021.xlsx
JRG Re - Governance and Risk Management 2021 - Track Changes.docx

Hi all,
Please find attached the updated risk registers and RMPs for JRG Re and Carolina Re. The RMPs are in track changes. All docs have no significant changes - only date updates to signify review and some housekeeping items.
Please note that we are not required to submit Risk Register and RMP for Car Re (being a Class 3A), but we maintain/submit them for good governance.
Appreciate if you can provide comments by Mar 31ˢᵗ; otherwise we will consider these versions as final.
Thanks!
**Allan Defante**
Chief Financial Officer
JRG Reinsurance Company Ltd.
Direct: +1 441 278 4585

287.    Moreover, on April 21, 2022, the Framework and Register were approved by a vote of JRG Re's Board of Directors, comprised entirely of individuals who reported to either Mr. D'Orazio or Ms. Doran.  At that time, JRG Re's directors voted in favor of board resolutions that the false and misleading Framework "fairly and accurately describe[d] the business of [JRG Re]"

and that "the control policies and procedures, corporate governance, and compliance functions . . . as set forth" therein were "appropriate considering the nature, scale and complexity of [JRG Re's] business."

288.    The following year, a lightly revised draft of the Framework and Register were circulated to Sarah Doran for her review once again in March 2023.  This time, Ms. Doran responded by noting several inaccurate statements in the regulatory filings, stating in particular that the Register was "very stale and needs updating," and questioning "who these go to and when they are due?"

**From:** Sarah Doran <Sarah.Doran@james-river-group.com>
**Sent:** Wednesday, March 22, 2023 5:19 PM
**To:** Joyce De Guzman Placedes <jdeguzmanplacedes@jrgre.bm>; Daniel Heinlein <Daniel.Heinlein@jrgre.bm>
**Cc:** Allan Defante <Allan.Defante@jrgre.bm>
**Subject:** RE: Risk Register and Risk Mgt - JRG Re 2023

The risk register is very stale and needs updating. For example, we are rated A-, not A (page 3). The CFO definitely is not part of the process around reviewing reinsurance agreements – and the COO doesn't approve that. (Slide 5). I believe the Chief Underwriting Officer approves many things which are not noted here. I don't review the quarterly claims report (haven't in some time). Legal should be reviewing docs and NDAs, and there is no mention of them (legal should also as a courtesy have this (these) documents and review).

Also – can we step back and get a reminder of who these go to and when they are due ?

Thanks
Sarah

289.    After being reminded that the Register and Framework "are filed as attachments" to JRG Re's annual regulatory submission that was due to the Bermuda Monetary Authority in a few weeks, Mrs. Doran further responded that "there are things here that are unfortunately just wrong perhaps because they are so dated," pointedly noting among other issues that "we don't even have a [chief operating officer] any longer," as noted above.  Ms. Doran then requested that JRG Re's leadership "take a shot at updating" these mandatory filings that were due shortly.

From: Sarah Doran <Sarah.Doran@james-river-group.com>
Sent: Thursday, March 23, 2023 12:24 AM
To: Allan Defante <Allan.Defante@jrgre.bm>; Joyce De Guzman Placedes <jdeguzmanplacedes@jrgre.bm>; Daniel Heinlein <Daniel.Heinlein@jrgre.bm>
Subject: Re: Risk Register and Risk Mgt - JRG Re 2023
Thanks Allan.
I'm not sure Erin would be helpful - there are things here that are unfortunately just wrong perhaps because they are so dated. I'm not sure w what Erin would be able to help you with. If you need 10 mins w me to review that live, I can do that. Daniel would I think also see how dated this is - I mean we don't even have a COO any longer and his interface has been w the CEO and CUO. It would be my suggestion given what's on my plate that you in Bermuda together take a shot at updating this, and if helpful I can then talk briefly w you on it next week. Thanks.
Get Outlook for iOS

290.    Instead of following through on her request for an update, however, JRG Re

subsequently suggested that it might simply "not attach[] an updated Risk Register and Risk

Management documents [*i.e.*, the Framework] for the 2022 year-end filings" owed to its regulator,

and instead "indicate 'Refer to PY [*i.e.*, prior year] for the section . . . that asks for the document

name and page number of the Risk Management Program and Risk Register."

From: Joyce De Guzman Placedes <jdeguzmanplacedes@jrgre.bm>
Sent: Thursday, March 23, 2023 10:34 AM
To: Allan Defante <Allan.Defante@jrgre.bm>; Sarah Doran <Sarah.Doran@james-river-group.com>; Daniel Heinlein <Daniel.Heinlein@jrgre.bm>
Subject: RE: Risk Register and Risk Mgt - JRG Re 2023
Hi Allan,
The requirement for the Risk Register within the Schedule of Risk Management of the BSCR is clear that it should be that of the insurer, i.e. the entity licensed by the BMA. I would not recommend submitting that of the Group as we would be providing information that is not relevant for purposes of BMA's assessment of JRG's material risks, controls and residual risks. The BMA would only accept the Group Register in lieu of that of the insurer if the BMA is the group supervisor, which is not the case for James River.
The expectation, however, for our material risks assessment, including that of our risk management process, is that it should be done on a forward looking basis. Given our current state, the suspension of UW activities, as you cited below, and next steps is still unknown as of the filing date (expected to be before end of April), I would suggest not attaching an updated Risk Register and Risk Management documents for the 2022 year-end filings. We can indicate 'Refer to PY' for the section within the BSCR that asks for the document name and page number of the Risk Management Program and Risk Register and adding a sentence or two within the CISSA report that self-assessment of the Company's prospective material risks, including changes (if any/as applicable) to Risk Register and Risk Management documents provided in prior year, will be performed once additional relevant information about our business plan becomes available.
Submitting what we have now or even if we update it as of this time, will not add value to the BMA and they would still require an update about the future of the Company later in the year, where at that point we would know our applicable material risks. That is only a suggestion. If not, we can still take a stab for updating with some controls no longer applicable.
Thank you.
Regards,
Joyce De Guzman Placedes
Controller
JRG Reinsurance Company Ltd.

291. Ms. Doran agreed, expressly approving of the decision not to submit updated and accurate information to JRG Re's regulator, notwithstanding her own commentary as to the inaccuracies in the information that had previously been provided to the Bermuda Monetary Authority in 2022.

**To:**    Allan Defante[Allan.Defante@jrgre.bm]; Joyce De Guzman Placedes[jdeguzmanplacedes@jrgre.bm]; Daniel Heinlein[Daniel.Heinlein@jrgre.bm]
**From:**    Sarah Doran[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=0ADF6F1CF21C42568310F131CD3A946F-DORAN, SARA]
**Sent:**    Thur 3/23/2023 1:54:07 PM (UTC)
**Subject:**    Re: Risk Register and Risk Mgt - JRG Re 2023

Yes, Joyce's suggestions seem very helpful and on point. Thank you very much for that perspective, Joyce.

292. Nor was Ms. Doran the only non-JRG Re employee of James River who was aware of this decision. On April 18, 2023, for instance, James River's risk officer, Erin Kline, inquired whether JRG Re had "completed [its] filing for the BMA" and asked for the finalized copies of JRG Re's Risk Register and Framework.

293. In response, Ms. Kline was informed that JRG Re's annual filing with the Bermuda Monetary Authority had not yet been filed as it remained subject to a meeting of JRG Re's board of directors later that week. Nevertheless, Ms. Kline was also informed of JRG Re's plan to "indicate[] that we use the [Risk Register] and [Framework] docs we filed in 2021 for 2022" rather than submitting a new Risk Register or Framework.

**From:** Allan Defante <Allan.Defante@jrgre.bm>
**Sent:** Tuesday, April 18, 2023 10:16 AM
**To:** Erin Kline <erin.kline@james-river-group.com>; Joyce De Guzman Placedes <jdeguzmanplacedes@jrgre.bm>
**Subject:** RE: Risk Register and Risk Mgt - JRG Re 2023

Erin,
This is not yet filed. BOD meeting is on Friday but we indicated that we use the RR and RMP docs we filed in 2021 for 2022 until we are clear on the strategy for the company, at which point we know the applicable material risks of the company.
Thanks!
**Allan Defante**
Direct: +1 441.278.4586
Mobile: +1 441.536.4586
Allan.Defante@jrgre.bm

**From:** Erin Kline <erin.kline@james-river-group.com>
**Sent:** Tuesday, April 18, 2023 10:14 AM
**To:** Joyce De Guzman Placedes <jdeguzmanplacedes@jrgre.bm>
**Cc:** Allan Defante <Allan.Defante@jrgre.bm>
**Subject:** RE: Risk Register and Risk Mgt - JRG Re 2023

Hi Joyce,
Have you completed your filing for the BMA? If so, do you mind sharing your final Risk Register and Gov. and Risk Management document?
Thanks!
Erin
**Erin Kline | Risk Officer**
**James River Group, Inc.**

294.    The James River risk officer subsequently approved of this approach and requested that she be provided a copy of the Risk Register and Framework that had been submitted in 2022 to ensure that James River had "the most up-to-date documentation used/filed."

295.    JRG Re provided the requested documents, noting that "The risk register, particularly, Sarah [Doran] has noted to be stale and needs updating" but reiterating that JRG Re had nevertheless "decided to hold off in updating" the documents due soon to the Bermuda Monetary Authority.

296.    Notwithstanding the decision not to submit accurate and updated documents to the Bermuda Monetary Authority as required under Bermuda law, in the spring of 2023 updated versions of those same documents were already available and circulated internally within James River.  Indeed, JRG Re also provided the risk officer with its own internal "latest versions following [its] preliminary updating" of the Risk Register and Framework, which would intentionally be withheld from the Bermuda Monetary Authority just days later.

| | |
|---|---|
| **To:** | Erin Kline[erin.kline@james-river-group.com] |
| **Cc:** | Allan Defante[Allan.Defante@jrgre.bm] |
| **From:** | Joyce De Guzman Placedes[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=D0C6BE1FD63C4A28BD91AA95A0D71680-C624B508-25] |
| **Sent:** | Tue 4/18/2023 8:03:52 PM (UTC) |
| **Subject:** | RE: Risk Register and Risk Mgt - JRG Re 2023 |

[17.1 Sched V - Risk Register.pdf](#)
[16.1 Sched V - Risk Management Programme.pdf](#)
[2022 - JRG Re Risk Register - DONT ATTACH.xlsx](#)
[JRG Re - Governance and Risk Management 2023 CLEAN - DONT ATTACH.docx](#)

Hi Erin,
Attached are the documents (in pdfs) submitted to the BMA last year as part of the 2021 year-end filing.
Sharing also the latest versions following our preliminary updating last month. The risk register, particularly, Sarah has noted to be stale and needs updating. With the points noted below, we have decided to hold off in updating.
Thank you.
Regards,
Joyce De Guzman Placedes
Controller
JRG Reinsurance Company Ltd.
Direct: +1 441.278.4584
jdeguzmanplacedes@jrgre.bm

From: Erin Kline <erin.kline@james-river-group.com>
Sent: Tuesday, April 18, 2023 3:40 PM
To: Joyce De Guzman Placedes <jdeguzmanplacedes@jrgre.bm>; Allan Defante <Allan.Defante@jrgre.bm>
Subject: RE: Risk Register and Risk Mgt - JRG Re 2023
Thanks for the additional color. Makes total sense.
Would you mind sending me the documents used for the 2021 filing? I'd like to just keep the most up-to-date documentation used/filed with our other ERM specific documents.
Thanks,
Erin
Erin Kline | Risk Officer
**James River Group, Inc.**

297.    Later that same week, on April 21, 2023, JRG Re's Board of Directors agreed that JRG Re's internal revised versions of the Register and Framework were "appropriate for the current business of" JRG Re, "fairly and accurately describe[d] the current business of" JRG Re, and were "approved, ratified and confirmed."

298.    Nevertheless, the Board agreed that the "appropriate," "fair[] and accurate[]" Risk Register and Framework would "not be circulated externally," *i.e.*, to the Bermuda Monetary Authority.

6.    **RISK REGISTER, GOVERNANCE FRAMEWORK AND INSURANCE CODE OF CONDUCT**

The Chairperson noted that in accordance with its Insurance Code of Conduct, the Company produced a register of the Company's risk (the "Risk Register") and established a governance and risk management framework (the "Governance Framework") to comply with the Insurance Code of Conduct requirements of Section 2BA of the Act. The Chairperson noted further that the Board has considered all of the various guidelines, manuals, policies, and procedures of the Risk Register and Governance Framework and has determined it is appropriate for the current business of the Company and will be re-evaluated once the updated business plan of the Company is determined. The Chairperson noted that the Risk Register and Governance Framework will not be circulated externally until such determination is made.

**RESOLVED** that the Risk Register and Governance Framework circulated to the Board fairly and accurately describes the current business of the Company.

**RESOLVED** that the control policies and procedures, corporate governance, and compliance functions of the Company, as set forth in the Risk Register and Governance Framework are appropriate considering the nature, scale, and complexity of the Company's current business; and

**RESOLVED** that all the guidelines, manuals, policies, and procedures set out in or attached to the Risk Register and Governance Framework are approved, ratified, and confirmed.

299.    JRG Re did not consult with legal counsel regarding the decision to withhold more accurate and updated versions of its Risk Register and Framework from the Bermuda Monetary Authority.

300.    JRG Re thereafter failed to provide the Bermuda Monetary Authority with its Risk Register and Framework in 2023, notwithstanding that the Framework and Register JRG Re had submitted to the regulator in 2022 were already false and misleading at that time but still had not been corrected.

301.    Accordingly, James River's representation in SPA § 2.13(a)(i) that JRG Re "has been in compliance in all material respects and has not been and currently is not in violation of any Laws" was false and misleading as of the November 8, 2023, signing of the Agreement in light of the misrepresentations it had made to the Bermuda Monetary Authority in 2022 and its failure to submit corrections to those misstatements via an accurate and updated Risk Register and Framework in 2023.

302.     In addition, James River's representation in SPA § 2.26 that it "ha[d] in place risk management . . . policies and procedures reasonably designed to protect against risks of the types reasonably expected to be incurred by Persons similarly situated" was also false and misleading as of the November 8, 2023, signing of the Agreement because it was not compliant with its own outdated Risk Register and Framework as submitted to the Bermuda Monetary Authority, and it had not subsequently put "in place risk management . . . policies and procedures" in light of the apparent disconnect between its written policies and its actual procedures.

303.     Likewise, James River's failure to operate JRG Re in compliance with its own Governance and Risk Management Framework breached its covenant in SPA § 4.1(x) to operate JRG Re, and cause JRG Re to operate, "in the ordinary course of business."  Plainly, it is not in the ordinary course for a company to operate in non-compliance with its own policies and procedures as submitted to its primary regulator, particularly where that same company has acknowledged that compliance "is a cultural imperative" and that "non-compliance can have material consequences" including "needless cost and increased risk."

304.     Nor are these mere technical foot-faults.  According to JRG Re's (outdated) Risk Register as filed with the Bermuda Monetary Authority in 2022, the impact of a potential reduction in JRG Re's value "as a result of litigation, regulatory actions, or political actions" was determined to be "H" (*i.e.*, "High") with possible repercussions for regulatory violations including "fines," "sanctions," and even the potential "revocation of [JRG Re's] license."

JRG Re
Risk Register

| Risk Number: | 3 | | Risk Category | Operational - Legal, reputational, Regulatory |
|---|---|---|---|---|

| Risk Owner: | President |
|---|---|

| Risk Event: | The company's value is reduced as a result of litigation, regulatory actions, or political actions. |
|---|---|

| Description of Risk Event: | Financial loss arising out of litigation, regulatory breaches and or political actions |
|---|---|

| Risk Components: | Loss of the Tax exempt status. |
|---|---|
| | Political changes, legal changes or socio-economic events in Bermuda hinder the achievement of business strategy or make operations in Bermuda impossible |
| | Loss or additional costs incurred as a result of change in legislation |
| | Non-compliance with regulatory requirements and/or legal requirements lead to losses/sanctions |
| | Potential fines and/or revocation of license for non-compliance with Bermuda regulations / international laws and regulations |
| | Potential fines and/or sanctions from regulators from failure to maintain required capital levels |
| | Ineffective planning / management of major regulatory initiatives adversely impacts business operations and compliance with requirements |
| | Poor communication adversely affects JRG Re's business relationship with the BMA |
| | The company suffers a Rating agency downgrade. |
| | Rating agencies don't upgrade the company following improvements in the companies financial strength or operational processes |
| | JRG Re is subject to a bad faith dispute or legal action or a law suit |
| | Employee HR complaint or legal action against the Company |

| Current Inherent Risk Levels: | Impact | Probability |
|---|---|---|
| | H | M |

305.    Ironically, one of the controls reported to the Bermuda Monetary Authority to protect against these risks was that James River's "Senior Executives have regular communications with executives at each of [its] Operating Units," including JRG Re, "to discuss developments and monitor performance."  And the individual "Control Owner" charged with ensuring compliance with company policies to protect against "regulatory breaches" was James River's chief financial officer, Sarah Doran.

| Communications with Hold Co executives | CFO of JRG | On a Group level, the James River Group Holdings, Ltd. Senior Executives have regular communications with executives at each of the Operating Units to discuss developments and monitor performance. |
|---|---|---|

306.    As discussed, Ms. Doran had nevertheless expressly approved of JRG Re breaching its obligations to provide updated and accurate information to the Bermuda Monetary Authority in 2023, and she was given the opportunity to review JRG Re's inaccurate 2022 filings before they were submitted to the regulator.

307.    Had she carefully reviewed JRG Re's Risk Register, she (and thus James River) would have been well aware that failing to provide the Bermuda Monetary Authority with updated and accurate information could have severe consequences for JRG Re.

E.    **James River Knew, or Was Reckless in Not Knowing, that Material Representations in the Agreement Were False at Closing.**

308.    James River knew, or was reckless in not knowing, that material representations in the Agreement were false when the Transaction closed on April 16, 2024, and, in some instances, as of the Agreement's signing on November 8, 2023.

309.    On March 13, 2024, in connection with state court litigation proceedings discussed further below, Frank D'Orazio nevertheless represented in a sworn statement that the "conditions to closing" required under the Agreement—which included the accuracy of James River's representations and warranties as of the closing date pursuant to SPA § 6.1(c)—"ha[d] been or [would] be satisfied at closing." *James River Group Holdings, Ltd. v. Fleming Intermediate Holdings LLC*, Index No. 651281/2024, NYSCEF Doc. No. 24 ¶ 9 (Sup. Ct. N.Y. Cnty. Mar. 13, 2024).

310.    Further, in connection with the closing on April 16, 2024, Mr. D'Orazio signed a "Closing Certificate" acting "solely in . . . his capacity as a duly authorized officer of the Seller," *i.e.*, James River, in which he represented that "Section 2.15(b) of the Agreement"—which specifies that "there has not been any event, occurrence or condition of any character that has had, or that would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect"—was "true and correct in all respects as of the date of the Agreement" and remained "true and correct as of the Closing Date as if made on the Closing Date."

311.    Mr. D'Orazio and James River also represented in the Closing Certificate that "[t]he other representations and warranties of the Seller [*i.e.*, James River] contained in Article II of the

Agreement were true and correct . . . as of the date of the Agreement" and remained "true and correct . . . as of the Closing Date as if made on the Closing Date . . . except where the failure of such representations and warranties to be so true and correct has not had or would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect."

312.    In particular, SPA § 2.4 represented and warranted that "The execution, delivery and performance by [James River] . . . of th[e] Agreement . . . and the consummation by [JRG Re] . . . of the transactions contemplated [t]hereby . . . require no filing . . . or notification to[] any Governmental Entity . . . or Governmental Approval" other than certain enumerated filings and approvals.

313.    Likewise, SPA § 2.13(a)(i) represented and warranted that JRG Re had "been in compliance in all material respects and has not and currently is not in violation of any Laws."

314.    Those representations were material because any reasonable investor considering the acquisition of a highly regulated company would view that company's compliance with governing law and regulations to be a significant factor in determining whether to proceed with such an acquisition.

315.    Indeed, JRG Re's Framework includes a discussion of JRG Re's "principal sources of Operational Risk," which expressly include the "risk of loss resulting from failure to comply with laws," including "[i]ntentional or unintentional violations of existing laws, regulations and/or ethical principles," as among the "principal" risks facing the company, while the Risk Register categorizes the potential impact of legal and regulatory issues as inherently high.

316.    But James River knew, or was reckless in not knowing, that the February 2024 payments made by JRG Re to James River were illegal under Bermudian law absent authorization from the Bermuda Monetary Authority, which authorization was never sought.  That is because

(i) JRG Re could not lawfully pay any dividend pursuant to Section 31B of the Insurance Act because it had not had any earnings or profits in several years and in fact had retained deficits in light of its financial losses since 2018, (ii) JRG Re could not lawfully pay a dividend of $90 million pursuant to Section 31B of the Insurance Act because that exceeded 25% of JRG Re's statutory capital, and (iii) JRG Re could not lawfully pay more than approximately $48 million to James River because Section 31C of the Insurance Act prohibited JRG Re from reducing its statutory capital of $323 million by more than 15%.

317.    Each of those facts would have been evident upon a review of JRG Re's finances, to which James River had access and about which James River made public disclosures in James River's own securities filings.

318.    Moreover, Sarah Doran personally knew, or was reckless in not knowing, that JRG Re's payments violated the Companies Act in that they resulted in JRG Re's inability to pay its liabilities as they became due, as reflected in Ms. Doran's correspondence concerning (i) the need for James River to refund part of the pre-closing payments that it had taken from JRG Re in order to allow pay JRG Re to pay its liabilities, (ii) her personal oversight of JRG Re's expenditures in order to manage its cashflow, and (iii) JRG Re's inability to post collateral as required under its reinsurance agreements.

319.    In addition, Ms. Doran personally knew, or was reckless in not knowing, that JRG Re violated Bermuda law by (i) submitting an inaccurate and outdated Risk Register and Framework to the Bermuda Monetary Authority in 2022 and (ii) failing to file an accurate and updated Risk Register or Framework with the Bermuda Monetary Authority in 2023, as reflected by Ms. Doran's correspondence concerning those same documents.

320.    SPA § 2.26 represented and warranted that JRG Re had "in place risk management . . . policies and procedures reasonably designed to protect against risks of the types reasonably expected to be incurred by Persons similarly situated."

321.    That representation was material because any reasonable investor considering the acquisition of a company would view that company's utilization of policies and procedures designed to protect against reasonably expected risks to be a significant factor in determining whether to proceed with such an acquisition.  Indeed, JRG Re's Governance and Risk Management Framework explained that "Compliance with policies, processes and procedures is a cultural imperative" because "Non-compliance can have material consequences, leading to needless cost and increased risk."

322.    Nevertheless, James River—and Ms. Doran, in particular—knew, or were reckless in not knowing, that JRG Re did not have "in place" appropriate "risk management . . . policies and procedures," as reflected by Ms. Doran's personal correspondence noting that JRG Re was not complying with its own false and outdated Risk Register or Framework, and as reflected by James River's withholding of Willis Towers Watson's reports from JRG Re's leadership notwithstanding the importance to JRG Re of the information contained in those reports.

323.    SPA § 2.15 represented and warranted that (a)  JRG Re had "conducted its business in the ordinary course," (b) there had not "been any event, occurrence or condition of any character" that had or would be expected to have a "Material Adverse Effect" which is further defined to include anything that would have "a material adverse effect on the assets, liabilities, financial condition, business or results of operations of JRG Re," and (c) neither James River nor JRG Re had breached SPA § 4.1.

324.    As denoted by the heading of SPA § 2.15, which is entitled "Absence of Changes," these representations were material because any reasonable investor considering the acquisition of a company would view it as critical that there were not significant changes to that company between the time at which they agreed to purchase the company and the time at which they actually did so.  In other words, a reasonable investor would consider the absence of changes to the company they were acquiring to be material because the absence of changes ensures that they got what they bargained for and what they paid for.

325.    James River—and Mr. D'Orazio and Ms. Doran in particular—knew, or were reckless in not knowing, that these representations were false as JRG Re was not operated in the ordinary course and SPA § 4.1 was breached in several respects, including because (i) Ms. Doran knew that JRG Re was not being operated in compliance with the Framework and Register that JRG Re submitted to the Bermuda Monetary Authority and that it had not properly submitted necessary annual regulatory filings; (ii) Mr. D'Orazio and Ms. Doran were members of James Rivers' Reserve Committee which failed to set aside reserves for JRG Re that were in-line with those deemed necessary by Willis Towers Watson as had been done historically, which constituted a change in JRG Re's actuarial, risk retention, risk management, reserving and/or accounting policies, practices and principles; (iii) Mr. D'Orazio and/or Ms. Doran had instructed that Willis Towers Watson's analysis be withheld from JRG Re's leadership notwithstanding that Mr. D'Orazio and Ms. Doran understood the consequences of such withholding and that such withholding was a deviation from the historic practices of James River and JRG Re; (iv) Ms. Doran instructed JRG Re to loan approximately $20 million to James River during December 2023, which loans were not extended in the ordinary course and were instead intended specifically to strip assets from JRG Re before the Transaction closed; (v) Mr. D'Orazio and Ms. Doran caused JRG Re to

make $139 million in payments to James River that were illegal under Bermuda law; and (vi) Mr. D'Orazio and Ms. Doran knew that JRG Re was not posting collateral to its cedents as required under the terms of its reinsurance agreements.

326.    James River—and Mr. D'Orazio and Ms. Doran in particular—knew, or were reckless in not knowing, that these issues would have a material adverse on the assets, financial condition, business and operations of JRG Re by causing it to violate Bermuda law, causing it to breach its material reinsurance agreements with  and leaving it unable to pay its liabilities as they came due.

327.    This is further made clear by Ms. Doran's personal correspondence regarding JRG Re's liquidity crisis in early 2024, resulting in James River refunding part of JRG Re's February 2024 payments back to JRG Re in April in order to pay JRG Re's claims and operating expenses, as well as Ms. Doran and Mr. D'Orazio's personal correspondence reflecting that the payments from JRG Re to James River triggered a $125 million liability from JRG Re to its reinsurance counterparties that JRG Re was unable to satisfy.  Indeed, James River's 2023 10-K filing with the SEC made clear that the payment from JRG Re to James River of "a $139 million dividend or return of capital or surplus" was "subject to the availability of unencumbered assets on the closing date," which could be impacted by a "number of factors . . . including collateral requirements of JRG Re's cedents."   That was an acknowledgement that JRG Re's pre-existing contractual obligations to its reinsurance counterparties, *i.e.*, "cedents," could result in JRG Re paying less than $139 million to James River.

328.    SPA § 2.17(c)(ii) provided that JRG Re was not "in default or breach in any material respect" under the terms of certain of its reinsurance agreements and that, to James River's knowledge, "no events or circumstances ha[d] occurred" that could result in "an event of default

thereunder or result in a termination thereof or would cause or permit the acceleration of or other changes of or to any right or obligation or the loss of any benefit" under such reinsurance agreements.

329.    Section 2.17(c)(ii) applies specifically to reinsurance agreements that were deemed by the parties to be "Material" under the terms of the Agreement in light of the scope of the parties' obligations thereunder.  Any reasonable investor would have considered such agreements to be material because they included only reinsurance agreements requiring reserves of more than $2 million, rendering them among JRG Re's largest and most important contractual relationships.[4]

330.    James River knew, or was reckless in not knowing, that the representation in SPA § 2.17(c)(ii) was false and misleading as of the date on which the Agreement was signed.

331.    In particular, JRG Re had several "Material Reinsurance Agreements" with the Cedent that obligated JRG Re to post collateral for the Cedent's benefit upon the occurrence of certain events.  Nevertheless, as of November 8, 2023, JRG Re had failed to do so and was in breach of each such Material Reinsurance Agreement with the Cedent.

332.    For instance, one of the Material Reinsurance Agreements was a June 1, 2015 quota share reinsurance agreement among certain of the Cedent's subsidiaries and JRG Re, which required JRG Re to "fund/obtain a security fund or letter of credit" in a specified amount "within two business days prior to the commencement of [each] calendar quarter."  That agreement further provided, however, that "each time that" JRG Re's "AM Best rating is at any time reduced" or

---

[4] Section 2.17(c)(ii) contains an exception for certain Material Reinsurance Agreements "as set forth in Section 2.17(c) of the Seller Disclosure Schedule," which, in turn, provided that JRG Re's earlier announcement of "the suspension of its underwriting activities on February 27, 2023 . . . may give rise to a termination or commutation right" under certain reinsurance agreements.  That carve-out is irrelevant for present purposes because Fleming's allegations do not relate to any rights triggered by the suspension of JRG Re's underwriting activities.

JRG Re's "capital and policyholder surplus reduces ten percent (10%) or more during any rolling twelve (12) month period," the amount of collateral required "shall increase by 25%." Similar, if not identical, language was found in other Material Reinsurance Agreements between JRG Re and the Cedent (and/or its subsidiaries).

333.    Put otherwise, these Material Reinsurance Agreements required JRG Re to have the requisite amount of collateral at the start of January, April, July and October, but they further specified that the requisite amount of collateral would increase by 25% if JRG Re's capital decreased by 10%.

334.    This collateral increase requirement was triggered at the end of 2022, at which time JRG Re's capital had decreased by 16%, from $447 million at year-end 2021 to $375 million at year-end 2022. As a result, JRG Re's Material Reinsurance Agreements with the Cedent (and/or its subsidiaries) required JRG Re to post an additional $55 million in collateral.

335.    James River was aware of this obligation under its Material Reinsurance Agreements, and it was further aware that this obligation had not been satisfied as of the signing of the Agreement on November 8, 2023. Indeed, it posted the requisite collateral two days after signing the Agreement but before closing the Transaction.

336.    As a result, $55 million of JRG Re's assets that were unencumbered as of November 8, 2023, were no longer available for any other purpose going forward. That was a material change in the company's finances between the signing of the Agreement on November 8, 2023, and the closing of the Transaction, as the unavailability of that $55 million significantly impaired JRG Re's ability to pay its other liabilities as they came due thereafter.

337.    In addition, James River—and Mr. D'Orazio and Ms. Doran in particular, as reflected by their personal correspondence—knew, or were reckless in not knowing, that AM

Best's December 2023 downgrade of its ratings for JRG Re and JRG Re's February 2024 payments to James River totaling $139 million triggered contractual obligations by JRG Re to post an additional $125 million in collateral that JRG Re could not afford because JRG Re did not have sufficient unencumbered assets to satisfy those contractual obligations. Accordingly, Mr. D'Orazio and Ms. Doran knew that JRG Re's payments to James River caused JRG Re to breach its material agreements prior to the Transaction closing, that JRG Re was further in default under those same material agreements in light of the December 2023 AM Best ratings downgrade, and that those breaches had not been cured as of the closing date.

338.    SPA § 2.24 provided that JRG Re's assets "as of the Closing" would "constitute all of the assets . . . necessary" to conduct the "business and operations of" JRG Re "immediately following the Closing Date in all material respects in substantially the same manner" as they were "being conducted as of" November 8, 2023, when the Agreement was signed.

339.    That representation was material because any reasonable investor considering the acquisition of a company would view it as critical that the company would be able to continue operating after the acquisition. Indeed, being able to continue operating a company post-acquisition is generally the very purpose for which companies are acquired.

340.    James River—including Mr. D'Orazio and Ms. Doran in particular, as reflected by their personal correspondence—knew, or were reckless in not knowing, that as of the closing JRG Re lacked the assets necessary to continue conducting its business and operations as they had been conducted in November 2023 because Mr. D'Orazio and Ms. Doran were each aware that James River's taking of $20 million of JRG Re's unencumbered assets in December 2023 and JRG Re's payments to James River totaling $139 million in February 2024 left JRG Re unable to continue operating immediately post-closing unless Fleming provided JRG Re with millions of dollars

necessary for JRG Re to pay its liabilities going forward, including as necessary to post $125 million in collateral as required under certain of JRG Re's reinsurance agreements in light of JRG Re's December 2023 ratings downgrade and February 2024 payments to James River.

## V.    JAMES RIVER PURPORTS TO SCHEDULE A MARCH 1 CLOSING NOTWITHSTANDING ITS FAILURE TO SATISFY CONDITIONS PRECEDENT.

### A.    Fleming Provided Notice to James River That Fleming Did Not Intend to Close Because of James River's Breaches of the Agreement.

341.    Section 1.3 of the Agreement required James River to provide an Estimated Closing Statement with certain updated information concerning JRG Re's finances not less than four business days prior to closing.

342.    Because James River sought to close the Transaction as soon as possible, it provided Fleming with purported Estimated Closing Statements on December 21, 2023 (in hopes of a possible year-end close), on January 29, 2024 (in hopes of closing in February), and on February 26, 2024 (in hopes of closing in March).

343.    These Estimated Closing Statements were incomplete and inaccurate but nevertheless revealed enough for Fleming to raise questions about what was going on at JRG Re. Throughout this period, Fleming began to press James River for information and demand that additional data be provided, much of which James River refused.

344.    With limited visibility into JRG Re's activities, on February 27, 2024, Fleming requested a "business-to-business" meeting in light of its concerns regarding JRG Re's apparent finances including, in particular, that JRG Re appeared to have deviated from its historic practice of setting aside reserves in line with Willis Towers Watson's recommendations and that JRG Re seemingly lacked adequate liquid assets to pay its liabilities as they came due because James River had stripped JRG Re of its assets.

345.    That business-to-business meeting did not happen because James River refused Fleming's request and instead informed Fleming that it did not intend to bring JRG Re's reserves in line with those required by Willis Towers Watson as had been done historically or to return any of the money it had wrongfully taken from JRG Re.

346.    Accordingly, on February 29, 2024, Fleming wrote to James River to provide notice that the Agreement had been breached while allowing James River an opportunity to cure.  As Fleming explained at the time, it "remain[ed] committed to pursuing the transaction on the terms and conditions set forth in the Agreement" and it "continue[d] to be ready and willing to proceed to Closing, subject in all cases to [James River's] satisfactory cure of [its] breaches."

347.    James River had 60 days from receipt of that notice letter to cure its breaches before Fleming could terminate the Agreement under § 7.1(d) of the Agreement, but James River made no attempt to do so.

B.    **The Side Letter Condition Precedent Remained Unsatisfied.**

348.    Setting aside James River's breaches of the Agreement, it remained the case as of late February that another express condition to closing had not been satisfied.

349.    As discussed earlier, and as reflected in Schedule 8.1(B)(2) to the Agreement, James River had offered Fleming "a right of first refusal" over certain insurance business from one of James River's affiliates pursuant to terms that were to be negotiated and finalized as part of a Side Letter that James River and Fleming were to execute before closing the Transaction.  That right of first refusal was worth many millions of dollars and constituted a material part of the consideration that Fleming expected to receive as part of the Transaction, which is why the Agreement made clear that the parties' obligations to close the Transaction were contingent on execution of a mutually acceptable Side Letter.

350.    Fleming and James River exchanged several proposed drafts of the Side Letter after the Agreement was signed in November 2023, during which time James River repeatedly insisted on provisions that would allow it to offer reinsurance to any third-party under different and more favorable terms than those offered to Fleming, but without providing Fleming an opportunity to accept those same terms that James River anticipated offering to others.

351.    As Fleming repeatedly explained, this would have vitiated the contemplated right-of-first-refusal, which is commonly understood as a "contractual right to meet the terms of a third-party's higher offer."  Black's Law Dictionary, *Right of First Refusal* (11th ed. 2019); *accord* Investopedia, "What is a Right of First Refusal (ROFR)?" ("a contractual right . . . to match an offer on an asset after other offers have been made").

352.    James River's insistence after entering into the Agreement that the Side Letter should allow it to offer parties other than Fleming superior terms that would never have been made available to Fleming was therefore a transparent bait-and-switch.

353.    In the early weeks of February 2024, the parties exchanged several rounds of comments on the Side Letter.  But on February 21, 2024, James River reversed any progress that the parties had seemingly made when it chose to re-send Fleming an earlier draft of the Side Letter that Fleming had already rejected as allowing James River to offer third-parties superior terms that would not have been made available to Fleming.  Accordingly, the parties remained at odds about the fundamental nature of the contemplated Side Letter and its promised right of first refusal.

354.    Following further discussions, James River provided a revised draft of the Side Letter to Fleming on February 29, 2024.  This draft largely adopted Fleming's view of the right of first refusal, but simultaneously also inserted different substantive changes.

355.    That same day Fleming made clear to James River that the newly proposed terms were unacceptable to Fleming.

356.    That evening, James River nevertheless purported to deliver a signature page for the Side Letter to Fleming, notwithstanding that James River knew full-well the parties had not yet reached agreement on the Side Letter's terms.  In particular, at the time James River sent its purported signature page it was already aware that Fleming had not accepted the new terms that James River had provided earlier that day.

357.    As of March 1, 2024, the parties had yet to finalize the Side Letter.  Accordingly, SPA § 6.1(d)'s closing condition remained unsatisfied on that date.

C.    **James River Schedules a March 1, 2024, Closing Meeting Notwithstanding Unsatisfied Conditions Precedent.**

358.    Early on the morning of March 1, 2024, James River sent a letter to Fleming "demand[ing] that Fleming proceed with Closing at 10am today, March 1st."

359.    James River then claims to have hosted a March 1, 2024, closing meeting that it knew Fleming would not attend because multiple conditions to closing were not satisfied, as Fleming had explained to James River by letter on February 29, 2024, just one day earlier.

360.    The purported March 1, 2024, closing meeting was a farce as it was inconsistent with the plain language of the Agreement, which only contemplated a closing once all conditions precedent had been satisfied or waived.

361.    As of March 1, 2024, that had not yet happened as closing conditions remained unsatisfied.  Setting aside whether James River had breached the Agreement (it had) and whether all representations and warranties made by James River in the Agreement were true as of March 1 (they were not), there was simply no final, executed Side Letter as required by SPA § 6.1(d).

362.    Standing alone, the indisputable absence of an agreed-upon and executed Side Letter as of March 1, 2024, precluded closing on that date.

## VI.    JAMES RIVER OBTAINS A PRELIMINARY INJUNCTION REQUIRING THE TRANSACTION TO CLOSE.

363.    Rather than making any good-faith effort to finalize the Side Letter or to cure its breaches in order to work toward an April 1, 2024, closing—which would still have been well within the "Outside Date" of June 3, 2024, for closing the Transaction pursuant to the Agreement—James River commenced litigation against Fleming in the Supreme Court of the State of New York on March 11, 2024, asserting a single cause of action for breach of the Agreement predicated on Fleming's purported failure to close on March 1, 2024.  *See James River Group Holdings, Ltd. v. Fleming Intermediate Holdings LLC*, Index No. 651281/2024 (Sup. Ct. N.Y. Cnty.).

364.    On March 13, 2024, James River moved for a mandatory preliminary injunction in that state court litigation to compel Fleming to close on the Transaction.

365.    At oral argument on its motion for a preliminary injunction on March 27, 2024, James River acknowledged that the parties still had not finalized the Side Letter required by the Agreement but nevertheless represented to the court that the parties "could negotiate the side letter in a matter of hours" because the remaining issues required only "the kind of revisions that typically get worked out" even as it admitted "we haven't signed it so far." *James River Group Holdings, Ltd. v. Fleming Intermediate Holdings LLC*, Index No. 651281/2024, NYSCEF Doc. No. 141, at 13:13-16, 16:11-13, 17:11-13 (Sup. Ct. N.Y. Cnty. Mar. 27, 2024) (hearing transcript).

366.    James River's preliminary injunction motion was granted on April 6, 2024, with the court stating in a footnote that it was "unnecessary for the court to address Fleming's side letter objection" because James River had expressed "its willingness to execute Fleming's side letter

with no modifications." No citation was provided for that proposition as the transcript—in which James River expressly acknowledged that further negotiations were still necessary—had not yet been finalized and made available to the parties or the Court. *James River Group Holdings, Ltd. v. Fleming Intermediate Holdings LLC*, Index No. 651281/2024, NYSCEF Doc. No. 1110, at n.4 (Sup. Ct. N.Y. Cnty. Mar. 27, 2024).

367.    The preliminary injunction compelled Fleming to close the Transaction within ten days, *i.e.*, by April 16, 2024.

368.    Fleming immediately noticed an appeal of the preliminary injunction but it was unable to obtain an interim stay of that order.

369.    James River delivered the final, signed Side Letter on April 15, 2024, and, as compelled by the state court order, Fleming closed on its acquisition of JRG Re on April 16, 2024.

370.    In doing so, Fleming was compelled to rely on the representations made by James River in the Agreement, which, pursuant to SPA § 6.1(c)(ii), were to be true "as of the date of th[e] Agreement and as of the Closing Date as if made on the Closing Date."

371.    Fleming was further compelled to rely on the representation made by Frank D'Orazio in his sworn statement to the state court that the "conditions to closing" required under the Agreement—which included the accuracy of James River's representations and warranties as of the closing date pursuant to SPA § 6.1(c)—"ha[d] been or [would] be satisfied at closing." *James River Group Holdings, Ltd. v. Fleming Intermediate Holdings LLC*, Index No. 651281/2024, NYSCEF Doc. No. 24 ¶ 9 (Sup. Ct. N.Y. Cnty. Mar. 13, 2024).

372.    Fleming was also compelled to rely on the representations made by Frank D'Orazio in the Closing Certificate on April 16, 2024, that James River's representations and warranties remained "true and correct . . . as of the Closing Date as if made on the Closing Date."

373. On April 18, 2024, the First Department of the Appellate Division denied Fleming's request for a stay of the preliminary injunction decision pending appeal. The stay application was moot at that point, however, as the Transaction had already closed two days earlier.

## VII. FLEMING SEEKS DISMISSAL OF THE STATE COURT LITIGATION AND COMMENCES AN INVESTIGATION OF JAMES RIVER'S MISCONDUCT.

374. On April 19, 2024, Fleming moved to dismiss James River's complaint on several grounds, including that it failed to state a claim that Fleming had breached the Agreement by refusing to close on March 1, 2024, because there was no allegation that all conditions precedent had been satisfied as of that date. In particular, Fleming explained that an express condition precedent to closing—namely, the execution of an agreed-upon Side Letter—had not been satisfied as of March 1, 2024. James River did not (and could not) allege otherwise.

375. Rather than oppose Fleming's motion, James River filed an amended complaint in the state court action on May 9, 2024, in which it again asserts a single cause of action for breach of contract predicated on Fleming not closing the Transaction on March 1, 2024.

376. On June 6, 2024, Fleming once again moved to dismiss, arguing, *inter alia*, that it had no obligation to close on March 1, 2024, because James River still did not (and could not) allege that the Side Letter condition precedent had been satisfied as of March 1, 2024.

377. As of the filing of this complaint, Fleming's motion to dismiss remains pending and discovery has not yet commenced in the state court action.

378. In the meantime, Fleming commenced an investigation of James River's misconduct. That investigation has included interviews of JRG Re's executives and review of JRG Re's records, both of which became available to Fleming only upon its April 16, 2024, acquisition of JRG Re from James River.

379.    On May 31, 2024, Fleming provided James River written notice that Fleming believes that James River breached myriad provisions of the SPA and expressly reserved its rights in connection therewith.

## VIII.    JAMES RIVER'S CONDUCT HAS DAMAGED FLEMING.

380.    James River's conduct has injured Fleming in many ways because the version of JRG Re that Fleming was forced to acquire is not the version of JRG Re that Fleming had agreed to acquire.

381.    James River's misrepresentations and breaches of the Agreement's operating covenants fundamentally altered the economics of the Transaction to which the parties agreed, forcing Fleming to overpay by tens of millions of dollars as compared to the deal contemplated by the Agreement.

382.    Indeed, defrauding Fleming into overpaying by tens of millions of dollars for JRG Re was the very purpose of James River's myriad misrepresentations.

383.    Fleming was further harmed by the need to provide millions of dollars to JRG Re shortly after closing the Transaction if it hoped to keep JRG Re from falling apart at the seams and going out of business altogether.  Fleming's post-closing capital contributions to JRG Re would not have been necessary but for James River's pre-closing misrepresentations and misconduct, including, but not limited to, hiding JRG Re's defaults under material contracts and that it had operated JRG Re in material non-compliance with Bermuda law, improperly stripping JRG Re of its liquid assets and causing JRG Re to be unable to pay its liabilities as they come due without post-closing financial support from Fleming.

384.    Aside from the reduced economic value of the Transaction, James River put Fleming and JRG Re in their regulators' crosshairs.  Fleming did not bargain to acquire a company that had repeatedly violated Bermudian law, which had received an opinion from its loss reserve

specialist at Willis Towers Watson formally documenting that its reserves were deficient in light of unauthorized pre-closing changes to its risk management and reserving practices, and which was in flagrant violation of Bermudian law both when the Agreement was entered into on November 8, 2023 and at the time of the closing on April 16, 2024. No reasonable investor considering investing in a highly regulated entity would have done so.

## IX.    JAMES RIVER FRUSTRATES THE POST-CLOSING PURCHASE PRICE TRUE-UP PROCESS AFTER THIS LITIGATION COMMENCED.

385.    Section 1.2 of the Agreement provided that the $138 million to be paid by Fleming to James River would, at closing, be "adjusted in accordance with Section 1.3" of the Agreement, and it would further "be subject to adjustment after the Closing as set forth in Section 1.4" of the Agreement, which proscribes a process for a "Post-Closing Purchase Price True-Up" to adjust the actual consideration that James River retains in light of changes to JRG Re's net-worth between the signing of the Agreement in November 2023 and the eventual closing date.

386.    Section 1.3 of the Agreement provided that "prior to the anticipated Closing" James River was to prepare and deliver to Fleming an "Estimated Closing Statement," which was to be "accompanied by reasonable information and detail to support the calculation of the amounts set forth thereon," and based upon which the actual amount paid by Fleming to James River at closing would be set.

387.    James River provided an Estimated Closing Statement to Fleming on April 10, 2024, pursuant to which Fleming paid $152.4 million to James River when the Transaction closed on April 16, 2024.

388.    Section 1.4(a) of the Agreement provided that Fleming was to prepare and deliver to James River "[n]o later than ninety (90) days following the Closing Date" a "Closing Statement" consisting of (i) "an unaudited balance sheet" for JRG Re "as of immediately prior to the Closing,"

(ii) "a calculation of the amount of [JRG Re's] Adjusted Net Worth as of immediately prior to the Closing, but after giving effect to" certain events, and (iii) "a calculation of the Closing Purchase Price" pursuant to a formula set forth in SPA § 1.3.

389.    Fleming provided the requisite Closing Statement to James River on May 30, 2024. Pursuant to the formula set forth in SPA § 1.3, the Closing Statement included a Closing Purchase Price of $86.9 million, reflecting a purchase price adjustment of $65.5 million in Fleming's favor as compared to the $152.4 million that Fleming paid to James River on April 16, 2024.

390.    In other words, separate and apart from James River's fraud and its breaches of the Agreement, Fleming calculated that it had overpaid JRG Re by approximately $65 million and that such funds were due to be returned to it by James River under the plain terms of the SPA.

391.    Section 1.4(b) of the Agreement provided that James River would thereafter "have forty-five (45) days . . . to review the Closing Statement" and, if it disagreed, to provide "written notice of its disagreement with the Closing Statement (such written notice, a 'Notice of Disagreement')" to Fleming, with its Notice of Disagreement to "specify in reasonable detail the nature of any disagreement so asserted."

392.    James River provided a Notice of Disagreement to Fleming on July 14, 2024. Therein, James River disputed seven items set forth in the Closing Statement and calculated a Closing Purchase Price of $141 million, as compared to the $152.4 million that Fleming actually paid to James River and as compared to the $86.9 million that Fleming calculated as the correct amount that it should have paid to James River.

393.    Section 1.4(c) of the Agreement provided for a fifteen-day "Resolution Period" following James River's delivery of its Notice of Disagreement, during which time James River and Fleming "shall seek in good faith to resolve in writing any differences that they may have with

respect to the matters specified in the Notice of Disagreement" and "shall cooperate in good faith . . . to arrive at a final determination of" the purchase price.

394.    Section 1.4(c) further provided, in relevant part, that during the Resolution Period "each party shall use its reasonable best efforts to provide to the other party all information and reasonable access to employees as such other party shall reasonably request in connection with review of the Closing Statement or the Notice of Disagreement, as the case may be, including all work papers of the accountants who audited, compiled or reviewed such . . . notice[]."

395.    More broadly, the Agreement also provides for broader informational rights that are not specifically tied to the Resolution Period.  Specifically, SPA § 4.5(b) provides, in relevant part, that "[f]rom and after the Closing until the sixth (6th) anniversary of the Closing, each party [t]hereto shall promptly afford the other party . . . reasonable access, during normal business hours and upon reasonable prior notice, to books, records and information related to [JRG Re] and the Business[5] in its possession . . . and employees . . . related to [JRG Re] and the Business, in each case, to the extent necessary or useful for such requesting party . . . in connection with any audit, investigation, dispute or Action."

396.    On July 18, 2024, as expressly contemplated by SPA § 1.4(c), Fleming wrote to James River requesting certain information and a meeting with a James River employee as necessary to understand James River's Notice of Disagreement (the "July 18 Letter").

397.    In particular, the single largest disputed item in James River's Notice of Disagreement is that James River believed JRG Re's reserves should have been calculated as $416 million while Fleming believed that JRG Re's reserves should have been calculated as $454

---

[5] "Business" is separately defined in SPA § 8.1(b) to "mean[] the business and operations of the Company," *i.e.*, JRG Re.

million. This single item reflected a possible adjustment to the purchase price of up to $38 million, which is approximately one-quarter of the entire $152 million that Fleming paid to James River at closing.

398. As discussed above, JRG Re's reserves were determined by James River's Reserve Committee, which was comprised of James River's (i) chief executive officer, (ii) chief financial officer, (iii) chief accounting officer, and (iv) chief actuary. Although the Reserve Committee ordinarily consulted with JRG Re's leadership, no JRG Re employees were members of the Reserve Committee. Accordingly, JRG Re employees did not have access to all of the Reserve Committee's materials relating to the determination of JRG Re's reserves, nor records of the Reserve Committee's deliberations.

399. James River's Reserve Committee relied on the actuarial analysis of Seema Wadwha, a James River employee holding the title of "segment actuary," when determining JRG Re's reserves. Because Ms. Wadwha is a James River employee, JRG Re also lacked access to Ms. Wadwha's analysis and work-product beyond any materials that were specifically shared with JRG Re employees.

400. Given the parties' $38 million disagreement as to the proper calculation of JRG Re's reserves for purposes of determining the Closing Purchase Price, Fleming in its July 18 Letter "reasonably requested in connection with [its] review of . . . the Notice of Disagreement" that James River provide (i) minutes of James River's Reserve Committee meetings, (ii) materials distributed to James River's Reserve Committee relating to JRG Re, (iii) materials relating to an adjustment James River's Reserve Committee made to JRG Re's reserve in response to analysis by Ernst & Young demonstrating that JRG Re's reserves were deficient, (iv) James River's

actuarial analysis relating to the setting of JRG Re's reserves, and (v) two "rollforwards" of JRG Re's reserves from prior balance sheets to the closing date balance sheet.[6]

401.    Pursuant to SPA § 1.4(c)'s provision for "access to employees," Fleming's July 18 Letter further requested a meeting "between Fleming's business professionals and the actuary who prepared James River's . . . actuarial reports."

402.    Each of these requests was made in order to ensure that Fleming fully understood James River's analysis and calculation of JRG Re's reserves, as necessary for Fleming to "seek in good faith to resolve . . . any differences" between the parties, as required by SPA § 1.4(c), concerning the $38 million discrepancy in the parties' approach to JRG Re's reserves.

403.    The second largest disputed item in the Notice of Disagreement is a $5.8 million adjustment to the purchase price based on James River's "capital contribution of $5,800,000 to [JRG Re] prior to Closing," which James River asserts was "necessary for [JRG Re's] normal business operations."

404.    As discussed previously, this capital contribution by James River violated SPA § 4.1(h)(B)'s prohibition against James River making "any . . . capital contributions to, or investments in, any other Person" and was necessary only because James River had earlier impermissibly looted JRG Re's assets and left JRG Re on the brink of insolvency. Accordingly, Fleming's July 18 Letter requested an "equity 'rollforward'" in order to ascertain and understand how James River accounted for these transactions.

---

[6] In accounting terminology, a "roll-forward" is a record of activity in an account between two dates, which allows the recipient to understand how the amounts in question have changed during the pertinent period.

405.    In addition, the Notice of Disagreement also included an approximately $2.7 million disputed item relating to JRG Re's reinsurance recoverables, which refer to the portion of an insurance company's losses from claims which it can recover from reinsurance companies.

406.    Accordingly, Fleming's July 18 Letter requested two "rollforwards" of JRG Re's reinsurance recoverables reflecting different periods of time in order to ensure that Fleming fully understood the basis for the parties' $2.7 million disagreement regarding this disputed item.

407.    Finally, the Notice of Disagreement included an approximately $500,000 disputed item relating to three specific pre-closing expenditures because "Seller [*i.e.*, James River] had been paying certain expenses of the Company," *i.e.*, JRG Re, in connection with which James River further claimed that it had "prepaid certain annual fees—ultimately for the benefit of the Buyer," *i.e.*, Fleming.

408.    Fleming has no ability to verify those purported expenditures because James River claims that they were incurred by James River rather than JRG Re, and thus proof of these expenses would not be found among JRG Re's business records.  Accordingly, Fleming's July 18 Letter requested "any contracts, invoices, and/or proofs of payment" associated with these specific items.

409.    Because the SPA provided for a Resolution Period of only fifteen days, and because these materials were not expected to be burdensome to compile, Fleming asked that these records be provided by July 19.  That timeline would have provided the parties with ten days to attempt in good faith to resolve their differences.

410.    Rather than produce any of the requested information, or even promptly declining to do so, James River waited five days—*i.e.*, allowing fully one-third of the entire Resolution Period to pass—before responding to Fleming's July 18 Letter, and then refusing to provide any of the requested information.

411.    Specifically, on July 23, 2024, James River wrote to Fleming that all of the requests in Fleming's July 18 Letter were "not 'reasonable'" because (i) James River had already "provided substantial information to Fleming in connection with the Estimated Closing Statement as required under Section 1.3 of the SPA," (ii) "Fleming has had full access to the books and records of JRG Re" since the closing, (iii) Fleming had requested information "without [making] any counterproposal" to James River's Notice of Disagreement or providing "an explanation of which Disputed items Fleming believes can be resolved" during the contractually mandated Resolution Period, and (iv) James River did "not anticipate discussions" with Fleming during the Resolution Period "being fruitful."

412.    Each of James River's arguments were baseless, but they were nevertheless revealing.

413.    *First*, James River had previously provided information in connection with its Estimated Closing Statement because, as James River acknowledged, it was "required" to do so under SPA § 1.3. But SPA § 1.4 plainly provides for additional information to be provided during the Resolution Period in connection with James River's Notice of Disagreement. James River's position that it had earlier satisfied its obligations under SPA § 1.3 does not satisfy its separate obligations arising under SPA § 1.4 and its argument suggests that it simply prefers to read SPA § 1.4's information-sharing obligations out of the Agreement rather than comply with them.

414.    *Second*, James River's reference to JRG Re's books and records was a *non-sequitur* because JRG Re's records do not contain the information sought by Fleming. Fleming requested information from James River precisely because Fleming does not already have it.

415.    *Third*, James River's complaint that Fleming had not made a counterproposal put the cart before the horse. The entire purpose of Fleming's request for information was to allow

Fleming to understand the bases for James River's Notice of Disagreement and the discrepancy in the parties' calculations. Receipt of the information requested was a necessary predicate for determining whether there was a way to bridge the gap between the parties. Fleming was in no position to do so without the requested information.

416. *Fourth*, that James River did "not anticipate discussions being fruitful" was simply an admission that James River had no intention of "seek[ing] in good faith to resolve . . . any differences that [the parties] may have with respect to the matters specified in the Notice of Disagreement" or of "cooperat[ing] in good faith . . . to arrive at a final determination" of the appropriate purchase price as required under SPA § 1.4(c). Indeed, James River underscored its intent *not* to seek an amicable resolution by reemphasizing that it "believes that the positions set forth in its Notice of Disagreement are reasonable and . . . has not become aware of any new or different information that would alter its positions set forth therein." But James River's bad-faith determination to frustrate the very purpose of the Resolution Period does not render Fleming's information requests unreasonable, nor relieve James River of its obligation under SPA § 1.4(c) to "use its reasonable best efforts" to provide the information requested in the July 18 Letter.

417. Given these issues, on July 23, 2024, Fleming responded to James River's letter of that same date, again requesting that James River honor its obligations under SPA § 1.4(c) by providing the information requested in its July 18 Letter.

418. James River has not responded as of the filing of this supplemental complaint, notwithstanding that July 29, 2024, is the final day of the Resolution Period under the Agreement.

419. By refusing to provide the information requested or to engage in good-faith efforts to resolve the parties' disputes, James River has violated its obligations under SPA § 1.4(c),

attempting to run out the clock while entirely frustrating the Resolution Period contemplated thereby.

420.    In addition, refusing to provide the information requested also violated James River's obligations under SPA § 4.5(b).

421.    Moreover, the impact of James River stonewalling Fleming's requests for information extends beyond the Resolution Period because Fleming needs that same information for the alternative dispute resolution process to which the parties agreed to submit any remaining disputes concerning the purchase price at the end of the Resolution Period.

422.    Section 1.4(d) of the Agreement provides that if any items remain in dispute at the end of the Resolution Period, then the parties "shall prepare separate written reports of such unresolved item or items and deliver such reports to [an] Independent Accounting Firm," whose determination of the disputed issues is to be "based on . . . such reports submitted by the [parties] and the basis for [their] respective positions."  Moreover, the Independent Accounting Firm's determinations "shall be final, binding and conclusive for all purposes of determining the Purchase Price and shall be an expert determination under applicable Law governing expert determinations and appraisal proceedings," meaning that such determinations are effectively unappealable except on exceptionally narrow grounds.

423.    Fleming needs the information requested in its July 18 Letter in order to meaningfully engage in SPA § 1.4(d)'s alternative dispute resolution process because it cannot adequately address and rebut James River's Notice of Disagreement in its submissions to the Independent Accounting Firm if it does not understand the reasoning, analysis, and facts behind the items disputed by James River.

424.    Moreover, Fleming will be irreparably harmed if it is forced to move forward with an unappealable alternative dispute resolution process absent information necessary to meaningfully engage in that process and to which it is contractually entitled under SPA § 1.4(c).

425.    Indeed, the parties expressly "acknowledge[d] and agree[d]" in SPA § 8.4 that "the breach of th[e] Agreement may cause irreparable damage" to the non-breaching party, which "will not have an adequate remedy at law."  Accordingly, the Agreement goes on to provide that "the parties shall be entitled to seek an injunction . . . to prevent breaches of th[e] Agreement and to enforce specifically the terms and provisions of th[e] Agreement and the obligations of the parties hereunder," in which circumstance "no party shall allege, and each party hereby waives the defense or counterclaim, that there is an adequate remedy at law."  James River has thus waived its right to argue that its breach of SPA § 1.4 will not cause irreparable harm to Fleming.

426.    A mandatory preliminary injunction is therefore necessary to compel James River to provide the information reasonably requested in Fleming's July 18 Letter in order to ensure that Fleming is not permanently prejudiced by James River's breaches and frustration of the parties' agreed-upon Post-Closing Purchase Price True-Up process in support of James River's wrongful attempt to inflate the purchase price by tens of millions of dollars.

## CAUSES OF ACTION

## COUNT I

**Securities Fraud Against James River**
**Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

~~385~~427.    Fleming incorporates by reference each and every allegation contained in paragraphs 1 through ~~384~~426 as if set forth fully herein.

~~386~~428.    James River, in connection with the purchase or sale of securities (namely, its sale of JRG Re's shares via the Agreement), by the use of means or instrumentalities of

interstate commerce, directly or indirectly (a) used or employed devices, schemes, or artifices to defraud; (b) made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon Fleming, in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

387429.    Article II of the Agreement contains a series of material representations and warranties by James River, which it represented were true as of the date on which the Agreement was signed as well as on the date on which the Transaction closed.

388430.    Furthermore, on March 13, 2024, Frank D'Orazio represented in a sworn statement that the "conditions to closing" required under the Agreement "ha[d] been or [would] be satisfied at closing."   Because that representation incorporated by reference the closing conditions in SPA § 6.1(c), Mr. D'Orazio was affirmatively stating and reiterating that James River's representations and warranties would be "true and correct . . . as of the Closing Date as if made on the Closing Date."

389431.    In addition, in connection with the closing on April 16, 2024, Mr. D'Orazio signed a "Closing Certificate" acting "solely in . . . his capacity as a duly authorized officer of the Seller," *i.e.*, James River, in which he represented that "Section 2.15(b) of the Agreement"—which specifies that "there has not been any event, occurrence or condition of any character that has had, or that would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect"—was "true and correct in all respects as of the date of the Agreement" and remained "true and correct as of the Closing Date as if made on the Closing Date."

~~390~~432.        Mr. D'Orazio and James River also represented in the Closing Certificate that "[t]he other representations and warranties of the Seller [*i.e.*, James River] contained in Article II of the Agreement were true and correct . . . as of the date of the Agreement" and remained "true and correct . . . as of the Closing Date as if made on the Closing Date . . . except where the failure of such representations and warranties to be so true and correct has not had or would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect."

~~391~~433.        James River made those representations with the intent and understanding that Fleming would rely on them when closing the Transaction and acquiring the shares of JRG Re.

~~392~~434.        Fleming reasonably relied on the representations and warranties provided by James River in closing the Transaction and acquiring the shares of JRG Re.

~~393~~435.        James River nevertheless knew, or was reckless in not knowing, that certain of those material representations and warranties on which Fleming relied in closing the Transaction and acquiring the shares of JRG Re were either affirmative misrepresentations or were materially misleading in light of information of which James River was aware but failed to disclose to Fleming.

~~394~~436.        Section 2.4 of the Agreement contained a representation by James River to Fleming stating, in relevant part, that "The execution, delivery and performance by the Seller [*i.e.*, James River] . . . of th[e] Agreement . . . and the consummation by the Company [*i.e.*, JRG Re] . . . of the transactions contemplated [t]hereby . . . require no filing . . . or notification to[] any Governmental Entity . . . or Governmental Approval" other than certain enumerated filings and approvals.

~~395~~437.     James River nevertheless knew, or was reckless it not knowing, that a payment from JRG Re to James River of more than $48 million would have required approval by the Bermuda Monetary Authority pursuant to Bermuda's Insurance Act 1978, which approval was not sought.

~~396~~438.     Section 2.13(a)(i) of the Agreement contained a representation by James River to Fleming stating, in relevant part, that "the Company [*i.e.*, JRG Re] has been in compliance in all material respects and has not been and currently is not in violation of any Laws . . . applicable to it or its assets, properties or businesses."

~~397~~439.     James River nevertheless knew, or was reckless in not knowing, that, in violation of Bermuda law, JRG Re's "Governance and Risk Management" Framework and Risk Register was outdated and inaccurate when submitted by JRG Re to its primary regulator, the Bermuda Monetary Authority, in April 2022.

~~398~~440.     James River also knew, or was reckless in not knowing, that JRG Re violated Bermuda law by refusing to submit an accurate and updated version of its Governance and Risk Management Framework and Risk Register to the Bermuda Monetary Authority in April 2023.

~~399~~441.     James River further knew, or was reckless in not knowing, that JRG Re's payments to James River in February 2024 totaling $139 million had violated Bermuda's Insurance Act and Companies Act.

~~400~~442.     Section 2.15 of the Agreement contained a representation by James River to Fleming stating, in relevant part, that, "Except as . . . expressly contemplated or required by th[e] Agreement . . . (a) the Company [*i.e.*, JRG Re] has conducted its business in the ordinary course, (b) there has not been any event, occurrence or condition of any character that has had, or

that would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect and (c) neither the Seller [*i.e.*, James River] nor the Company [*i.e.*, JRG Re] has taken any action or failed to take any action that . . . would constitute a breach of Section 4.1" of the Agreement.

401443.      James River nevertheless knew, or was reckless in not knowing, that James River breached § 4.1 of the Agreement, including by failing to operate JRG Re in the ordinary course as required by Section 4.1(x), which § 8.1(a)(xv) of the Agreement further defines to mean "the ordinary course of business of [JRG Re] consistent with past practice," as further set forth below.

402444.      James River further knew, or was reckless in not knowing, that JRG Re's payments to James River in February 2024 totaling $139 million were not made in the ordinary course and were not "expressly contemplated or required by th[e] Agreement" as such payments breached § 4.12 of the Agreement, as further set forth below.

403445.      James River also knew, or was reckless in not knowing, that its breaches of §§ 4.1 and 4.12 of the Agreement, as further set forth below, had, or would reasonably be expected to have, a Material Adverse Effect, which is defined in relevant part to include "a material adverse effect on the assets, liabilities, financial condition, business or results of operations of the Company [*i.e.*, JRG Re], taken as a whole."

404446.      Section 2.17(c)(ii) of the Agreement contained a representation by James River to Fleming stating, in relevant part, that "neither the Company [*i.e.*, JRG Re] nor . . . any other party" to certain reinsurance agreements was "in default or breach in any material respect under the terms [there]of" and that, "to the Knowledge of the Seller [*i.e.*, James River], no event or circumstances ha[d] occurred that, with notice or lapse of time or both, would constitute an

event of default thereunder or result in a termination thereof or would cause or permit the acceleration of or other changes of or to any right or obligation or the loss of any benefit thereunder."

~~405~~447.    James River nevertheless knew, or was reckless in not knowing, that JRG Re was in breach of its reinsurance agreements with the Cedent as of the signing of the Agreement on November 8, 2023, because it had not posted $55 million in collateral that it was obligated to post as a result of its 16% decline in capital as of year-end 2022.

~~406~~448.    In addition, James River knew, or was reckless in not knowing, that JRG Re's December 2023 ratings downgrade and February 2024 payments to James River totaling $139 million triggered its obligation to post $125 million in collateral pursuant to its reinsurance agreements with the Cedent, which obligation JRG Re could not satisfy because it lacked adequate assets to post $125 million in collateral.  Accordingly, James River knew, or was reckless in not knowing, that it was in default or breach in a material respect under the terms of its material reinsurance agreements with the Cedent.

~~407~~449.    Section 2.24 of the Agreement contained a representation by James River to Fleming stating, in relevant part, that "The assets . . . of the Company [*i.e.*, JRG Re] . . . as of the Closing . . . . constitute all of the assets . . . that are necessary to conduct the Business immediately following the Closing Date in all material respects in substantially the same manner as the Business is being conducted as of the date" of the Agreement.

~~408~~450.    James River nevertheless knew, or was reckless in not knowing, that JRG Re's assets were inadequate because it lacked sufficient unencumbered assets to pay its liabilities as they came due and JRG Re would instead require an immediate post-closing capital contribution by Fleming.

409451.      Section 2.26 of the Agreement contained a representation by James River to Fleming stating, in relevant part, that "The Company [*i.e.*, JRG Re] has in place risk management . . . policies and procedures reasonably designed to protect against risks of the types reasonably expected to be incurred by Persons similarly situated."

410452.      James River nevertheless knew, or was reckless in not knowing, that JRG Re did not have appropriate risk management policies and procedures "in place" as necessary to protect against such risks because JRG Re had long been non-compliant with its Governance and Risk Management Framework and Risk Register submitted by JRG Re to its primary regulator, the Bermuda Monetary Authority.

411453.      While engaged in the conduct described above, James River acted knowingly or recklessly for the purpose of inducing Fleming to purchase the shares of JRG Re from James River.

412454.      Fleming has suffered damages in that, in reasonable reliance on James River's actions, statements and omissions, Fleming paid an artificially inflated price in its acquisition of the shares of JRG Re.  Fleming would not have purchased the shares of JRG Re at the price it paid, or at all, had it known the truth concealed from it by James River.

413455.      As a direct and proximate result of James River's wrongful conduct, Fleming suffered damages, including in connection with its purchase of the shares of JRG Re, in an amount to be determined at trial.

## COUNT II

**Control Person Liability Against Frank D'Orazio and Sarah Doran**
**Violation of § 20(a) of the Exchange Act**

~~414~~456.     Fleming incorporates by reference each and every allegation contained in paragraphs 1 through ~~413~~455 as if set forth fully herein.

~~415~~457.     D'Orazio and Doran acted as controlling persons of James River within the meaning of § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), as alleged herein. By reason of their positions as senior executives of James River, and as the direct supervisors of the chief executive officer and chief financial officer of JRG Re, respectively, they had the power and authority to cause James River to engage in the wrongful conduct complained of herein.

~~416~~458.     By reason of such conduct as complained of herein, D'Orazio and Doran are liable pursuant to § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).

~~417~~459.     By reason of the conduct of Mr. D'Orazio and Ms. Doran described above, Defendants, in connection with the purchase or sale of securities (namely, James River's sale of JRG Re's shares via the Agreement), by the use of means or instrumentalities of interstate commerce, directly or indirectly (a) used or employed devices, schemes, or artifices to defraud; (b) made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon Fleming, in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

~~418~~460.     As a direct and proximate result of Mr. D'Orazio's and Ms. Doran's wrongful conduct, Fleming suffered damages, including in connection with its purchase of the shares of JRG Re, in an amount to be determined at trial.

## COUNT III

**Common Law Fraud Against James River
False Representations and Warranties**

~~419~~461.    Fleming incorporates by reference each and every allegation contained in ~~Counterclaim~~ paragraphs 1 through ~~418~~460 as if set forth fully herein.

~~420~~462.    Fleming and James River are parties to the Agreement, which is a valid binding contract.

~~421~~463.    Article II of the Agreement contains a series of material representations and warranties by James River, which it represented were true as of the date on which the Agreement was signed as well as on the date on which the Transaction closed.

~~422~~464.    Furthermore, on March 13, 2024, Frank D'Orazio represented in a sworn statement that the "conditions to closing" required under the Agreement "ha[d] been or [would] be satisfied at closing."   Because that representation incorporated by reference the closing conditions in SPA § 6.1(c), Mr. D'Orazio was affirmatively stating and reiterating that James River's representations and warranties would be "true and correct . . . as of the Closing Date as if made on the Closing Date."

~~423~~465.    In addition, in connection with the closing on April 16, 2024, Mr. D'Orazio signed a "Closing Certificate" acting "solely in . . . his capacity as a duly authorized officer of the Seller," *i.e.*, James River, in which he represented that "Section 2.15(b) of the Agreement"—which specifies that "there has not been any event, occurrence or condition of any character that has had, or that would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect"—was "true and correct in all respects as of the date of the Agreement" and remained "true and correct as of the Closing Date as if made on the Closing Date."

424466.    Mr. D'Orazio and James River also represented in the Closing Certificate that "[t]he other representations and warranties of the Seller [*i.e.*, James River] contained in Article II of the Agreement were true and correct . . . as of the date of the Agreement" and remained "true and correct . . . as of the Closing Date as if made on the Closing Date . . . except where the failure of such representations and warranties to be so true and correct has not had or would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect."

425467.    Certain of those representations and warranties were either affirmative misrepresentations or were materially misleading.

426468.    Moreover, James River knew, or was reckless in not knowing, that these material representations were false or materially misleading.

427469.    James River made those representations with the intent and understanding that Fleming would rely on them when closing the Transaction and acquiring the shares of JRG Re.

428470.    Fleming reasonably relied on the representations and warranties provided by James River in closing the Transaction and acquiring the shares of JRG Re.

429471.    Section 2.4 of the Agreement contained a representation by James River to Fleming stating, in relevant part, that "The execution, delivery and performance by the Seller [*i.e.*, James River] . . . of th[e] Agreement . . . and the consummation by the Company [*i.e.*, JRG Re] . . . of the transactions contemplated [t]hereby . . . require no filing . . . or notification to[] any Governmental Entity . . . or Governmental Approval" other than certain enumerated filing filings and approvals.

430472.    James River nevertheless knew, or was reckless it not knowing, that a payment from JRG Re to James River of more than $48 million would have required approval by

the Bermuda Monetary Authority pursuant to Bermuda's Insurance Act 1978, which approval was not sought.

431473.    Section 2.13(a)(i) of the Agreement contained a representation by James River to Fleming stating, in relevant part, that "the Company [*i.e.*, JRG Re] has been in compliance in all material respects and has not been and currently is not in violation of any Laws . . . applicable to it or its assets, properties or businesses."

432474.    James River nevertheless knew, or was reckless in not knowing, that, in violation of Bermuda law, JRG Re's Governance and Risk Management Framework and Risk Register submitted in April 2022 by JRG Re to the Bermuda Monetary Authority was outdated and inaccurate.

433475.    James River further knew, or was reckless in not knowing, that JRG Re violated Bermuda law by refusing to submit an accurate and updated version of its Governance and Risk Management Framework and Risk Register to the Bermuda Monetary Authority in April 2023.

434476.    James River also knew, or was reckless in not knowing, that JRG Re's payments to James River in February 2024 totaling $139 million had violated Bermuda's Insurance Act and Companies Act.

435477.    Section 2.15 of the Agreement contained a representation by James River to Fleming stating, in relevant part, that, "Except as . . . expressly contemplated or required by th[e] Agreement . . . (a) the Company [*i.e.*, JRG Re] has conducted its business in the ordinary course, (b) there has not been any event, occurrence or condition of any character that has had, or that would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect and (c) neither the Seller [*i.e.*, James River] nor the Company [*i.e.*, JRG Re] has taken any

action or failed to take any action that . . . would constitute a breach of Section 4.1" of the Agreement.

436478.    James River nevertheless knew, or was reckless in not knowing, that it breached § 4.1 of the Agreement, including by failing to operate JRG Re in the ordinary course as required by Section 4.1(x), which § 8.1(a)(xv) of the Agreement further defines to mean "the ordinary course of business of [JRG Re] consistent with past practice," as further set forth below.

437479.    James River also knew, or was reckless in not knowing, that JRG Re's payments to James River in February 2024 totaling $139 million were not made in the ordinary course and were not "expressly contemplated or required by th[e] Agreement" as such payments breached § 4.12 of the Agreement, as further set forth below in light of those payments' structure and violation of Bermuda law.

438480.    James River further knew, or was reckless in not knowing, that James River's breaches of §§ 4.1 and 4.12 of the Agreement, as further set forth below, had, or would reasonably be expected to have, a Material Adverse Effect, which is defined in relevant part to include "a material adverse effect on the assets, liabilities, financial condition business or results of operations of the Company [*i.e.*, JRG Re], taken as a whole."

439481.    Section 2.17(c)(ii) of the Agreement contained a representation by James River to Fleming stating, in relevant part, that "neither the Company [*i.e.*, JRG Re] nor . . . any other party" to certain reinsurance agreements was "in default or breach in any material respect under the terms [there]of" and that, "to the Knowledge of the Seller [*i.e.*, James River], no event or circumstances ha[d] occurred that, with notice or lapse of time or both, would constitute an event of default thereunder or result in a termination thereof or would cause or permit the

acceleration of or other changes of or to any right or obligation or the loss of any benefit thereunder."

440482.      James River nevertheless knew, or was reckless in not knowing, that JRG Re's payments to James River in February 2024 totaling $139 million triggered its obligation to post $125 million in collateral pursuant to its reinsurance agreements with the Cedent, which obligation JRG Re could not satisfy because it lacked adequate assets to post $125 million in collateral.  Accordingly, James River was in default or breach in a material respect under the terms of its material reinsurance agreements with the Cedent.

441483.      James River also knew, or was reckless in not knowing, that JRG Re was in default and breach under those same reinsurance agreements with the Cedent at the time that the Agreement was entered into on November 8, 2023, as JRG Re had been obligated to post approximately $55 million of collateral for the benefit of the Cedent as a result of JRG Re's capital decreasing by 16% at year-end 2021., but JRG Re had not yet posted such collateral as of November 8, 2023.

442484.      Section 2.24 of the Agreement contained a representation by James River to Fleming stating, in relevant part, that "The assets . . . of the Company [*i.e.*, JRG Re] . . . as of the Closing . . . . constitute all of the assets . . . that are necessary to conduct the Business immediately following the Closing Date in all material respects in substantially the same manner as the Business is being conducted as of the date" of the Agreement.

443485.      James River nevertheless knew, or was reckless in not knowing, that JRG Re's assets as of the closing were inadequate to pay its liabilities as they came due and JRG Re would instead require an immediate post-closing capital contribution by Fleming.

444486.        Section 2.26 of the Agreement contained a representation by James River to Fleming stating, in relevant part, that "The Company [*i.e.*, JRG Re] has in place risk management . . . policies and procedures reasonably designed to protect against risks of the types reasonably expected to be incurred by Persons similarly situated."

445487.        James River nevertheless knew, or was reckless in not knowing, that JRG Re did not have appropriate risk management policies and procedures "in place" as necessary to protect against such risks because JRG Re had long been non-compliant with its Governance and Risk Management Framework and Risk Register submitted by JRG Re to its primary regulator, the Bermuda Monetary Authority.

446488.        Fleming has suffered damages in that, in reasonable reliance on James River's actions, statements and omissions, Fleming paid an artificially inflated price in its acquisition of the shares of JRG Re.  Fleming would not have purchased the shares of JRG Re at the price it paid, or at all, had it known the truth concealed from it by James River.

447489.        As a direct and proximate result of James River's wrongful conduct, Fleming suffered damages, including in connection with its purchase of the shares of JRG Re, in an amount to be determined at trial.

### COUNT IV

**Breach of Contract Against James River
Violation of § 4.1(x) of the Agreement**

448490.        Fleming incorporates by reference each and every allegation contained in Counterclaim paragraphs 1 through 447489 as if set forth fully herein.

449491.        Fleming and James River are parties to the Agreement, which is a valid binding contract.

450492.        Fleming performed all of its obligations under the Agreement.

451493.    Section 4.1(x) of the Agreement provides, in relevant part, that "From the date [t]hereof through the Closing . . . (x) the Seller [*i.e.*, James River] shall, and shall cause the Company [*i.e.*, JRG Re], to operate the Company [*i.e.*, JRG Re] in the ordinary course of business, and use reasonable best efforts to preserve substantially intact the current material business relationships and material goodwill of the Company [*i.e.*, JRG Re] with its policyholders and other customers," among others.

452494.    Section 8.1(a)(xv) further specifies that "references to 'ordinary course of business,'" including as used in § 4.1(x), "means the ordinary course of business of [JRG Re] consistent with past practice."

453495.    James River breached § 4.1(x) by operating JRG Re, and causing JRG Re to operate, in non-compliance with JRG Re's Governance and Risk Management Framework and Risk Register submitted by JRG Re to the Bermuda Monetary Authority.

454496.    James River further breached § 4.1(x) by intentionally withholding from JRG Re's leadership reports concerning JRG Re's finances that were issued by Willis Towers Watson on December 28, 2023, and February 20, 2024, respectively, when such reports from Willis Towers Watson had historically been provided to JRG Re's leadership in the ordinary course prior to signing of the Agreement, and by failing to set aside reserves for JRG Re that were in-line with those deemed necessary by Willis Towers Watson.

455497.    James River also breached § 4.1(x) by causing JRG Re to loan approximately $20 million to James River during December 2023, which loans were not extended in the ordinary course and were instead intended specifically to strip assets from JRG Re and artificially increase the "intercompany receivable" to a level far above its historical norms before the Transaction closed.

~~456~~498.     James River further breached § 4.1(x) by failing to satisfy JRG Re's obligations under its reinsurance agreements with the Cedent to post $125 million in collateral for the benefit of the Cedent.

~~457~~499.     James River also breached § 4.1(x) by implementing new oversight and approval processes involving Ms. Doran in connection with JRG Re's expenditures in 2024.

~~458~~500.     James River further breached § 4.1(x) by causing JRG Re to trigger its obligations to post collateral under certain reinsurance agreements while failing to cause JRG Re to post the requisite collateral.

~~459~~501.     As a direct and proximate result of James River's wrongful conduct, Fleming suffered damages in connection with its purchase of the shares of JRG Re in an amount to be determined at trial.

<u>**COUNT V**</u>

**Breach of Contract Against James River**
**Violation of § 4.1(f) of the Agreement**

~~460~~502.     Fleming incorporates by reference each and every allegation contained in ~~Counterclaim~~ paragraphs 1 through ~~459~~501 as if set forth fully herein.

~~461~~503.     Fleming and James River are parties to the Agreement, which is a valid binding contract.

~~462~~504.     Fleming performed all of its obligations under the Agreement.

~~463~~505.     Section 4.1(f) of the Agreement provides, in relevant part, that "From the date [t]hereof through the Closing . . . the Seller [*i.e.*, James River] shall not, and shall cause the Company [*i.e.*, JRG Re] not to . . . (f) make or adopt any changes in the actuarial, . . . risk retention, risk management, . . . [or] reserving . . . policies, practices or principles of the Company," *i.e.*, JRG Re.

464506.          James River breached § 4.1(f) by intentionally withholding from JRG Re's leadership reports concerning JRG Re's finances that were issued by Willis Towers Watson on December 28, 2023, and February 20, 2024, respectively, when such reports from Willis Towers Watson had historically been provided to JRG Re's leadership in the ordinary course prior to signing of the Agreement.

465507.          James River further breached § 4.1(f) by causing JRG Re to materially deviate from the reserves required by Willis Towers Watson as of December 31, 2023, notwithstanding that Willis Towers Watson acts as JRG Re's "loss reserve specialist" and, accordingly, the Bermuda Monetary Authority requires Willis Towers Watson to submit an opinion annually deeming JRG Re's reserves to be adequate, in light of which prior to signing of the Agreement James River had always ensured that JRG Re's reserves as of year-end were in line with those deemed necessary by Willis Towers Watson.

466508.          As a direct and proximate result of James River's wrongful conduct, Fleming suffered damages in connection with its purchase of the shares of JRG Re in an amount to be determined at trial.

## COUNT VI

**Breach of Contract Against James River**
**Violation of § 4.1(h) of the Agreement**

467509.          Fleming incorporates by reference each and every allegation contained in Counterclaim paragraphs 1 through 466508 as if set forth fully herein.

468510.          Fleming and James River are parties to the Agreement, which is a valid binding contract.

469511.          Fleming performed all of its obligations under the Agreement.

470512.    Section 4.1(h) of the Agreement provides, in relevant part, that "From the date [t]hereof through the Closing . . . the Seller [*i.e.*, James River] shall not, and shall cause the Company [*i.e.*, JRG Re] not to . . . (h) make any material loans, advances or capital contributions to, or investments in, any other Person," where Person is defined to include "any individual, partnership, association, trust, limited liability company, corporation, or other organization or entity."

471513.    James River breached § 4.1(h) by causing JRG Re to loan approximately $20 million to James River during December 2023.

472514.    James River further breached § 4.1(h) by making a capital contributions or investments in JRG Re prior to the Closing in order to cover up its earlier breaches of the Agreement.

473515.    As a direct and proximate result of James River's wrongful conduct, Fleming suffered damages in connection with its purchase of the shares of JRG Re in an amount to be determined at trial.

### COUNT VII

**Breach of Contract Against James River**
**Violation of § 4.12 of the Agreement**

474516.    Fleming incorporates by reference each and every allegation contained in Counterclaim paragraphs 1 through 473515 as if set forth fully herein.

475517.    Fleming and James River are parties to the Agreement, which is a valid binding contract.

476518.    Fleming performed all of its obligations under the Agreement.

477519.    Section 4.12 of the Agreement provides, in relevant part, that "The Seller [*i.e.*, James River] shall use reasonable best efforts (including making any Governmental Filings)

to cause the Company [*i.e.*, JRG Re] to declare and pay, at least three (3) Business Days prior to the Closing Date, a payment (whether as a dividend or return of capital or surplus, in accordance with applicable Law) to the Seller . . . in an amount equal to the Pre-Closing Dividend Amount," which is defined to mean "$139,000,000."

478520.    In drafting § 4.12, the parties specifically chose the "shall use reasonable best efforts" formulation, rather than agreeing that JRG Re "shall" or "will" pay $139 million to James River, because they recognized that JRG Re might not be able to make "a payment" in that amount.

479521.    James River breached § 4.12 by causing JRG Re to make two separate payments—one payment in the form of a purported $90 million dividend, and a second payment in the form of a $49 million distribution of capital—notwithstanding that the Agreement contemplated only "a payment" of "a dividend or return of capital or surplus," but not both.

480522.    James River further breached § 4.12 by causing JRG Re to pay $139 million to JRGH, notwithstanding that doing so was not "in accordance with applicable Law" because JRG Re's payments violated the Bermuda Insurance Act and Companies Act.

481523.    James River also breached § 4.12 in that it did not "mak[e] any Governmental Filings" to the Bermuda Monetary Authority as necessary to obtain an exemption from the requirements of the Bermuda Insurance Act, the absence of which would reasonably be expected to be material and adverse to JRG Re.

482524.    As a direct and proximate result of James River's wrongful conduct, Fleming suffered damages in connection with its purchase of the shares of JRG Re in an amount to be determined at trial.

### COUNT VIII

### Breach of Contract Against James River
### Violation of § 1.4 of the Agreement

525.    Fleming incorporates by reference each and every allegation contained in paragraphs 1 through 524 as if set forth fully herein.

526.    Fleming and James River are parties to the Agreement, which is a valid binding contract.

527.    Fleming performed all of its obligations under the Agreement.

528.    Section 1.4 of the Agreement provides for a "Post-Closing Purchase Price True-Up" process, which includes a "Resolution Period" during which, pursuant to § 1.4(c), "the Seller [*i.e.*, James River] and the Buyer [*i.e.*, Fleming] shall seek in good faith to resolve in writing any differences that they may have with respect to the matters specified in [James River's] Notice of Disagreement."

529.    Section 1.4(c) further provides, in relevant part, that during the Resolution Period "each party shall use its reasonable best efforts to provide to the other party all information and reasonable access to employees as such other party shall reasonably request in connection with review of . . . the Notice of Disagreement, . . . including all work papers of the accountants who audited, compiled or reviewed such . . . notices . . . and shall cooperate in good faith with such other party to arrive at a final determination of the Closing Statement."

530.    James River breached § 1.4(c) by failing to seek in good faith to resolve the parties' differences with respect to the matters set forth in James River's Notice of Disagreement and by failing to cooperate in good faith with Fleming to arrive at a final determination of the Closing Statement.

531.     James River further breached § 1.4(c), and is continuing to breach § 1.4(c), by refusing to provide any information or access to its employees in connection with Fleming's review of the Notice of Disagreement.

532.     As a direct and proximate result of James River's wrongful conduct, Fleming has suffered and is continuing to suffer irreparable harm in connection with James River's intentional frustration and prevention of the Post-Closing Purchase Price True-Up process as set forth in the Agreement.

### COUNT IX

### Breach of Contract Against James River
### Violation of § 4.5 of the Agreement

533.     Fleming incorporates by reference each and every allegation contained in paragraphs 1 through 532 as if set forth fully herein.

534.     Fleming and James River are parties to the Agreement, which is a valid binding contract.

535.     Fleming performed all of its obligations under the Agreement.

536.     Section 4.5(b) of the Agreement provides, in relevant part, that "[f]rom and after the Closing until the sixth (6th) anniversary of the Closing, each party [t]hereto shall promptly afford the other party . . . reasonable access, during normal business hours and upon reasonable prior notice, to books, records and information related to the Company [*i.e.*, JRG Re] and the Business[7] in its possession . . . and employees . . . related to the Company [*i.e.*, JRG Re] and the Business, in each case, to the extent necessary or useful for such requesting party . . . in connection with any audit, investigation, dispute or Action."

---

[7] "Business" is separately defined in SPA § 8.1(b) to "mean[] the business and operations of the Company," *i.e.*, JRG Re.

537.    James River breached § 4.5(b), and is continuing to breach § 4.5(b), by refusing to provide any information or access to its employees in connection with Fleming's review of the Notice of Disagreement.

538.    As a direct and proximate result of James River's wrongful conduct, Fleming has suffered and is continuing to suffer irreparable harm in connection with James River's intentional frustration and prevention of the Post-Closing Purchase Price True-Up process as set forth in the Agreement.

**WHEREFORE**, Fleming requests that this Court enter judgment in favor of Fleming:

1. Awarding Fleming compensatory damages in an amount to be determined at trial;

2. Awarding Fleming consequential damages in an amount to be determined at trial;

3. Awarding Fleming punitive damages in an amount to be determined at trial;

4. Awarding Fleming its reasonable costs and expenses;

5. Awarding Fleming pre-judgment and post-judgment interest; ~~and~~

6. Declaring that the Post-Closing Purchase Price True-Up Process shall be stayed and tolled until after James River has provided Fleming with the information and access requested by Fleming and required by SPA §§ 1.4(c) and 4.5(b);

7. Preliminarily and permanently enjoining James River to provide the information and access requested by Fleming and required by SPA §§ 1.4(c) and 4.5(b); and

~~6~~8. Granting all other relief that it deems appropriate.


Dated:   July ~~15~~29, 2024

Respectfully submitted,

 */s/ Reed Brodsky*
Reed Brodsky
Akiva Shapiro
Michael L. Nadler
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue

New York, NY 10166
(212) 351-4000
rbrodsky@gibsondunn.com
ashapiro@gibsondunn.com
mnadler@gibsondunn.com

*Attorneys for Plaintiff Fleming
Intermediate Holdings LLC*

| **Summary report:** | |
|---|---|
| **Litera Compare for Word 11.4.0.111 Document comparison done on 7/28/2024 1:51:11 PM** | |
| **Style name:** GDCv11Rendering | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** \\NYFAS2\public\31780-00001 (Fleming Intermediate Holdings LLC - SPA)\0. Working\M. Potluri\Fleming -- SDNY Cplt -- FINAL(107506826.22).docx | |
| **Modified filename:** \\NYFAS2\public\31780-00001 (Fleming Intermediate Holdings LLC - SPA)\0. Working\M. Potluri\Fleming -- SDNY Supp Cplt - circulated_107683968_7.docx | |
| **Changes:** | |
| Add | 187 |
| Delete | 114 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 301 |