UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

FLEMING INTERMEDIATE HOLDINGS,
LLC,

        Plaintiff,

    v.

JAMES RIVER GROUP HOLDINGS, LTD.,
FRANK D'ORAZIO, and SARAH DORAN,

        Defendants.

No. 24-cv-5335 (JLR)

**MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS
PLAINTIFF'S AMENDED COMPLAINT**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 3

    A.    Fleming Agrees To Acquire JRG Re From JRGH ........................................ 3

    B.    The Stock Purchase Agreement ................................................................... 3

    C.    Fleming Manufactures Reasons To Avoid Closing ..................................... 3

    D.    The New York County Supreme Court Orders The Transaction To Close ............ 4

    E.    Fleming's Claims ......................................................................................... 4

LEGAL STANDARD .................................................................................................. 5

ARGUMENT ............................................................................................................... 5

I.      FLEMING'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED AS
      EXTRATERRITORIAL AND FOR FAILURE TO STATE A CLAIM ........................... 5

    A.    Fleming's Exchange Act Claims Are Impermissibly Extraterritorial ..................... 5

        1.    The Transaction Was Not "Domestic" ........................................... 6

            a.    *Title Was Not Transferred In The U.S.* ............................ 6

            b.    *Irrevocable Liability Was Not Incurred In The U.S.* ......................... 6

        2.    Fleming's Claims Are So Predominantly Foreign As To Be
            Impermissibly Extraterritorial ......................................................... 8

    B.    Fleming Cannot Transform Breach Of Contract Claims Into Exchange Act
        Claims ......................................................................................................... 10

    C.    Plaintiff Did Not Rely On Post-Signing Representations ..................................... 10

    D.    The Alleged Misrepresentations Were Not Materially False Or Misleading ........ 11

        1.    Pre-Signing Representations Were Not Materially False or
            Misleading ....................................................................................... 11

            a.    *Section 2.13(a)(i)* ........................................................... 11

            b.    *Section 2.26* ................................................................... 12

            c.    *Section 2.15* ................................................................... 13

        2.    Post-Signing Representations Were Not Materially False Or
            Misleading ....................................................................................... 13

            a.    *Section 2.15* ................................................................... 14

            b.    *Section 2.4* ..................................................................... 14

            c.    *Section 2.13(a)(i)* ........................................................... 15

|   | d. | Section 2.17(c)(ii) ............................................................. 15 |
|---|----|-----|
|   | e. | Section 2.24 ...................................................................... 16 |
|   | f. | Section 2.26 ...................................................................... 16 |

E.      Fleming Does Not Adequately Plead Scienter ........................................ 17

        1.      Fleming Does Not Allege Any Unique Motive to Defraud ...................... 17

        2.      Fleming Fails To Plead Strong Circumstantial Evidence Of Conscious Misbehavior Or Recklessness .................................... 19

F.      Count III Should Be Dismissed For Lack Of A Predicate Violation ................... 20

II.      FLEMING'S COMMON LAW FRAUD CLAIM (COUNT IV) SHOULD BE DISMISSED. ......................................................................................................... 20

A.      None Of The Alleged Misrepresentations Are Collateral To The SPA ............... 20

B.      Fleming Fails To Adequately Plead The Elements Of Fraud ................................ 21

III.      FLEMING'S BREACH OF CONTRACT CLAIMS (COUNTS V THROUGH X) SHOULD BE DISMISSED .................................................................... 21

A.      Count V: Section 1.3 ...................................................................... 22

B.      Count VI: Section 4.1(x) ................................................................ 22

C.      Count VII: Section 4.1(f) ................................................................ 24

D.      Count VIII: Section 4.1(h) .............................................................. 24

E.      Count IX: Section 4.1(h) ................................................................. 25

F.      Count X: Section 4.12 .................................................................... 26

IV.      FLEMING'S CLAIMS AND ALLEGATIONS RELATED TO JRG RE'S RESERVES SHOULD BE DISMISSED IN FAVOR OF ARBITRATION ................... 27

V.      THE COURT SHOULD DECLINE SUPPLEMENTAL JURISDICTION OVER THE STATE LAW CLAIMS (COUNTS IV THROUGH X) ........................................... 28

CONCLUSION ........................................................................................................... 29

# TABLE OF AUTHORITIES

Page

## Cases

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012) ............................................................................. 6

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ...................................................................................... 10

*Arco Cap. Corps. Ltd. v. Deutsche Bank AG*,
    949 F. Supp. 2d 532 (S.D.N.Y. 2013) ............................................................ 7

*Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*,
    849 F. App'x 289 (2d Cir. 2021) .................................................................... 7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................ 5

*Buy This, Inc. v. MCI Worldcom Commc'ns, Inc.*,
    209 F. Supp. 2d 334 (S.D.N.Y. 2002) .......................................................... 20

*Carnegie-Mellon Univ. v. Cohill*,
    484 U.S. 343 (1988) ...................................................................................... 28

*Cavello Bay Reinsurance Ltd. v. Shubin Stein*,
    986 F.3d 161 (2d Cir. 2021) ........................................................................... 9

*Cavello Bay Reinsurance Ltd. v. Stein*,
    2020 WL 1445713 (S.D.N.Y. Mar. 25, 2020), *aff'd*, 986 F.3d 161 (2d Cir.
    2021) ................................................................................................................ 7

*Cottam v. Glob. Emerging Cap. Grp., LLC*,
    2020 WL 1528526 (S.D.N.Y. Mar. 30, 2020) .............................................. 10

*CSI Inv. Partners II, L.P. v. Cendant Corp.*,
    507 F. Supp. 2d 384 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 56 (2d Cir. 2009) ....................... 10

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) .............................................................. 17, 18, 19

*EMA Fin., LLC v. Vystar Corp.*,
    2021 WL 1177801 (S.D.N.Y. Mar. 29, 2021) .............................................. 10

*In re Enron Creditors Recovery Corp.*,
    380 B.R. 307 (S.D.N.Y. 2008) ..................................................................... 26

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*,
   309 F. Supp. 3d 100 (S.D.N.Y. 2018) ........................................................................20

*James River Grp. Holdings, Ltd. v. Fleming Intermediate Holdings LLC*,
   2024 WL 2839267 (Sup. Ct. N.Y. Cty. Apr. 6, 2024) .......................4, 14, 23, 24, 28

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991) ....................................................................................10

*Lehmann v. Ohr Pharm., Inc.*,
   830 F. App'x 349 (2d Cir. 2020) ..............................................................................19

*Levine v. NL Indus., Inc.*,
   926 F.2d 199 (2d Cir. 1991) ....................................................................................12

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
   861 F. Supp. 2d 262 (S.D.N.Y. 2012) ........................................................................7

*Meridian Autonomous Inc. v. Coast Autonomous LLC*,
   2018 WL 4759754 (S.D.N.Y. Sept. 30, 2018) ..........................................................28

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010) ...................................................................................................8

*Nicosia v. Amazon.com, Inc.*,
   834 F.3d 220 (2d Cir. 2016) ......................................................................................5

*One Commc'ns Corp. v. JP Morgan SBIC LLC*,
   381 F. App'x 75 (2d Cir. 2010) ...............................................................................19

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
   763 F.3d 198 (2d Cir. 2014) ...................................................................................8, 9

*Pension Ben. Guar. Corp. v. Morgan Stanley Inv't Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013) ......................................................................................5

*Pesa v. Yoma Dev. Grp. Inc.*,
   18 N.Y.3d 527 (2012) ..............................................................................................27

*Richter v. Achs*,
   962 F. Supp. 31 (S.D.N.Y. 1997) .............................................................................11

*Russo v. Bruce*,
   777 F. Supp. 2d 505 (S.D.N.Y. 2011) ......................................................................18

*S.E.C. v. Tecumseh Holdings Corp.*,
   765 F. Supp. 2d. 340 (S.D.N.Y. 2011) .....................................................................12

*Savasta & Co. v. Interactive Planet Software Motion Inc.*,
    2008 WL 2563485 (Sup. Ct. N.Y. Cnty. June 12, 2008) .......................................................20

*SEC v. Ahmed*,
    308 F. Supp. 3d 628 (D. Conn. 2018) ...............................................................................6, 7

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) ...............................................................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................................ 11, 17, 19

*Torchlight Loan Servs., LLC v. Column Fin., Inc.*,
    2012 WL 3065929 (S.D.N.Y. July 25, 2012) ...................................................................21

*In re Tremont Sec. L., State L. & Ins. Litig.*,
    703 F. Supp. 2d 362 (S.D.N.Y. 2010) ..............................................................................21

*Villare v. Abiomed, Inc.*,
    2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) .................................................................18

*Vitrano v. State Farm Ins. Co.*,
    2008 WL 2696156 (S.D.N.Y. July 8, 2008) .....................................................................21

*Wu v. Bitfloor, Inc*,
    460 F. Supp. 3d 418 (S.D.N.Y. 2020) ..............................................................................28

### Statutes

15 U.S.C. § 78j(b) [Exchange Act § 10(b)] .................................1, 2, 4, 6, 8, 10, 11, 12, 17, 20, 21

15 U.S.C. § 78t(a) [Exchange Act § 20(a)].............................................................................1, 4, 20

15 U.S.C. § 78u-4(b)(2) [Private Securities Litigation Reform Act] .........................................2, 17

28 U.S.C. § 1367(c)(iii).................................................................................................................28

<u>**PRELIMINARY STATEMENT**</u>

This action is yet another maneuver in Fleming Intermediate Holdings LLC's ("Fleming") months-long effort to retrade the terms of the deal it struck with James River Group Holdings, Ltd. ("JRGH") in November 2023, when Fleming signed a Stock Purchase Agreement ("SPA") to acquire JRG Reinsurance Company Ltd. ("JRG Re") after months of diligence. On the eve of closing, Fleming presented JRGH with a contrived list of alleged breaches of the SPA that Fleming claimed excused its failure to close. To force Fleming to fulfill its contractual bargain, JRGH sued Fleming in the New York County Supreme Court, Commercial Division, and sought a mandatory preliminary injunction ordering the transaction to close. On April 6, 2024, after two days of argument, Justice Masley concluded that JRGH had "eviscerated" Fleming's arguments, which she repeatedly described as "contrived" and "contrary to the SPA," and ordered the transaction to close within ten days. After the First Department Appellate Division rejected Fleming's efforts to stay the order and obtain appellate relief, Fleming closed the transaction and acquired JRG Re on April 16, 2024.

Having struck out in the New York State courts, Fleming filed its complaint in this Court, manufacturing claims under Sections 10(b) and 20(a) of the Exchange Act as its sole alleged basis for federal subject matter jurisdiction. Fleming then amended its complaint, seeking to bolster these allegations. But Fleming still fails to state a claim under the Exchange Act because the SPA concerns a predominantly foreign transaction for the sale of a Bermuda entity, by a Bermuda-registered seller, to a Cayman Island-incorporated buyer. Fleming's claims under the Exchange Act are impermissibly extraterritorial. Moreover, Fleming's claims are not properly pleaded under federal securities laws because they are duplicative of its breach of contract claims. Even if Fleming's Exchange Act claims were not improperly extraterritorial and duplicative of its contract claims, the Amended Complaint ("AC") still fails to state a claim for securities fraud. Fleming's

falsity and scienter allegations fail to meet the heightened pleading standards under the Private Securities Litigation Reform Act ("PSLRA"). Fleming also fails to establish that it relied upon any of the SPA's representations in closing the transaction—to the contrary, Fleming repeatedly contended such representations were false and closed only because it was ordered to by Justice Masley.

Because Fleming fails to state a claim under the Exchange Act, the Court should decline to exercise supplemental jurisdiction over its remaining state law claims and permit Justice Masley to continue her adjudication of the parties' disputes. But even if the Court elects to retain jurisdiction, Fleming still fails to state claims for common law fraud and breach of contract.

Fleming's common law fraud claims are premised on the same alleged misrepresentations as its Section 10(b) claim. As with Fleming's Section 10(b) claim, Fleming fails to establish falsity and scienter, and Fleming did not justifiably rely upon representations in the SPA stated to be true at closing. Moreover, none of the alleged misrepresentations are collateral to the contract, as required to state a fraud claim under New York law. And Fleming fails to state a claim for breach of contract because the allegations of the AC are insufficient to show that JRGH breached the provisions at issue.

Finally, Fleming's claims and allegations regarding the appropriate measure of JRG Re's reserves must be dismissed because the SPA provides that that issue will be fully and finally determined by the Independent Accounting Firm ("IAF") under the SPA's Post-Closing True-Up Process.

Fleming's AC should be dismissed in its entirety.

## FACTUAL BACKGROUND

### A.      Fleming Agrees To Acquire JRG Re From JRGH

JRGH is a publicly-traded insurance holding company.  ¶ 17.[1]  JRG Re is a Bermuda-based reinsurer of third-party casualty risks that was previously one of JRGH's wholly-owned subsidiaries.  ¶¶ 1, 309.  In early 2023, JRGH began exploring the potential sale of JRG Re.  ¶ 18.

JRGH engaged with several potential counterparties, including Fleming, over multiple rounds of discussions and preliminary diligence.  Fleming submitted its final bid on June 16, 2023.  ¶ 38.  In November 2023, after negotiations and extensive additional diligence by Fleming into JRG Re, Fleming and JRGH reached agreement on the terms of the transaction.  ¶ 44.

### B.      The Stock Purchase Agreement

The terms of the acquisition are embodied in the SPA, executed on November 8, 2023.  ¶ 44.  In Article II of the SPA, JRGH represented that certain statements were true at the time of signing.  ¶ 507.  In Section 6.1(c)(ii), JRGH further represented, as a condition to closing, that these same statements were true "as of the Closing Date as if made on the Closing Date," except with respect to certain of the statements, "where the failure of such representations and warranties to be so true and correct has not had or would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect."  ¶ 98.

### C.      Fleming Manufactures Reasons To Avoid Closing

On February 29, 2024, the night before the planned closing, Fleming sent a letter to JRGH arguing that JRGH had breached the SPA.  ¶ 405.  Fleming argued that the $139 million Pre-Closing Dividend, the settlement of certain intercompany receivables, and setting of reserves for

---

[1]  Citations to "¶" or "¶¶" are citations to Fleming's Amended Complaint.

JRG Re violated various covenants in the SPA, and that a signed, mutually acceptable Side Letter had not been delivered to Fleming.  ¶¶ 403, 416.

### D.    The New York County Supreme Court Orders The Transaction To Close

JRGH sued Fleming in the New York County Supreme Court, Commercial Division, on March 11, 2024 for breaching its obligation to close.  ¶ 422.  Two days later, JRGH filed a motion for a mandatory preliminary injunction ordering Fleming to close.  ¶ 423.

Following briefing and two days of argument, Justice Masley granted JRGH's motion on April 6, 2024 and "directed [the parties] to close within 10 days." *James River Grp. Holdings, Ltd. v. Fleming Intermediate Holdings LLC*, 2024 WL 2839267, at *9 (Sup. Ct. N.Y. Cty. Apr. 6, 2024).  Justice Masley found that JRGH had "eviscerate[ed] Fleming's contrived objections," *id.* at *7, and that Fleming's arguments were "contrary to the SPA," *id.* at *1, *5.

On April 12, 2024, the First Department Appellate Division denied Fleming's request for interim appellate relief.  ¶ 474.  Fleming nonetheless continued its efforts to evade closing, claiming that its lenders would not fund the transaction due to purported solvency issues.  Fleming only relented after Justice Masley, at an emergency hearing on Sunday, April 14, 2024, stated it was "obvious" that Fleming was trying "to tank the deal" and warned Fleming that "contempt is really serious in New York, and … I'm not afraid to send someone to jail for contempt."  ECF No. 25-1 at 32.

The transaction closed on April 16, 2024.  ¶ 469.

### E.    Fleming's Claims

Fleming filed this action on July 15, 2024 and amended its complaint on October 18, 2024. Fleming's AC asserts claims under Section 10(b) and 20(a) of the Exchange Act (Counts I through III) and state law claims for common law fraud (Count IV) and breach of contract (Counts V through X).

## LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Allegations that do not make sense, as well as assertions that omit critical facts, need not be accepted on a motion to dismiss. *See Pension Ben. Guar. Corp. v. Morgan Stanley Inv't Mgmt. Inc.,* 712 F.3d 705, 717-18 (2d Cir. 2013). On a motion to dismiss, the court must "accept[] all factual allegations in the complaint" but may also consider "statements or documents incorporated into the complaint by reference" and documents upon which the plaintiff "relied in bringing the suit." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013).[2]

## ARGUMENT

### I. FLEMING'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED AS EXTRATERRITORIAL AND FOR FAILURE TO STATE A CLAIM

Fleming's Exchange Act claims (Counts I through III) are impermissibly extraterritorial and duplicative of its breach of contract claims, and Fleming fails to adequately allege the required elements of reliance, falsity, and scienter.

#### A. Fleming's Exchange Act Claims Are Impermissibly Extraterritorial

*First,* to plead a claim under the Exchange Act, Fleming must allege facts showing both that a domestic transaction occurred and that the claims are not so predominantly foreign as to be impermissibly extraterritorial. Fleming fails both requirements.

---

[2] For this reason, the SPA and Justice Masley's preliminary injunction decision may be considered on JRGH's motion to dismiss. The Court may additionally rely upon these documents because the AC "'relies heavily upon [their] terms and effect,' thereby rendering the document[s] 'integral' to the complaint." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230-31 (2d Cir. 2016) (quotations omitted).

### 1. The Transaction Was Not "Domestic"

The sale of JRG Re did not involve securities traded on a domestic exchange. As such, Fleming must plead facts sufficient to establish "irrevocable liability [was] incurred or title passe[d] within the United States" in order to state a claim under Section 10(b). *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012).

### a. Title Was Not Transferred In The U.S.

The Amended Complaint fails to establish that title was transferred in the U.S. for the simple reason that it lacks any allegation that Fleming's executives—rather than just lawyers— were located in the U.S. when they received title to the shares. This alone is dispositive.

Under *Absolute Activist*'s first prong, courts focus on "*where the buyer was located when it received title to the securities*." *SEC v. Ahmed*, 308 F. Supp. 3d 628, 666 (D. Conn. 2018) (emphasis added). Fleming fails to allege it was located in the U.S. at the time it received title to the shares. The AC (¶ 9) alleges Fleming is a Bermuda-based company registered under Cayman Islands law. Fleming's executives are Bermuda-based, and the AC's allegations are limited to assertions that lawyers and Fleming's directors were located in the U.S. when title was transferred. *See* ¶ 45 (alleging that Fleming's in-house and outside counsel were present in the U.S. at signing of the SPA). The AC's allegations that certain Fleming directors (¶ 40) and its general counsel were located in the U.S. (¶46) are insufficient to establish title was passed in the U.S. given Fleming does not plead with specificity that title was passed by "deliver[y] to the location" of such directors or of its general counsel of signed instruments transferring title. *Ahmed*, 308 F. Supp. 3d at 667.

### b. Irrevocable Liability Was Not Incurred In The U.S.

Fleming likewise fails to allege that irrevocable liability was incurred in the U.S.

*First*, Fleming's allegations regarding negotiations (¶¶ 39-44), pre-closing money transfers (¶ 51), the SPA's New York governing law clause (¶ 47), and the SPA specifying closing was to occur in New York (¶ 52) are all irrelevant to whether a domestic transaction occurred. *See Liberty Media Corp. v. Vivendi Universal, S.A.*, 861 F. Supp. 2d 262, 269 (S.D.N.Y. 2012) (irrevocable liability was incurred at *execution* of binding merger agreement, when the parties "bec[a]me bound to effectuate the transaction"); *Arco Cap. Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 541 (S.D.N.Y. 2013) (allegations that contract was "governed by New York law" were "irrelevant" to whether a domestic transaction occurred); *id.* at 543 ("[T]he irrevocable sale of the Notes occurred with the parties' performance on the Closing Date…."); *Ahmed*, 308 F. Supp. 3d at 667 (contract language specifying location for closing was irrelevant when closing instead occurred electronically and/or by mail).

*Second*, Fleming's allegations regarding external counsel are insufficient to establish a domestic transaction. *See Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*, 849 F. App'x 289, 294 (2d Cir. 2021) (no domestic transaction where individuals located in the U.S. do not act as "principals" and instead act as "agents who merely facilitated the sale and purchase of the [securities] between the parties").

*Finally*, Fleming's allegation (¶ 45) that Defendant D'Orazio executed a signature page in the U.S. is likewise insufficient to establish a domestic transaction as Fleming fails to sufficiently allege that, under New York law, irrevocable liability was incurred at the time of that act rather than at the time of the "delivery of [documents] to Plaintiff (in Bermuda)." *Cavello Bay Reinsurance Ltd. v. Stein*, 2020 WL 1445713, at *7 (S.D.N.Y. Mar. 25, 2020) (signing in New York by Bermudan seller's CEO of agreement with Bermudan buyer did not establish irrevocable liability was incurred in the U.S.), *aff'd*, 986 F.3d 161, 165 (2d Cir. 2021) (declining to decide

whether a domestic transaction occurred because the "place of transaction [was] difficult to locate, and impossible to do without making state law" and instead affirming dismissal of claims as so predominantly foreign as to be impermissibly extraterritorial).

### 2. Fleming's Claims Are So Predominantly Foreign As To Be Impermissibly Extraterritorial

Even if Fleming properly pleaded a domestic transaction, it would still fail to state a claim under Section 10(b) because its claims involve conduct "so predominantly foreign as to be impermissibly extraterritorial." *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 215 (2d Cir. 2014). Foreign activity predominates here and the limited U.S. activity Fleming stitches together is insufficient. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266 (2010) ("[T]he presumption against extraterritorial application would be a craven watchdog if it retreated to its kennel whenever *some* domestic activity is involved in the case.").

Fleming's allegations revolve around a transaction involving a seller and acquired entity incorporated in Bermuda, a buyer headquartered in Bermuda and incorporated in the Cayman Islands, and extensive regulatory involvement from the Bermudan Monetary Authority ("BMA"). *See Parkcentral*, 763 F.3d at 216 (complaint failed to state a claim due to parties being entirely foreign and German regulatory authorities' involvement). Indeed, most of the alleged misrepresentations on which Fleming's Exchange Act claims are predicated involve compliance with BMA regulations and statutes administered by the BMA, and even include contrived allegations of misrepresentations to the BMA.

The extensive involvement of the BMA—"the primary regulator of both Fleming and JRG Re"—is inescapable on the face of the AC,[3] and adjudication of Fleming's claims "would

---

[3] *See* ¶¶ 77-78, 123, 141-81, 316, 319, 325, 437-39.

inevitably place § 10(b) in conflict with the regulatory laws of other nations." *Id.* at 215. All but one of Fleming's alleged pre-signing misrepresentations center upon BMA filings—including allegations of misrepresentations in BMA filings (¶ 350)—or allege violations of BMA-promulgated rules or BMA-administered statutes. *See infra* Section I.D.I. Likewise, most of Fleming's alleged post-signing misrepresentations center upon BMA-regulated conduct. *See infra* Section I.D.2. Fleming's own allegation (¶ 151) that the BMA recently determined that JRG Re's reduction of capital and surplus violated Bermuda law demonstrates the "inevitabl[e]" risk of "conflict with the regulatory laws of other nations." *Parkcentral*, 763 F.3d at 215 (finding that "foreign activity clearly subject to regulation by foreign authorities" predominated).

In face of this extensive foreign activity and foreign regulatory involvement, Fleming's allegations that certain individuals operated out of the U.S. are immaterial. The Second Circuit's decision in *Cavello Bay* is illustrative. There, a Bermudan corporate buyer sued a seller that operated out of New York in connection with its purchase of shares in a Bermudan holding company. *Cavello Bay*, 986 F.3d at 167 ("The claims here are based on a private agreement for a private offering between a Bermudan investor … and a Bermudan issuer …. The [purchased] shares reflect only an interest in [the entity], and they are listed on no U.S. exchange and are not otherwise traded in the United States."). As *Cavello Bay* makes clear, allegations that Defendants "made the misstatement[s] from [the U.S.]" and had its "principal place of business and CEO and directors in [the U.S.]" are merely "vestiges from our 'now-defunct conduct and effects test.'" *Id.* Fleming's allegations regarding contract formation are similarly insufficient. *See id.* at 167-68 ("allegations that the parties' communications executing the agreement were between New York and Bermuda" were insufficient because the "claims are nevertheless so predominantly foreign").

**B.  Fleming Cannot Transform Breach Of Contract Claims Into Exchange Act Claims**

*Second*, Fleming's Exchange Act claims should be dismissed in their entirety because they are duplicative of its breach of contract claims and a plaintiff "may not transform a state law breach of contract … action into a fraud claim under the federal securities laws." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 776 (2d Cir. 1991); *see EMA Fin., LLC v. Vystar Corp.*, 2021 WL 1177801, at *4 (S.D.N.Y. Mar. 29, 2021) (dismissing Exchange Act counterclaim because its allegations "ultimately sound in contract and are not a proper subject for a securities claim").  Fleming's claims exclusively concern alleged breaches of representations and warranties in the SPA and thus "ultimately sound in contact." *Id.*  Courts routinely dismiss Exchange Act claims where the alleged misstatements are contained in contracts.  *See CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 426-28 (S.D.N.Y. 2007) (dismissing as duplicative securities fraud claim based on representations and assurances during negotiation of stock purchase agreement), *aff'd*, 328 F. App'x 56 (2d Cir. 2009); *Cottam v. Glob. Emerging Cap. Grp., LLC*, 2020 WL 1528526, at *15 (S.D.N.Y. Mar. 30, 2020) ("Defendants' breach of contract ... is not appropriately resolved under federal securities law.").

**C.  Plaintiff Did Not Rely On Post-Signing Representations**

*Third*, Fleming's Exchange Act claims should be dismissed because Fleming cannot establish reliance.  Reliance "is an essential element of the § 10(b) private cause of action because proof of reliance ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury."  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 461 (2013).

Fleming alleges that five of JRGH's representations—Sections 2.4, 2.13(a)(i), 2.15, 2.17(c)(ii), and 2.24 (the "Post-Signing Representations")—were false at closing.  ¶¶ 576, 578-80,582, 587, 593.  However, the AC itself shows that far from relying on the Post-Signing

Representations, Fleming repeatedly asserted they were untrue and did its best to avoid closing. ¶¶ 426-27. Fleming closed the transaction only because it was ordered to do so by Justice Masley—not because it relied on any Post-Signing Representation. *Id.*

For this reason, the AC does not and cannot allege a "proper connection" between the Post-Signing Representations and Fleming's alleged injury. *See Richter v. Achs*, 962 F. Supp. 31, 34 (S.D.N.Y. 1997) (dismissing Section 10(b) claim and rejecting plaintiffs' assertion they were "'forced' to rely on price quoted by defendants" because "[plaintiffs] did not rely on it" and had in fact "been engaged in an ongoing dispute regarding the valuation … throughout which their position has never wavered"). Here, as in *Richter*, if "plaintiff[] truly relied on the alleged misrepresentations of the defendants, there would have been no [] dispute at the time of sale." *Id.*

### D. **The Alleged Misrepresentations Were Not Materially False Or Misleading**

Fleming's Exchange Act claims should also be dismissed because Fleming does not plead with specificity why the alleged misrepresentations were materially false or misleading. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

#### 1. **Pre-Signing Representations Were Not Materially False or Misleading**

Fleming alleges that JRGH's representations in Sections 2.13(a)(i), 2.15, and 2.26 (the "Pre-Signing Representations") were false at signing. They were not.

##### a. *Section 2.13(a)(i)*

JRGH represented in Section 2.13(a)(i) that it was in material compliance with and not in violation of applicable laws. Fleming alleges (¶¶ 309-358) this representation was false and misleading because (1) JRG Re's "Governance and Risk Management" Framework (the "Framework") and Risk Register (the "Register") were outdated when submitted to the BMA in April 2022 and (2) JRG Re failed to submit updated versions in April 2023. Fleming alleges (¶ 310) that Section 5 of the Insurance Code required JRG Re to "adopt an effective risk

management and internal controls framework," but fails to plead with specificity why updated versions of the Framework and Register not being provided would constitute material non-compliance with or violation of Section 5.  Fleming likewise fails to plead with specificity why its bare assertions that JRG Re made "misrepresentations … to the [BMA] in 2022" and "fail[ed] to submit a Risk Register or Framework in 2023" (¶ 350) establish material non-compliance with or violation of any laws.

Fleming also alleges (¶ 352) that Section 2.13(a)(i)'s "in violation of" prong "is not qualified by the word 'material'" and therefore "relates to _any_ violation of applicable laws," regardless of the violation's materiality.  But to prove a violation of the Exchange Act, the misrepresentation itself must be "material," *i.e.*, there must be a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable shareholder as having significantly altered the 'total mix' of information available."  *S.E.C. v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d. 340, 349 (S.D.N.Y. 2011).  Failing to disclose an immaterial violation of law does not rise to the level of materiality required under the Exchange Act.  *See Levine v. NL Indus., Inc.*, 926 F.2d 199, 203 (2d Cir. 1991) (failure to disclose environmental law violations was not material because "there was no plausible way that [Defendant's] shareholders could suffer financially from the[ir] consequences").

### b.  *Section 2.26*

For similar reasons, Fleming's (¶¶ 353-55) allegation that JRG Re was not following versions of the Register and Framework on file with the BMA fails to establish JRGH's representation in Section 2.26—that JRG Re had in place reasonable risk management policies and procedures—was materially false and misleading.  In fact, Fleming alleges that JRG Re adopted revised versions of the Register and Framework in April 2023.  ¶¶ 345-47.  The AC confirms those revised versions were "in place" at the time the SPA was signed and Fleming fails

to plead with specificity why they were not "reasonably designed to protect against risks of the types reasonably expected to be incurred by Persons similarly situated." SPA § 2.26.

### c. *Section 2.15*

Fleming's bare allegations (¶ 582) regarding material reinsurance agreements and JRGH's Risk Register and Framework do not adequately allege that the ordinary course representation (SPA § 2.15) was materially false at signing because Fleming fails to plead with specificity what JRGH's "past practice" was. SPA § 8.1. Fleming fails to plead that JRGH had not previously failed to post collateral within the contractually-required period for reinsurance agreements. Rather, Fleming alleges (¶¶ 195-98) that JRGH was already in breach of its collateral obligations *prior to June 30, 2023*—the beginning of the period at which JRGH represented business was conducted in the ordinary course. SPA § 2.15. Likewise, to the extent Fleming does plead what JRGH's past risk management practice was, it asserts that practice was having outdated and inaccurate Risk Registers and Governance Frameworks. *See* ¶¶ 320-48 (allegations pre-dating June 2023).

### 2. Post-Signing Representations Were Not Materially False Or Misleading

Even if Fleming relied on the Post-Signing Representations—it did not—Fleming's allegations fail to establish they were materially false and misleading. Each of these Post-Signing Representations warranted to be true at closing, as if made at closing, <u>except</u> "where the failure of such representations and warranties to be so true and correct has not had or would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect ["MAE"]." SPA § 6.1(c)(ii). The AC's strained efforts to gin up any MAE fall flat; this deficiency alone is fatal. In addition, as explained below, Fleming fails independently to allege that each of the Post-Signing Representations was materially false or misleading.

### a. Section 2.15

JRGH represented in Section 2.15 that JRG Re conducted its business in the ordinary course and without any MAE from June 30, 2023. Fleming alleges this representation was false and misleading at closing based on JRG Re's payment of the $139 million Pre-Closing Dividend to JRGH. ¶¶ 543-44. But Fleming ignores that Section 2.15 includes an exception for actions "expressly contemplated or required by this Agreement." As Justice Masley already determined, JRG Re's $139 million payment to JRGH was contemplated and required by Section 4.12 of the SPA. *See James River*, 2024 WL 2839267, at *1, *6, *9 (rejecting "Fleming's argument that JRGH was allowed to take <u>up to</u> $139 million" as depending on a "misreading" of the agreement and noting that JRGH "diligently worked to satisfy its SPA obligations" including by "t[aking] the Pre-Closing Dividend of $139 million at the amount stated in § 8.1(b))"). And the SPA's definition of an MAE expressly carves out "any adverse fact, circumstance, event, change or effect ***arising out of, resulting from or attributable to*** … compliance with the terms of, or the taking of any action required by, th[e SPA]," including "any actions by … ***ceding companies***." SPA § 8.1(b) (emphasis added). Because the $125 million collateral requirement resulted from payment of the Pre-Closing Dividend (¶ 381) as required by Section 4.12, it cannot constitute an MAE.

### b. Section 2.4

JRGH represented in Section 2.4 that consummation of the SPA "require[d] no filing … or notification to[] any Governmental Entity … or Governmental Approval" other than certain enumerated exceptions. Fleming fails to plead with specificity why any failure to notify the BMA of JRG Re's payment of the Pre-Closing Dividend would reasonably be expected to be "material and adverse to the Company or the Business," as required under Section 2.4, much less that the "failure" of this representation to be true and correct would "reasonably be expected … to have a [MAE]," as required under Section 6.1(c)(ii). Because the alleged BMA notification requirement

was "attributable to" and/or "ar[ose] out of" a payment required by Section 4.12 of the SPA, as discussed *supra*, it cannot constitute an MAE. SPA § 8.1(b). And even if a finding that an MAE occurred were not barred by the SPA, Fleming's new, speculative assertion of "irreparable harm"—based solely upon an October 2024 letter from the BMA (¶¶ 150-52), the same regulator that approved the transaction (¶ 87)—would still be insufficient, as the letter confirms that the BMA declined to take any action given the reduction "occurred prior to the current ownership" of JRG Re.

### c. Section 2.13(a)(i)

Fleming still fails to plead with specificity why JRGH's representation in Section 2.13(a)(i) regarding material compliance and non-violation of applicable laws was false at closing. Fleming's allegations that the $139 million Pre-Closing Dividend from JRG Re to JRGH violated Bermuda law (¶¶ 128, 539) fail to establish falsity. As discussed *supra*, the $139 million payment was required by the SPA and thus any regulatory issues that "result[ed] from" and/or were "attributable to" that payment could not constitute an MAE. SPA § 8.1. Separately, Fleming fails to show that JRGH's alleged refusal to secure BMA approval of the $139 million payment has had "a material adverse effect on the assets, liabilities, financial condition, business or results of operations of [JRG Re] taken as a whole." SPA § 8.1(b). As discussed *supra*, Fleming's speculative assertions of "irreparable harm" (¶¶ 150-52) are belied by the BMA declining to take any action given the payment was made prior to Fleming's ownership of JRG Re.

### d. Section 2.17(c)(ii)

Fleming's allegations regarding the representation in Section 2.17(c)(ii) are foreclosed by the SPA to the extent they rely on payment of the $139 million Pre-Closing Dividend, as discussed in Section I(D)(a), *supra*.

### e. Section 2.24

Fleming's allegations (¶¶ 395-97) that the representation in Section 2.24 was false at closing because the December 2023 and February 2024 payments from JRG Re left it unable to post required collateral fail to establish that JRG Re was unable to conduct business following closing "in all material respects in substantially the same manner … as of the date hereof [*i.e.*, November 8, 2023]." SPA § 2.24. In fact, Fleming alleges (¶¶ 204-08) that at signing of the SPA, JRG Re had failed to post required collateral for Cedent's benefit.

### f. Section 2.26

Fleming's allegations (¶¶ 550-52) regarding JRGH's risk management policies fail to establish the representation in Section 2.26 was false at closing. Fleming's allegation (¶ 551) that versions of the Register and Framework on file with the BMA were not up-to-date is irrelevant to whether the versions adopted and put in place by JRG Re's board (¶ 347) were reasonably designed to address relevant risks. Fleming fails to plead with specificity why these updated versions were not reasonably designed to address relevant risks, and instead relies on the conclusory assertion that the occurrence of a liquidity risk from payment of the Pre-Closing Dividend somehow demonstrates the policies could not have been reasonably designed. ¶ 552. Regardless, this allegation fails to establish an MAE because the Pre-Closing Dividend was required by the SPA, and any adverse effects "arising out of, resulting from or attributable to" the performance of the SPA cannot constitute a MAE. SPA § 8.1.

### E. <u>Fleming Does Not Adequately Plead Scienter</u>

Fleming's Section 10(b) claim also fails because the AC is devoid of particularized allegations establishing that D'Orazio or Doran (the "Individual Defendants") acted with scienter.[4] Claims under Section 10(b) are subject to the heightened pleading standards of the PSLRA, which requires the complaint, "with respect to ***each*** act or omission alleged to violate this chapter, state with particularity facts giving rise to a ***strong inference*** that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). This is an "[e]xacting pleading requirement[]": plaintiffs must allege facts supporting an inference of an "intent to deceive, manipulate, or defraud," and that inference "must be more than merely 'reasonable' or 'permissible'—it must be ... cogent and at least as compelling as any opposing inference ...." *Tellabs*, 551 U.S. at 308, 313, 319, 324. Fleming fails to allege sufficient facts to "show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Because Fleming fails to allege any unique motive to defraud, the strength of its circumstantial evidence must be "correspondingly greater." *Id.* at 199. Fleming's circumstantial evidence fails to meet that "greater" burden because the AC fails to adequately allege conscious misbehavior or recklessness, and likewise fails to dispel non-culpable opposing inferences.

#### 1. **Fleming Does Not Allege Any Unique Motive to Defraud**

Fleming attempts to plead scienter by alleging that Defendants were incentivized to defraud Fleming because: (1) they were "desperate for cash" (¶ 19); (2) motivated to "pay down debts that

---

[4]    Because Fleming has not adequately pleaded that any Individual Defendant intended to defraud, it cannot allege corporate scienter. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

[JRGH] owed … with respect to which [JRGH] was already in default" (¶ 86); and (3) wanted to "offload JRG Re before Fleming could learn what [JRGH] had been up to" (¶¶ 4, 84). These motives are not sufficient to demonstrate that Defendants benefitted in "some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198. And Fleming's complaint is devoid of other allegations that would demonstrate Defendants D'Orazio or Doran personally and directly profited from the alleged misstatements.

Fleming's allegation (¶ 19) that Defendants were "desperate for cash" does not state any unique motive to defraud. Motives such as maintaining or boosting a company's stock price or financial results and raising capital are insufficient. *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *21 (S.D.N.Y. Sept. 21, 2021). Likewise, "rais[ing] cash" is insufficient as a motive and "comfortably fits within the set of universal corporate motivations that are inadequate to sustain a securities fraud complaint." *Russo v. Bruce*, 777 F. Supp. 2d 505, 520 (S.D.N.Y. 2011) (executives' alleged desire to inflate price of company stock so that company could sell stock to raise cash was insufficient).

Fleming's allegation (¶ 86) that Defendants were motivated by a need to pay down debts is insufficient for much the same reason, as is Fleming's allegation that JRGH needed to pay sums in connection with a settlement agreement. *See Hawaii Structural Ironworkers Pension Tr. Fund.*, 422 F. Supp. 3d at 849 ("[T]he 'need to attract investors in order to pay down debt accruing ... is insufficient to demonstrate scienter because it is common to most for-profit companies.'").

Fleming's allegation (¶¶ 4, 84) that Defendants wanted to complete the transaction before Fleming could uncover the alleged fraud is similarly insufficient. These allegations do not establish a concrete benefit from any fraud, and instead merely establish motive to close the transaction expeditiously. And Fleming fails to rebut the more plausible inference from its own

allegations (¶ 86) that JRGH was motivated to close the transaction expeditiously to "pay down debts." *See Tellabs*, 551 U.S. at 324 (inference "must be more than merely 'reasonable' or 'permissible'—it must be … cogent and at least as compelling as any opposing inference").

### 2. Fleming Fails To Plead Strong Circumstantial Evidence Of Conscious Misbehavior Or Recklessness

Because Fleming fails to make any showing of unique motive, "the strength of [its] circumstantial allegations must be correspondingly greater." *ECA*, 553 F.3d at 199. Fleming's circumstantial allegations regarding the alleged misrepresentations fail to meet that heightened burden. For instance, for the various alleged misrepresentations based upon failure to comply with applicable laws and regulations, Fleming does not allege strong evidence that any Individual Defendants knew that JRG Re was in material non-compliance. *See One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75, 80 (2d Cir. 2010) (complaint "fail[ed] to identify which named defendants were even aware of [state law] violations, much less that any defendant had the required scienter"). Similarly, for representations regarding Material Reinsurance Agreements, Fleming fails to allege strong evidence that Defendants D'Orazio or Doran were actually informed by Cedent—or even by JRGH or JRG Re employees—that JRG Re was in *material* breach or an event of default had occurred.[5] At best, Fleming's allegations could establish ordinary negligence, although even "heightened negligence" would still fall short of the "state of mind approximating actual intent" required to plead scienter by recklessness. *Lehmann v. Ohr Pharm., Inc.*, 830 F. App'x 349, 352 (2d Cir. 2020). And for the various alleged misrepresentations predicated upon the $139 million Pre-Closing Dividend, Fleming fails to rebut the more plausible, non-culpable

---

[5] *See, e.g.*, ¶ 208 (alleging Cedent called collateral and declared an event of default after signing of the SPA, following which JRG Re posted required collateral); ¶¶ 225-30 (failing to allege Defendants Doran or D'Orazio were actually informed a material breach of event of default had occurred).

inference that Defendants believed that the $139 million payment—as Justice Masley expressly found—was required by the SPA and that the BMA's approval of the transaction prior to this payment supplied necessary regulatory approval.

### F. Count III Should Be Dismissed For Lack Of A Predicate Violation

To plead a control person claim under Section 20(a) of the Exchange Act, Fleming must adequately plead a violation of Section 10(b). Because Plaintiff has failed to plead such a violation, the Section 20(a) claim should also be dismissed. *See Kleinman*, 706 F.3d at 156 n.14.

## II. FLEMING'S COMMON LAW FRAUD CLAIM (COUNT IV) SHOULD BE DISMISSED.

Fleming's common law fraud claim is predicated on the same alleged misrepresentations at issue in its Section 10(b) claim. The claim fails because none of the alleged misrepresentations are collateral to the SPA, as required under New York law, and the AC lacks allegations sufficient to establish the required elements of fraud.

### A. None Of The Alleged Misrepresentations Are Collateral To The SPA

Under New York law, "where a fraud claim is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie." *Buy This, Inc. v. MCI Worldcom Commc'ns, Inc.*, 209 F. Supp. 2d 334, 341 (S.D.N.Y. 2002). Fleming bases its fraud claim upon representations made by JRGH in the SPA, which are not collateral to the contract and thus cannot support a claim of fraud under New York law. *See Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, 309 F. Supp. 3d 100, 115 (S.D.N.Y. 2018) ("[I]t is not sufficient that the alleged misrepresentations are about then-present facts; rather, they also must be 'extraneous to the contract and involve a duty separate from or in addition to that imposed by the contract.'"); *Savasta & Co. v. Interactive Planet Software Motion Inc.*, 2008

WL 2563485 (Sup. Ct. N.Y. Cnty. June 12, 2008) (where alleged "misrepresentations of ... present fact ... fall exactly within the warranties," they "are not extraneous to the Agreement" and cannot support a fraud claim); *Torchlight Loan Servs., LLC v. Column Fin., Inc.*, 2012 WL 3065929, at *10 (S.D.N.Y. July 25, 2012) (same).

Moreover, "[a] plaintiff's claims for fraud ... do not provide a distinct cause of action [when] they rest on the same allegations as the breach of contract claim." *Vitrano v. State Farm Ins. Co.*, 2008 WL 2696156, at *3 (S.D.N.Y. July 8, 2008). Fleming's common law fraud claim— like its securities fraud claims, *see supra* I(B)—is predicated on the same allegations that support its breach of contract claims. Fleming makes nearly identical allegations that JRGH failed to receive BMA approval before making a loan (¶¶ 576, 656), that JRG Re's Register and Framework submitted to the BMA was outdated (¶¶ 578, 595, 616), that JRGH failed to operate JRG Re in the ordinary course (¶¶ 542, 616-621), that JRGH failed to post collateral pursuant to its reinsurance agreement with Cedent (¶¶ 546, 621), and that JRGH deprived JRG Re of liquid assets (¶¶ 593, 654).

## B. Fleming Fails To Adequately Plead The Elements Of Fraud

Dismissal of Fleming's fraud claim is independently warranted for the reasons discussed in connection with Fleming's Section 10(b) claim (*supra*, at I(C)-(E)). *See In re Tremont Sec. L., State L. & Ins. Litig.*, 703 F. Supp. 2d 362, 372 (S.D.N.Y. 2010) ("Since plaintiffs' Section 10(b) claim does not survive, plaintiffs' common law fraud claim, based on the same allegations of fact, must be dismissed as well.").

## III. FLEMING'S BREACH OF CONTRACT CLAIMS (COUNTS V THROUGH X) SHOULD BE DISMISSED

Fleming's breach of contract claims should be dismissed because the allegations of the AC are insufficient to show that JRGH breached each relevant provision.

## A. **Count V: Section 1.3**

Fleming's allegations that JRGH did not (1) account for the latest actuarial data in its Estimated Closing Statement, (2) immediately provide access to the latest actuarial data, (3) provide reasonable access to actuarial data and Ernst & Young ("EY") auditors, and (4) consider in good faith Fleming's comments on the Estimated Closing Statement fail to state a claim for breach of Section 1.3.

*First*, Fleming's own allegations confirm the Reserve Committee did not approve JRG Re actuarial data and analysis until two days *after* delivery of the Estimated Closing Statement. *See* ¶ 454.

*Second*, Fleming's own allegations also show that JRGH provided relevant actuarial data within three days of its review and approval by the Reserve Committee, substantially performing JRGH's obligations under Section 1.3. ¶ 454.

*Third*, Fleming fails to allege Allan Defante and EY were in any way involved in preparing the Estimated Closing Statement such that Fleming's requests to meet with them were "reasonably related or relevant to preparing and analyzing the Estimated Closing Statement." SPA § 1.3.

*Finally*, Fleming fails to plead any facts sufficient to establish that JRGH's declining to accept Fleming's eleventh hour proposed revisions to the Estimated Closing Statement—sent to JRGH the night before Judge Masley ordered the transaction to close (¶¶ 462-63)—amounted to bad faith. Regardless, Fleming's claims depend upon "fact[s], condition[s], development[s], or issue[s] relating to the adequacy of … reserves," and thus cannot be "used, directly or indirectly, to demonstrate or support the breach" of Section 1.3. SPA § 8.14; *see* ¶ 464.

## B. **Count VI: Section 4.1(x)**

Fleming alleges that JRGH breached Section 4.1(x) by failing to "operate [JRG Re] in the ordinary course of business." ¶¶ 616-621. The alleged "ordinary course" violations all fail.

*First*, Fleming alleges that JRGH operated JRG Re in non-compliance with versions of the Register and Framework filed with the BMA. ¶ 616. Fleming's bald assertion that "it is not in the ordinary course for a company to operate in non-compliance with its own policies" (¶ 354) is insufficient to show that JRG Re's compliance with those specific policies would have been "consistent with [JRG Re's] past practice." SPA § 8.1(a)(xv).

*Second*, Fleming alleges that JRGH "deviat[ed] from its historic reserving" practices, including by "materially deviat[ing] from the reserves required by Willis Towers Watson." ¶¶ 617, 629. But Section 8.14 expressly provides that "no fact, condition, development or issue pertaining to the adequacy of insurance or reinsurance loss related reserves or accruals may be used, directly or indirectly, to demonstrate or support the breach of any … covenant or agreement contained in [the SPA]." *See James River*, 2024 WL 2839267, at *5.

*Third*, Fleming's argument that "[JRGH] breached § 4.1(x) by failing to satisfy JRG Re's obligations under its reinsurance agreements with the Cedent to post $125 million in collateral" (¶ 619) is similarly deficient because it fails to allege that JRGH's actions deviated from "past practice." On the contrary, as discussed *supra* at I(D)(1)(b), Fleming in fact alleges (¶¶ 195-98) that JRGH had long been in breach of its collateral obligations to Cedent, even prior to June 2023.

*Fourth*, based off of a single email from Defante to Doran in which he requested approval for certain funding (¶ 165), Fleming alleges that JRGH "implement[ed] new oversight and approval processes involving Ms. Doran in connection with JRG Re's expenditures in 2024." ¶ 620. This email—and Fleming's unsubstantiated allegation of "other similar examples"—fail to establish any new oversight and approval process was imposed. And, to the extent additional oversight of JRG Re was put in place pending closing of the SPA, such action was contemplated by Section 1.4 of the SPA, which obligated JRGH to "cause [JRG Re] to operate … in the ordinary

course of business."  Any additional oversight oriented towards performance of JRGH's obligations under Section 1.4 cannot constitute a breach of Section 1.4.

*Fifth*, Fleming alleges that JRGH breached Section 4.1(x) by causing JRG Re to loan $20 million to JRGH in December 2023, which was not in the ordinary course of business.  ¶ 618.  But this increase in the intercompany receivable was "part of the Pre-Closing Dividend which is permissible under the SPA," *James River*, 2024 WL 2839267, at *7, as Section 4.12 required JRGH to make the payment "first, by the extinguishment of the Intercompany Receivable which shall be valued as of the date of extinguishment," and "second, from unrestricted cash or other unencumbered assets."  SPA § 4.12.  And Section 4.1 expressly exempts acts "expressly contemplated by [the SPA] or required to complete the transactions contemplated hereby."

### C.  **Count VII: Section 4.1(f)**

Fleming alleges that JRGH breached Section 4.1(f) by causing JRG Re to "adopt [] changes in the actuarial, … risk retention, risk management, ... [or] reserving ... policies, practices or principles of [JRG Re]."  ¶ 626.  But each of the alleged changes pertained to the maintenance of reserves for JRG Re (¶¶ 626-33), and thus cannot be used, "directly or indirectly," to establish breach under Section 8.14. They are instead subject to final, binding, and conclusive determination by the IAF.  *Supra*, at III(A).

### D.  **Count VIII: Section 4.1(h)**

Fleming also alleges that JRGH breached Section 4.1(h), which prohibits "any material loans, advances or capital contributions to, or investments in, any other Person," by "causing JRG Re to loan $20 million to JRGH during December 2023" and making "capital contributions to or investments in JRG Re" prior to the Closing.  ¶¶ 639-40.  Section 4.1(h), however, does not extend to loans, advances, or capital contributions **between JRGH and JRG Re**; it prohibits JRGH from making, or causing JRG Re to make loans, advances, or capital contributions to "***any other***

**Person**," *i.e.*, a person other than JRGH. Further, as discussed *supra* at III(A), both the loan from and the capital contribution from JRGH to JRG Re were exempt from Section 4.1(h) because they were "required to complete the transactions." SPA § 4.1.

### E. Count IX: Section 4.1(h)

Fleming alleges that JRGH breached Section 4.5 by offering to make personnel other than Defante available and not immediately providing actuarial data. These allegations are insufficient to establish a breach.

Section 4.5 provides for "*reasonable* access … upon *reasonable prior notice*" to JRG Re personnel—not *immediate* access to whomever Fleming desires. Fleming's own allegations establish that—after doing their utmost to avoid closing—Fleming then ambushed JRGH with requests for meetings with Defante and other personnel, seeking meetings as soon as "tomorrow morning" and demanding responses with availability "as soon as possible." ¶ 437. Further, as discussed *supra*, Fleming fails to plead with specificity why speaking with Defante was a "reasonabl[e] request[]" under Section 4.5 in relation to Fleming's stated purpose of assessing "the preparation of … the Estimated Closing Statement" given Fleming does not even allege Defante was involved in preparation of the Estimated Closing Statement.

Fleming's allegation that JRGH breached Section 4.5 by "refusing to timely provide Fleming" with certain actuarial data and then "misrepresenting the nature of such data" similarly misses the mark. Section 4.5 requires provision of data that Fleming "reasonably requests" without imposing any timeframe—it does not provide for immediate access to whatever data Fleming requests. Fleming's allegations, at best, establish that on April 13, 2024—just one day after JRGH's Reserve Committee approved the actuarial analysis (¶ 454)—JRGH committed to provide "reasonably available Q1 actuarial data" by two days later and delivered on that commitment. And Fleming's allegations of related misrepresentations (*e.g.*, ¶¶ 456-61) do not adequately plead an

independent breach given that Fleming admits that JRGH provided the actuarial data within days of Fleming's eleventh hour request, substantially performing its obligations under Section 4.5.

## F.  Count X: Section 4.12

Fleming alleges that JRGH breached Section 4.12, which required JRGH to "use reasonable best efforts ... to cause [JRG Re] to declare and pay ... a payment (whether as a dividend or return of capital or surplus, in accordance with applicable Law) to [JRGH] ... in an amount equal to the Pre-Closing Dividend Amount," defined as "$139,000,000."  SPA §§ 4.12, 8.1(b).  But Fleming fails to allege a breach of this provision because, as it admits, JRGH used "reasonable best efforts," and did, cause JRG Re to pay $139 million.  ¶¶ 652, 655.

Fleming's argument that Section 4.12 somehow permitted JRGH to cause JRG Re to make a payment less than $139 million is contradicted by the plain language of Section 4.12, which requires that payment be made "in an amount *equal* to the Pre-Closing Dividend Amount [*i.e.*, $139 million]."  SPA § 4.12 (emphasis added).

Fleming further argues that the Pre-Closing Dividend was required to be "in accordance with applicable Law."  ¶ 655.  Fleming misreads the parenthetical language of Section 4.12, which requires "a payment (whether as a dividend or return of capital or surplus, in accordance with applicable Law)."  The plain language clearly requires the *form* of the payment be in accordance with applicable law; it does not require the entire transaction be in accordance with applicable law. Such an interpretation is required both by the plain meaning of the clause as well as the "rule of the last antecedent."  *In re Enron Creditors Recovery Corp.*, 380 B.R. 307, 319 (S.D.N.Y. 2008).

Fleming argues JRGH breached Section 4.12 by causing the Pre-Closing Dividend to be paid in two separate payments (a dividend and a return of capital) rather than a single payment consisting of "a dividend or return of capital" (but not both).  ¶¶ 136-37, 654.  Fleming is incorrect that Section 4.12 of the SPA only permits a single payment.  *See* SPA § 8.1(a)(v) (rule of

construction specifying "the word 'or' shall not be exclusive"). And, even if the SPA did only permit a single payment, Fleming has failed to adequately plead how the form of the payment harmed Fleming. *See Pesa v. Yoma Dev. Grp. Inc.*, 18 N.Y.3d 527, 532 (2012) ("[D]amages for breach of contract are not recoverable where they were not actually caused by the breach.").

## IV. FLEMING'S CLAIMS AND ALLEGATIONS RELATED TO JRG RE'S RESERVES SHOULD BE DISMISSED IN FAVOR OF ARBITRATION

To the extent this Court does not dismiss Counts II, IV, and V-VII for the foregoing reasons, those Counts should be dismissed to the extent they rely on allegations regarding the appropriate measure of JRG Re's reserves because that question will be determined by the SPA's Post-Closing True-Up Process.

The AC is replete with allegations regarding JRGH's conduct in setting reserves for JRG Re. *See* ¶¶ 35, 65, 232-262, 263-308. Those allegations underlie Fleming's causes of action. Fleming alleges that (1) JRGH breached Section 4.1(x) by "deviating from its historic reserving policies, practices and principles" (Count VI, ¶ 617); (2) that JRGH breached Section 4.1(f) by, *inter alia*, failing to set reserves in accordance with Willis Towers Watson and Ernst & Young's estimates (Count VII, ¶¶ 629-30); and (3) that JRGH breached the Exchange Act and committed fraud by breaching, *inter alia*, Sections 4.1(x) and 4.1(f) (Count II, ¶ 542; Count IV, ¶ 584).

The appropriate measure of JRG Re's reserves falls within the IAF's jurisdiction under the SPA's Post-Closing True-Up Process. Pursuant to that process, the parties exchanged (from JRGH) an Estimated Closing Statement and (from Fleming) a Closing Statement. Those statements include, as one line item, each party's valuation for Total Shareholders' Equity at closing. One component of that equity is loss reserves. *See* ECF No. 13-4 at 9. The parties currently dispute the appropriate amount of JRG Re's loss reserves at closing. *See* ECF No. 30 at 3. The SPA provides that "in the event that the Seller and the Buyer are unable to agree on any

item or items shown or reflected in the Closing Statement," the parties shall submit their dispute to the IAF. § 1.4(d). The IAF's determinations as to disputed items "shall be final, binding and conclusive for all purposes of determining the Purchase Price." SPA § 1.4(d). Justice Masley has already found that Fleming's "contrived" allegations regarding improper reserving were "contrary to the SPA" and an "attack on th[e] 'true-up process'" because disputed items in the True-Up Process fall within "the [IAF's] jurisdiction." *James River*, 2024 WL 2839267, at *1, 4, 5, 7.

Because Counts II, IV, and V-VII rely, in whole or in part, on allegations regarding the appropriate measure of JRG Re's reserves, and because the question of reserves is subject to the SPA's Post-Closing True-Up Process, this Court should dismiss those allegations in favor of that arbitration process. *See Meridian Autonomous Inc. v. Coast Autonomous LLC*, 2018 WL 4759754, at *1 (S.D.N.Y. Sept. 30, 2018) ("Because at least some of Plaintiffs' claims … are subject to arbitration, those claims are dismissed ….").

## V. THE COURT SHOULD DECLINE SUPPLEMENTAL JURISDICTION OVER THE STATE LAW CLAIMS (COUNTS IV THROUGH X)

If the Court dismisses only Fleming's Exchange Act claims, it should decline supplemental jurisdiction over Fleming's state law claims. "A district court 'may decline to exercise supplemental jurisdiction over a claim' once it 'has dismissed all claims over which it has original jurisdiction.'" *Wu v. Bitfloor, Inc*, 460 F. Supp. 3d 418, 429 (S.D.N.Y. 2020) (quoting 28 U.S.C. § 1367(c)(iii)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Here, the *Carnegie Hill* factors weigh against retaining jurisdiction. Fleming's state law claims can easily be asserted in the state court proceeding, and hearing them in a separate federal

proceeding disserves judicial economy. Carrying on substantially-related litigation in both state and federal court is inconvenient for Defendants. And this Court's continued jurisdiction would effectively reward Fleming for its failed attempt to manufacture federal law claims to evade the state court's jurisdiction.

## CONCLUSION

Defendants respectfully request that the Court grant their motion to dismiss.


DATED:     New York, New York
           November 15, 2024

                              QUINN EMANUEL URQUHART &
                              SULLIVAN, LLP

                        By:   */s/ Michael B. Carlinsky*
                              Michael B. Carlinsky
                              Renita Sharma
                              Todd Beattie
                              51 Madison Avenue, 22nd Floor
                              New York, NY 10010
                              Tel: (212) 849-7000
                              Fax: (212) 849-7100
                              michaelcarlinsky@quinnemanuel.com
                              renitasharma@quinnemanuel.com
                              toddbeattie@quinnemanuel.com

                              *Attorneys for Defendants James River Group*
                              *Holdings, Ltd., Frank D'Orazio, and Sarah*
                              *Doran*

**ATTORNEY CERTIFICATION PURSUANT TO RULE 3(C) OF THE INDIVIDUAL RULES OF PRACTICE IN CIVIL CASES OF JUDGE ROCHON**

I, Michael B. Carlinsky, an attorney duly admitted to practice law before this Court, hereby certify that this memorandum of law complies with the word limit set forth in Rule 3(C) of Your Honor's Individual Rules of Practice in Civil Cases because it contains 8,745 words, excluding the parts of the motion exempted from the word limit under Rule 3(C). In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

DATED:    New York, New York
             November 15, 2024

                                          */s/ Michael B. Carlinsky*
                                          Michael B. Carlinsky