UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FLEMING INTERMEDIATE HOLDINGS LLC,

Plaintiff,

-versus -

JAMES RIVER GROUP HOLDINGS, LTD.,
FRANK D'ORAZIO, and SARAH DORAN,

Defendants.

Case No. 1:24-cv-05335 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

In November 2023, Fleming Intermediate Holdings, LLC ("Fleming" or "Plaintiff"), a

Cayman Islands insurance company based in Bermuda, agreed to purchase the equity of a

Bermudan reinsurance company, JRG Reinsurance Company Ltd. ("JRG Re"), from its then-

parent James River Group Holdings, Ltd. ("James River" or "Defendant").  According to

Fleming, James River made material misrepresentations in connection with the parties' Stock

Purchase Agreement ("SPA") and breached various covenants contained therein.  Fleming

asserts claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), as well as state-law claims for fraud and

breach of contract.  Now before the Court is James River's Motion to Dismiss the Amended

Complaint.  For the following reasons, James River's motion is GRANTED.

## BACKGROUND[1]

### I.    Factual Allegations

### A.    The Parties

Fleming is a limited liability insurance company registered under the laws of the

Cayman Islands with a principal place of business in Bermuda and is majority owned by

---

[1] The Court considers "facts stated on the face of the complaint, documents appended to the
complaint or incorporated in the complaint by reference," and "documents not expressly

Altamont Capital Partners ("Altamont").  Dkt. 38 ("AC") ¶¶ 9, 16.  James River, a Bermuda

limited liability company headquartered in North Carolina, is a holding company that owns

and operates several insurance and reinsurance subsidiaries.[2]  AC ¶¶ 10, 17.  In or around

early 2023, James River "decided to exit the reinsurance business and began soliciting officers

for JRG Re, its wholly owned reinsurance subsidiary."  AC ¶ 18.  Frank D'Orazio is James

River's Chief Executive Officer and a director of the company.  AC ¶ 11.  Sarah Doran is

James River's Chief Financial Officer.  AC ¶ 12.

According to Fleming, when James River sought a purchaser for JRG Re in early

2023, it was "desperate for cash because, among other reasons, it had been embroiled for

several years in a significant securities fraud class action."  AC ¶ 19; *see* AC ¶ 18.  Fleming

submitted an offer to purchase JRG on June 16, 2023, AC ¶ 38, after which the parties entered

"several months of comprehensive negotiations regarding the specific terms on which

Fleming might purchase JRG Re," including "specific representations and warranties" that

would be incorporated in the parties' agreement, AC ¶ 39.  On behalf of Fleming, the

---

incorporated by reference in the complaint that are nevertheless 'integral' to the complaint."
*Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023) (alterations adopted) (citation omitted).  This
includes the November 8, 2023 Stock Purchase Agreement.

[2] The parties dispute the location of James River's headquarters.  Fleming alleges that James
River is "headquartered in North Carolina."  AC ¶ 42.  James River, on the other hand,
maintains that, as reflected in its 2023 public regulatory filings, it is a "Bermuda-based
company" with its "principal executive offices" in Bermuda.  Reply at 1-2 (citing James River
Group Holdings, Ltd., Annual Report (Form 10-K) at 5 (Feb. 29, 2024),
https://investors.jrvrgroup.com/static-files/e98692c4-e72b-4dd9-a050-7b93ebc71cb1).  At
oral argument, Fleming argued that, to the extent James River's 2023 10-K filing represents
that James River's principal executive offices are in Bermuda, that filing is "inaccurate."  Tr.
at 94:2-7.  According to Fleming, the Bermuda-based office was JRG Re's office, and, with
the exception of a single executive officer, James River's executive officers were located in
the United States.  *Id.* at 93:20-94:2.  Since this is a motion to dismiss, the Court must draw
"all inferences in the light most favorable" to Fleming, and therefore assumes for purposes of
this motion that James River is headquartered in North Carolina.  *In re NYSE Specialists Sec.
Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

negotiations were led by its Chief Executive Officer, its Head of Mergers and Acquisitions, and several of its directors, with "significant support form Fleming's general counsel." AC ¶ 40. The participating directors were Altamont employees who participated in the negotiations from California, while Fleming's general counsel participated in the negotiations from New Jersey. AC ¶ 40. On James River's side, the negotiations were led by D'Orazio, who participated from his home state of New Jersey and/or from James River's North Carolina headquarters, and Doran, who participated from North Carolina. AC ¶ 41. The negotiations also involved U.S.-based entities that provided the financing for Fleming's purchase of JRG Re, including New York–based bankers who provided debt financing for a portion of JRG Re's purchase price, AC ¶ 43, and U.S.-based lawyers for both sides, AC ¶ 42.

Fleming and James River executed the SPA on November 8, 2023, "pursuant to which Fleming agreed to purchase all shares of JRG Re from James River." AC ¶ 44. The "[a]greement was entered into upon the electronic exchange of signature pages transmitted by counsel for the parties . . . including a signature page executed in the United States by Frank D'Orazio on behalf of James River." AC ¶ 45. The parties agreed that they had until the "Outside Date" of June 3, 2024, to close the transaction, and if the transaction did not close by that date, either party could terminate the agreement. AC ¶ 53.

On November 22, 2023, the parties applied for approval of the transaction to the Bermuda Monetary Authority ("BMA"), "the primary regulator of both Fleming and JRG Re." AC ¶ 77.

### B.    The Stock Purchase Agreement

The parties agreed to close the agreement upon the satisfaction of various conditions precedent. Specifically, under section 6.1 of the SPA, Fleming's obligation to close the transaction was contingent on, among other things, (1) James River having "performed in all

material respects its obligations, covenants and agreements under" the SPA; (2) the agreement's representations and warranties being true "as of the date of th[e] [a]greement and as of the Closing Date as if made on the Closing Date"; and (3) the execution of a "side letter to be negotiated by the parties in good faith prior to Closing setting forth certain rights of Fleming . . . with respect to certain reinsurance transactions involving" a James River affiliate, for which James River was required to "have delivered to the Buyer [*i.e.,* JRG Re] a signature page" once the side letter was "in a form mutually acceptable to the parties."  AC ¶ 56 (first and third alterations in original).  According to Fleming, these and other conditions precedent to closing were not satisfied.  *See, e.g.*, AC ¶¶ 88-94.

The SPA did not set forth a specific purchase price for JRG Re.  Rather, in consideration for its sale of JRG Re's equity, James River "was to receive *up to* approximately $300 million" consisting of (1) "a cash payment from Fleming to James River of $138 million," subject to a pre-closing adjustment and a post-closing "true-up" process pursuant to SPA sections 1.3 and 1.4, and (2) "*up to* $139 million that was to be paid by JRG Re to James River prior to the closing date pursuant to SPA § 4.12."  AC ¶ 63.  SPA section 1.3 provided that the actual amount paid by Fleming to James River would vary in accordance with JRG Re's net worth as of the closing date.  AC ¶ 64.  JRG Re's net worth was in turn "directly impacted by the amount of reserves it ha[d] set aside to pay future claims."  AC ¶ 65.

As for JRG Re's payment to James River, SPA section 4.12 provided that James River would "use reasonable best efforts (including making any Governmental Filings) to cause the Company [*i.e.*, JRG Re] to declare and pay, at least three (3) Business Days prior to the Closing Date, a payment (whether as a dividend or return of capital or surplus, in accordance with applicable Law) to the Seller," "in an amount equal to the Pre-Closing Dividend Amount," defined as $139 million.  AC ¶ 66 (alteration in original).  According to Fleming,

section 4.12's "reasonable best efforts language" reflects the parties' "acknowledge[ment] and agree[ment] that the actual amount paid by JRG Re to James River pursuant to Section 4.12 might have to be a lesser sum in light of 'applicable law,'" namely, Bermuda's Insurance Act 1978 and Bermuda's Companies Act 1981, AC ¶ 69. Specifically, Fleming alleges that JRG Re and James River "negotiated for a single payment compliant with Bermudan law that could be comprised of either a dividend, a return of capital, or a return of surplus — but not a combination thereof." AC ¶ 71. The parties "further agreed that James River would bear the risk that JRG Re might not be able to pay the contemplated $139 million"; "[i]n other words, the amount paid by Fleming would not increase in the event that JRG Re's payment to James River fell short." AC ¶ 75.

### C. Closing

According to Fleming, once the SPA was executed, James River "rushed" to close the transaction by year-end 2023, AC ¶ 81, including by lobbying the BMA "to provide prompt approval for the [t]ransaction so that it might close on or before December 31, 2023," AC ¶ 83. Fleming alleges that James River "hoped that the [t]ransaction would be completed before Fleming had an opportunity to discover James River's flagrant violations of the parties' [a]greement and the misrepresentations that James River had made in the [a]greement itself, which would result in Fleming purchasing JRG Re at a vastly inflated price." AC ¶ 84.

Moreover, "prompt closing of the [t]ransaction would have allowed James River to use consideration received for the sale of JRG Re to pay out tens of millions of dollars owed to investors in connection with its December 2023 settlement of earlier securities fraud claims brought against James River, D'Orazio, and Doran, as well as to pay down debts that James River owed to others with respect to which James River was already in default." AC ¶ 86.

Notwithstanding James River's efforts, however, "the [BMA] did not provide its approval for the [t]ransaction until February 2, 2024." AC ¶ 87.

### D.    James River's Breaches and Material Misrepresentations

Fleming alleges that "James River breached myriad covenants in the agreement, which was also replete with James River's material misrepresentations." AC at 22 (further capitalization omitted). Specifically, Fleming alleges that the following representations and warranties in the SPA were false, and that James River "knew, or was reckless in not knowing," that these representations and warranties were "either affirmative misrepresentations or . . . materially misleading in light of information of which James River was aware but failed to disclose to James River," AC ¶ 510; *see also* AC ¶ 535:

- SPA section 2.15: "[F]rom June 30, 2023 . . . (a) [JRG Re] has conducted its business in the ordinary course, (b) there has not been any event, occurrence or condition of any character that has had, or that would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, and (c) neither [James River] nor [JRG Re] has taken any action or failed to take any action that . . . would constitute a [breach] of Section 4.1." AC ¶ 514; *see* AC ¶¶ 514, 516, 541-544.

- SPA section 2.17(c)(ii): JRG Re is not "in default or breach in any material respect under the terms of" any Material Reinsurance Agreement, and "no event or circumstance ha[d] occurred that . . . would constitute an event of default thereunder or result in a termination thereof or would cause or permit acceleration of or other changes of or to any right or obligation or the loss of any benefit thereunder." AC ¶ 517 (alteration in original); *see* AC ¶¶ 517-519; 545-547.

- SPA section 2.24: "The assets . . . of [JRG Re] . . . as of the Closing . . . constitute all of the assets . . . that are necessary to conduct the Business immediately following the Closing Date in all material respects in substantially the same manner as the Business is being conducted as of the date [hereof]." AC ¶ 548 (omissions in original); AC ¶¶ 548-549.

- SPA section 2.26: JRG Re "has in place risk management . . . policies and procedures reasonably designed to protect against risks of the types reasonably expected to be incurred by Persons similarly situated." AC ¶ 520 (alteration in original); *see* AC ¶¶ 520-522, 550-552.

- SPA section 2.13(a)(i): JRG Re "has been in compliance in all material respects and has not been and currently is not in violation of any Laws . . . applicable to it or its assets, properties, or businesses." AC ¶ 511; *see* AC ¶¶ 511-513, 538-540.

- SPA section 2.4: "The execution, delivery, and performance by [James River or JRG Re] of th[e] Agreement . . . and the consummation . . . of the transactions contemplated [t]hereby . . . require no filing . . . or notification to[] any Governmental Entity . . . or Governmental Approval." AC ¶ 537 (second, third, and fourth alterations in original and first, third, fourth, and fifth omissions in original); *see* AC ¶¶ 536-37.

Specifically, Fleming alleges that various circumstances within JRG Re rendered the above-cited representations and warranties false and/or materially misleading, including: (1) debts owed by James River to JRG Re; (2) JRG Re's payment of an allegedly illegal dividend and return of capital to James River in February 2024; (3) JRG Re's default under its material reinsurance agreements; (4) the suppression of JRG Re's reserves; (5) James River's withholding of, and failure to adhere to, an independent analysis and recommendation with respect to JRG Re's reserves; and (6) JRE Re's failure to file accurate and updated regulatory filings with the BMA. AC ¶¶ 103-126, 127-135, 166-169, 177-182, 186-358. Those circumstances are discussed more fully below.

### 1. *Debts owed by James River to JRG*

Fleming alleges that, contrary to James River's covenant "to operate JRG Re in the ordinary course of business," AC ¶ 105 (alteration adopted), and James River's representation that it would "cause [JRG Re] not to . . . make any material loans, advances or capital contributions," AC ¶ 106 (alteration and omission in original) (quoting SPA § 4.1(h)), James River "[l]ooted $20 [m]illion from JRG Re in December 2023," AC at 24.

Specifically, "[p]ursuant to a longstanding practice," JRG Re would "pay various expenses on James River's behalf" or "provide James River with money to pay those expenses," with the debts owed to JRG Re by James River recorded as an "intercompany receivable" from James River to JRG Re. AC ¶ 103. Prior to the year-end closing of the

books, the outstanding amount of the intercompany receivable owed by James River would ordinarily be paid down to "just under $20 million"; "[i]n other words, James River typically owed JRG Re approximately $20 million at the end of each year." AC ¶ 104.

"As of November 30, 2023, the intercompany receivable owed by James River to JRG Re was approximately $111 million and JRG Re had approximately $28 million in unencumbered assets." AC ¶ 108. In December 2023, contrary to James River's ordinary practice, James River caused JRG Re to advance an additional $20 million in cash in exchange for no consideration, "notwithstanding that JRG Re had only approximately $28 million in liquid assets at the start of that month." AC ¶ 109. "As a result, the intercompany receivable stood at approximately $130 million as of December 31, 2023 — more than six times its typical $20 million year-end value." AC ¶ 118.

According to Fleming, "James River had begun contemplating this exact plan months before the [a]greement had even been signed." AC ¶ 112. For example, on July 29, 2023, Doran wrote to James River's Chief Accounting Officer, James River's controller, and JRG Re's Chief Financial Officer "asking whether anything would preclude James River 'from moving assets out of JRG Re now' and thereby 'increasing the intercompany receivable,' notwithstanding James River and JRG Re's historic 'focus on the size of the intercompany receivable at [year end].'" AC ¶ 112 (alterations adopted).

On January 29, 2024, Fleming first learned about the $20 million transaction from JRG Re to James River, AC ¶ 123, and inquired as to what was "driving the increase in intercompany receivables from 11/30/23 to 12/31/23," AC ¶ 124. On February 6, 2024, James River replied, "[m]ainly the $20.5 total intercompany advances a part of ordinary business to funding Holding's operational cash needs and dividends." AC ¶ 125. Fleming argues that there was "nothing 'ordinary' about James River's looting of JRG Re in advance

of the closing, nor its related decision to deviate from its ordinary course of business by not paying down the intercompany receivable at year-end."  AC ¶ 126.

### 2.  JRG Re Payments

Fleming next alleges that in February 2024, JRG Re made a combined $139 million payment to James River, thereby "violat[ing] Bermuda law (as the Bermuda Monetary Authority recently confirmed), breach[ing] the SPA, and render[ing] several material representations that James River made therein false and misleading as of the [t]ransaction's closing date."  AC ¶ 135.  Specifically, Fleming alleges that "Bermuda law did not permit JRG Re's combined $139 million payments to James River"; "Bermuda insurance law did not permit either of JRG Re's individual payments"; and the "payments violated Bermuda law by rendering JRG Re insolvent."  AC at 33, 37-38 (further capitalization omitted).

As noted above, section 4.12 of the SPA provided that, prior to closing, James River would "use reasonable best efforts (including making any Governmental Filing)" to cause JRG Re to make "a payment (whether as a dividend or return of capital or surplus, in accordance with applicable Law) to James River in an amount _up to_ $139 million."  AC ¶ 127. On February 23, 2024, James River caused JRG Re to make two payments totaling $139 million, reducing JRG RE's statutory capital of $323 million by approximately 43 percent, without first obtaining the permission of its Bermudan regulator.  AC ¶ 149.  Fleming alleges that while the language of section 4.12 provided for a "_single_ transaction that could take the form of _either_ a dividend, or a return of capital, or a return of surplus, . . . it did not provide for multiple payments comprised of a combination thereof."  AC ¶ 136.

Fleming also alleges that the SPA was breached because the payments were not made "in accordance with applicable [l]aw," AC ¶ 140, that is, Bermuda's Insurance Act 1978, _see_ AC ¶¶ 140-146.  Section 31B of Bermuda's Insurance Act 1978 prohibits a Bermuda

insurance company from "paying dividends which would exceed 25% of its total statutory capital and surplus in any given financial year without first submitting an application to the [BMA]," AC ¶ 142 (alteration adopted) (internal quotation marks omitted), while section 31C prohibits a Bermuda insurance company from "reducing by 15% or more its total statutory capital in any given year without first receiving authorization from the [BMA]," AC ¶ 143 (internal quotation marks omitted).  "Read together, and absent application to or approval from the [BMA], Section 31C thus limits Bermudian insurance companies from taking payments that would reduce their statutory capital by 15% or more in any given year, unless they also have 'surplus' (*i.e.*, profits) from which they can make a further payment in the form of a dividend up to the higher 25% limit imposed by Section 31B."  AC ¶ 144.

According to Fleming, JRG Re's combined payments to James River surpassed these thresholds and were made without first obtaining the permission of the BMA, thereby rendering them illegal under Bermuda law.  AC ¶¶ 148-149.  In an October 15, 2024 letter, the BMA noted that JRG Re's reduction of capital and surplus exceeded by more than 15 percent the company's total statutory capital as set out in the company's prior year financial statements dated December 31, 2023, and that JRG Re's failure to formally seek the BMA's approval prior to the capital reduction constituted a "breach of Section 31C(4) of the [Bermuda] Insurance Act 1978."  AC ¶ 151.  Fleming alleges that the payments also violated section 54 of Bermuda's Companies Act 1981, which "prohibits companies from paying dividends or distributing capital if there are 'reasonable grounds for believing that' after doing so the company would be 'unable to pay its liabilities as they become due.'"  AC ¶ 160.

"Eventually, the continued delay in closing the [t]ransaction forced James River to consider reversing some of the payments it had taken and refunding money to JRG Re to allow its subsidiary to continue operating."  AC ¶ 172.  In April 2024, James River provided

JRG Re with approximately $6 million to fund JRG Re's operating expenses and to allow JRG Re to pay out pending insurance claims.  AC ¶ 177.  According to Fleming, this payment, too, was in breach of the SPA, as subsection 4.1(h)(B) prohibited James River from "making any . . . capital contributions to, or investments in, any other Person" between its execution of the agreement in November 2023 and the transaction's closing.  AC ¶ 178 (alteration adopted) (omission in original).

### 3.  JRG Re's Default Under Material Reinsurance Agreements

Fleming also alleges that James River misrepresented that it was not "'in default or breach in any material respect under the terms of' certain reinsurance agreements and that, 'to the Knowledge of the Seller [*i.e.,* James River] no event or circumstance had occurred that . . . would constitute an event of default thereunder or result in a termination thereof or would cause or permit the acceleration of or other changes of or to any right or obligation or the loss of any benefit thereunder.'"  AC ¶ 186 (alteration and omission in original) (quoting SPA § 2.17(c)(ii)).  According to Fleming, this representation "was not true at the time the parties entered into the [a]greement," and "James River's illegal looting of JRG Re's assets caused JRG Re to further breach its reinsurance agreements before the [t]ransaction closed."  AC ¶ 187.  "In particular, certain of JRG Re's reinsurance agreements with a significant counterparty (the 'Cedent') included covenants requiring JRG Re to post collateral upon the occurrence of various enumerated events in order to provide the Cedent with confidence that JRG Re actually had sufficient assets to pay out insurance claims under their contracts."  AC ¶ 188.  According to Fleming, "JRG Re breached those agreements in a material respect and was in default thereunder both prior to signing the [SPA] and prior to closing the [t]ransaction in light of its failure to post that required collateral."  AC ¶ 188.

Specifically, when JRG Re's capital decreased by more than 10 percent between year-end 2021 and year-end 2022, JRG Re was obligated to post "tens of millions of dollars" of collateral in early 2023 but did not honor that obligation.  AC ¶ 191.  On November 10, 2023, the Cedent sought to enforce its rights in connection with JRG Re's year-end 2022 default, stating in email correspondence that JRG Re's year-end 2022 decrease in capital "'constituted a default event under the parties' applicable agreements' such that the Cedent was now acting upon that earlier 'policyholder surplus covenant breach.'"  AC ¶ 208 (alteration adopted).  On December 20, 2023, JRG Re's financial-strength rating was downgraded by credit-ratings agency AM Best, AC ¶ 211, "trigger[ing] JRG Re's obligations to post approximately $63 million in additional collateral to certain of its reinsurance counterparties, with nearly $62 million of that collateral due to the Cedent specifically," AC ¶ 212.  JRG nevertheless did not post that collateral because it lacked sufficient assets to do so.  AC ¶ 213.

On March 5, 2024, Doran and D'Orazio were informed that, because of the pre-closing dividend that JRG Re paid to James River in February 2024, JRG Re was contractually obligated to post approximately $62 million in collateral to two reinsurance counterparties, and an additional $63 million in collateral to three reinsurance counterparties due to JRG Re's credit-rating downgrade.  AC ¶¶ 217-218.  "In total, Mr. D'Orazio and Ms. Doran were informed that JRG Re owed its counterparties approximately $125 million in collateral — nearly all of which was due to the Cedent specifically."  AC ¶ 219.  "On March 14, 2024, the Cedent informed JRG Re that its obligation to post additional collateral for the Cedent's benefit had been triggered."  AC ¶ 226.  JRG Re did not satisfy its obligations under these reinsurance agreements.  AC ¶¶ 220, 231.

### 4.  *JRG Re's Reserves*

Fleming next alleges that "James River attempt[ed] to artificially manipulate the

purchase price by improperly manipulating JRG Re's reserves."  AC at 60 (further

capitalization omitted).  According to Fleming, James River's Reserve Committee had

"significant incentive" to manipulate JRG Re's reserves because "suppressing . . . JRG Re's

reserves would increase JRG Re's net worth and thus increase the component of the purchase

price that Fleming was to pay James River."  AC ¶ 234.  Fleming alleges that in changing how

it set JRG Re's reserves, James River violated SPA section 4.1(x)'s covenant that JRG Re had

"conducted its business in the ordinary course," as well as section 4.1(f)'s prohibition on

"making or adopting any changes in the actuarial, . . . risk retention, risk management . . . and

reserving . . . policies, practices, or principles" of JRG Re.  AC ¶ 260 (alterations adopted)

(omissions in original).

Reserves are "the funds from which policyholder claims are paid," making them "a

key metric of an insurer's financial health."  AC ¶ 232.  "Reserves are recorded as liabilities

on insurance companies' balance sheets to account for payments that the insurance company

expects to make on future claims."  AC ¶ 232.  During the relevant time period, James River

changed its policies for setting reserves, including "by ceasing to use the Paid Loss

Development Method, one of five actuarial techniques that James River had previously used

to determine JRG Re's reserves but which it ceased using prior to year-end 2023."  AC ¶ 236.

On December 12, 2023, Ernst & Young ("E&Y") "met with James River . . . at which

time [E&Y] provided a presentation demonstrating that JRG Re's reserves of $185 million

were nearly 30% below the $258 million that Ernst & Young deemed appropriate, reflecting a

shortfall of approximately $73 million."  AC ¶ 243.  On or about February 5, 2024, E&Y met

with Doran to inform James River that it had identified a "judgmental misstatement"

concerning JRG Re's reserves, "meaning that [E&Y] was formally notifying James River that it could not sign off on James River's financial statements as part of the annual audit process in light of problems with JRG Re's reserves." AC ¶ 246. After this meeting, Doran instructed James River to increase JRG Re's reserves by $17 million, "the minimum increase that [E&Y] had informed Ms. Doran would be needed for [E&Y] to sign off on James River's financial statements, but still tens of millions of dollars below [E&Y's] central estimate for appropriate reserving at JRG Re." AC ¶ 254.

"As a result of these adjustments, JRG Re's $207 million in reserves now met the low-end of the range [E&Y] was willing to accept for the larger James River group (which included JRG Re, among other subsidiaries), but JRG Re's reserves were still $48 million short of the amount that [E&Y] deemed appropriate . . . ." AC ¶ 262.

### 5. Independent Analysis of JRG Re's Reserves

Fleming next alleges that "James River intentionally and wrongfully deprived JRG Re of necessary information concerning JRG Re's finances," AC at 70 (further capitalization omitted), breaching SPA section 4.1(x)'s requirement that it operate JRG Re "in the ordinary course of business," as well as SPA section 4.1(f)'s prohibition against making any changes to JRG Re's "actuarial, . . . risk retention, risk management, [or] reserving . . . policies, practices, or principles," AC ¶ 281 (omission and alteration in original).

Specifically, in addition to retaining E&Y as an independent auditor, since at least 2019, James River has retained insurance company Willis Towers Watson to "provide an independent analysis of JRG Re's reserves as of the third and fourth quarter of each year." AC ¶ 263. This is consistent with Bermuda's Insurance Act 1978, which "requires insurance companies to have a 'loss reserve specialist' opine on the adequacy of their reserves." AC

¶ 264.  Willis Towers Watson's opinions pertaining to the adequacy of JRG Re's reserves are also submitted annually to the BMA, as mandated by Bermuda law.  AC ¶ 264.

On December 28, 2023, Willis Towers Watson provided Doran with its September 30, 2023 Loss Reserve Analysis for JRG Re, AC ¶ 274; however, "[i]n a break from normal practice, Willis Towers Watson's analysis was never provided to . . . JRG Re executives because James River expressly instructed Willis Towers Watson not to do so in light of the anticipated [t]ransaction," AC ¶ 275.  "[T]he substance of Willis Towers Watson's December 28, 2023, report was troubling because it revealed that James River's Reserve Committee (including Mr. D'Orazio and Ms. Doran) had set aside approximately $185 million in reserves for JRG Re as of September 30, 2023, but Willis Towers Watson determined that JRG Re actually needed reserves of approximately $205 million as of that date in light of the claims it would be expected to pay out going forward."  AC ¶ 276.  A subsequent Willis Tower Watson analysis, circulated on February 20, 2024, AC ¶ 283, revealed that "JRG Re's reserves were short by at least $26 million as of year-end 2023, 11% below the amount needed, even after accounting for the increase mandated by Ernst & Young," AC ¶ 287.

On April 18, 2024, JRG Re was informed that Willis Towers Watson was issuing a "deficient opinion" that it was prepared to present to the BMA.  AC ¶ 304.  That is, Willis Towers Watson had formally concluded that JRG Re did "not make a reasonable provision" of reserves given the "terms of its insurance contracts and agreements."  AC ¶ 305.  According to Fleming, this opinion caused "immense harm to JRG Re as it required a significant increase to the company's reserves," AC ¶ 306, and "prevented JRG Re from finalizing its 2023 financial statements," AC ¶ 307.

6. *JRE Re's Annual Filings to the BMA*

Moreover, Fleming alleges that JRG Re violated Bermuda law, in contravention of the SPA's representation that James River was "in compliance in all material respects and has not been and currently is not in violation of any Laws," by submitting inaccurate and outdated regulatory filings to the BMA in 2022 and by failing to file accurate and updated filings with the BMA in 2023. AC ¶ 372.

As a Bermuda-based insurance company, JRG Re is required to comply with the Insurance Code of Conduct (the "Bermuda Insurance Code"), section 5 of which requires Bermudan insurance companies to "adopt an effective risk management and internal controls framework" that is consistent with "international best practices on risk management and internal controls." AC ¶¶ 309-310. For Class 3B insurers like JRG Re, the BMA also requires that annual capital and solvency return filings include a:

> "Schedule of Risk Management" that addresses the "insurer's risk management structure" including various components such as a "Risk Register" disclosing to the regulator "the insurer's material risks," the "impact and profitability of the risk," a "summary of the risk mitigation/controls" that the insurer has 'in place and an assessment of their effectiveness,' and an "overall assessment of the impact and profitability of the residual risk" once the company's controls are accounted for.

AC ¶ 312. According to Fleming, JRG Re "failed to comply with the Bermuda Insurance Code" because "its Framework and Register were each both false and woefully outdated, as a result of which the company lacked an effective risk management and internal controls framework." AC ¶ 317.

Although JRG Re's Register provided that it would be updated annually, the last nonsubstantive update to JRG Re's Register as submitted to the BMA took place more than two years before the closing of the transaction in April 2024, and the last substantive update was "years earlier than that." AC ¶ 321; *see* AC ¶¶ 319-321. Moreover, according to

Fleming, the Risk Register and Framework that JRG Re submitted to the BMA in April 2022 was "already woefully outdated and inaccurate" as of the date of its submission.  AC ¶ 323. "JRG Re thereafter failed to provide the [BMA] with its Risk Register and Framework in 2023, notwithstanding that the Framework and Register JRG Re had submitted to the regulator in 2022 were already false and misleading at the time but still had not been corrected."  AC ¶ 349.

> ### E.    Closing

On December 21, 2023, and January 29, 2024, James River provided Fleming with allegedly "incomplete and inaccurate" Estimated Closing Statements.  AC ¶¶ 401-402.  The closing statements "nevertheless revealed enough for Fleming to raise questions about what was going on at JRG Re," AC ¶ 402, and on February 27, 2024, Fleming requested a "business-to-business meeting," AC ¶ 403.  James River refused Fleming's request.  AC¶ 404. On February 29, 2024, Fleming wrote to James River to provide notice that the Agreement had been breached but underscored that it "remained committed to pursuing the transaction on the terms and conditions set forth in the [a]greement" and that it "continued to be ready and willing to proceed to Closing, subject in all cases to James River's satisfactory cure of its breaches."  AC ¶ 405 (alterations adopted).  Moreover, as of March 1, 2024, the parties had yet to finalize the side-letter condition precedent to closing, meaning that "SPA § 6.1(d)'s closing condition remained unsatisfied on that date."  AC ¶ 416.

According to Fleming, early in the morning on March 1, 2024, James River sent a letter to Fleming "demanding that Fleming proceed with the Closing at 10am today, March 1st."  AC ¶ 417 (alteration adopted).  James River purportedly proceeded with the March 1, 2024 closing meeting, notwithstanding "that it knew Fleming would not attend because multiple conditions to closing were not satisfied."  AC ¶ 418.

### F.   State Court Litigation

On March 11, 2024, James River commenced litigation against Fleming in the Supreme Court of the State of New York, asserting a single cause of action for breach of the SPA predicated on Fleming's purported failure to close on March 1, 2024.  AC ¶ 422.  On March 13, 2024, James River moved for a mandatory preliminary injunction in state court to compel Fleming to close on the transaction.  AC ¶ 423.  In a sworn affidavit submitted in support of the motion for a preliminary injunction, D'Orazio represented that the "conditions to closing" required under the Agreement "had been or would be satisfied at closing."  AC ¶ 361 (alterations adopted) (quoting Affirmation of Frank D'Orazio in Support of Plaintiff's Application for an Order to Show Cause for Entry of a Preliminary Injunction at ¶ 29, *James River Grp. Holdings, Ltd. v. Fleming Intermediate Holdings LLC*, Index No. 651281/2024, (N.Y. Sup. Ct. Mar. 13, 2024), NYSCEF No. 24).

At oral argument on its motion for a preliminary injunction on March 27, 2024, James River acknowledged that the parties still had not finalized the side letter required by the agreement but nevertheless represented to the court that the parties "could negotiate the side letter in a matter of hours" because the remaining issues required only "the kind of revisions that typically get worked out," even as it admitted that they "haven't signed [it] so far." Transcript of Oral Argument at 13:13-16, 16:11-13, 17:11-13, *James River Grp. Holdings*, Index No. 651281/2024 (N.Y. Sup. Ct. Mar. 27, 2024), NYSCEF No. 141.  James River's preliminary injunction motion was granted on April 6, 2024, with the New York Supreme Court stating in a footnote that it was "unnecessary for the court to address Fleming's side letter objection" because James River had expressed "its willingness to execute Fleming's side letter with no modifications."  Decision & Order on Motion at 2 n.4, 20, *James River Grp. Holdings*, Index No. 651281/2024 (N.Y. Sup. Ct. Apr. 6, 2024), NYSCEF No. 110.

As compelled by the state-court order, Fleming closed on its acquisition of JRG Re on April 16, 2024, at which time Fleming paid $152.4 million to James River.  TAC ¶ 469.  On April 18, 2024, the First Department of the Appellate Division denied Fleming's request for a stay of the preliminary-injunction decision pending appeal.  TAC ¶ 474.

## II.    Procedural History

Fleming commenced this litigation on July 15, 2024.  Dkt. 1.  On July 30, 2024, the parties submitted a joint stipulation to, among other things: (1) stay the True-Up Process's resolution period as required under the SPA until after the parties resolved their informational disputes or the Court ruled on Fleming's preliminary-injunction motion, and (2) permit Fleming to file a supplemental complaint incorporating new factual allegations concerning events that occurred subsequent to the filing of the original complaint but stemmed from the same conduct.  Dkt. 21.  The Court entered the joint stipulation on July 31, 2024, Dkt. 22, and Fleming filed its supplemental complaint with additional allegations pertaining to James River's further misconduct since the filing of the Complaint the same day, Dkt. 23.  On August 29, 2024, Fleming's motion for a preliminary injunction was granted, Dkt. 32, requiring James River to produce information sought by Fleming to resolve the parties' dispute with respect to the post-closing purchase price, *see id.* at 1-2.  Fleming filed an Amended Complaint on October 18, 2024, Dkt. 38, which it subsequently refiled with appropriate redactions on November 14, 2024, Dkt. 52.  On November 15, 2024, James River moved to dismiss the Second Amended Complaint.  Dkt. 53; Dkt. 54 ("Br.").  On December 23, 2024, Fleming filed an opposition to the motion to dismiss, Dkt. 58 ("Opp."), and on January 17, 2025, James River filed a reply, Dkt. 60 ("Reply").

**LEGAL ANALYSIS**

Fleming brings securities fraud claims against James River under section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in connection with James River's alleged pre- and post-signing misrepresentations (Counts I & II), as well as a control-person liability claim against D'Orazio and Doran under section 20(a) of the Exchange Act (Count III). Fleming also brings a state law fraud claim against James River (Count IV), and various state-law claims for breach of contract against James River in connection with alleged violations of the parties' SPA (Counts V-X).

James River moves to dismiss the Exchange Act claims because (1) the Act cannot apply extraterritoriality; (2) they are duplicative of the breach of contract claims; and (3) they fail to state a claim on the merits. *See* Br. at 5-20. James River likewise argues that Fleming's common law fraud claim should be dismissed as duplicative of its breach of contract claim and for failure to allege the required elements of fraud. *Id.* at 20-21. As for Fleming's breach of contract claims, James River argues that Fleming has not adequately alleged breaches of each relevant provision of the SPA. *Id.* at 21-27. Finally, James River contends that Claims II, IV, and V-VII "should be dismissed to the extent they rely on allegations regarding the appropriate measure of JRG Re's reserves," because "that question will be determined by the SPA's Post-Closing True-Up Process." *Id.* at 27-28.

The Court turns first to Fleming's federal securities claims.

**I.    Fleming's Section 10(b) Claim**

"Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014). "To state a claim under Section 10(b) and Rule 10b-5,

a plaintiff must allege: '(1) a material misrepresentation or omission by the defendant;

(2) scienter; (3) a connection between the misrepresentation or omission and the purchase or

sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and

(6) loss causation.'" *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 532 (S.D.N.Y.

2024) (quoting *Halliburton*, 573 U.S. at 267). The requisite state of mind for purposes of a

section 10(b) violation is an "intent to deceive, manipulate, or defraud." *Tellabs, Inc. v.

Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*,

425 U.S. 185, 193-94 (1976)). As noted above, James River argues that Fleming's section

10(b) claims (1) are impermissibly extraterritorial; (2) are duplicative of Fleming's breach of

contract claim; and (3) fail to state a claim on the merits. *See* Br. at 5.

For the reasons set forth below, the Court finds that Fleming's section 10(b) claim is

extraterritorial. The Court therefore need not reach James River's other grounds for dismissal.

### A.    Extraterritoriality

The SPA did not involve a transaction in securities listed on any U.S. exchange. In

*Morrison v. National Australia Bank Ltd.*, the Supreme Court declined to apply section 10(b)

extraterritorially, holding that the Exchange Act applies "only [to] transactions in securities

listed on domestic exchanges, and domestic transactions in other securities." 561 U.S. 247,

267 (2010); *see id.* at 265. Prior to *Morrison*, the Second Circuit applied a "conducts-and-

effects" test to discern whether section 10(b) should apply in a given case: district courts

asked "whether the wrongful conduct had a substantial effect in the United States or upon

United States citizens," and "whether the wrongful conduct occurred in the United States."

*Morrison*, 561 U.S. at 257-58 (citation omitted); *see also Cavello Bay Reinsurance Ltd. v.

Stein*, 986 F.3d 161, 165 (2d Cir. 2021). *Morrison* supplanted that test, finding that it

"disregard[ed] . . . the presumption against extraterritoriality," *id.* at 255, and was too "vague"

and difficult to implement, *id.* at 258; *see id.* at 257-59. Affirming the Second Circuit's

dismissal of Australian nationals' claims against an Australian bank in connection with shares

traded on Australian exchanges, *Morrison* observed that "the focus of the Exchange Act is not

upon the place where the deception originated, but upon purchases and sales of securities in

the United States." *Id.* at 266.

As relevant here, in "reject[ing] the notion that the Exchange Act reaches conduct in

this country affecting exchanges or transactions abroad," the Supreme Court underscored that

"[t]he probability of incompatibility with the applicable laws of other countries is so obvious

that if Congress intended such foreign application 'it would have addressed the subject of

conflicts with foreign laws and procedures.'" *Id.* at 269 (*quoting EEOC v. Arabian Am. Oil

Co.*, 499 U.S. 244, 256 (1991)). The Supreme Court stressed:

> Like the United States, foreign countries regulate their domestic securities
> exchanges and securities transactions occurring within their territorial
> jurisdiction. And the regulation of other countries often differs from ours as to
> what constitutes fraud, what disclosures must be made, what damages are
> recoverable, what discovery is available in litigation, what individual actions
> may be joined in a single suit, what attorney's fees are recoverable, and many
> other matters.

*Id.; see also Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198,

215 (2d Cir. 2014) (identifying as the "principal reason" for *Morrison*'s rejection of

section 10(b)'s extraterritorial application the "probability of incompatibility with the

applicable laws of other countries" (quoting *Morrison*, 561 U.S. at 269)).

*Morrison* thus adopted a "transactional test" that asks only "whether the purchase or

sale is made in the United States, or involves a security listed on a domestic exchange."

*Morrison*, 561 U.S. at 269-70. Therefore, post-*Morrison*, "[w]ith regard to securities *not*

registered on domestic exchanges, the exclusive focus [is] on *domestic* purchases and sales."

*Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 66 (2d Cir. 2012) (second alteration in original) (quoting *Morrison*, 561 U.S. at 268).

Interpreting *Morrison*, the Second Circuit has since clarified that, while a "domestic securities transaction (or transaction in a domestically listed security) [is] necessary to a properly domestic invocation of § 10(b), such a transaction is not alone sufficient to state a properly domestic claim under the statute." *Parkcentral*, 763 F.3d at 215.  Section 10(b) will still be inapplicable if "the claims in th[e] case are so predominantly foreign as to be impermissibly extraterritorial." *Id.* at 216.  Finally, "whether [Plaintiff's] claims are sufficiently domestic under *Morrison* 'is a merits question' that properly is considered on a motion to dismiss under Rule 12(b)(6)." *In re iAnthus Cap. Holdings, Inc. Sec. Litig.*, No. 20-cv-03135 (LAK), No. 20-cv-03898 (LAK), 2022 WL 4539119, at *5 (S.D.N.Y. Sept. 28, 2022) (quoting *Morrison*, 561 U.S. at 254), *modified on other grounds*, 2022 WL 19037215 (S.D.N.Y. Dec. 7, 2022); *see also Parkcentral*, 763 F.3d at 201-02 (affirming dismissal of complaint under Rule 12(b)(6) based on extraterritoriality of plaintiff's section 10(b) claim; *Cavello Bay Reinsurance Ltd. v. Stein*, 986 F.3d 161, 163-64 (2d Cir. 2021) (same).

James River argues that Fleming's section 10(b) claim is impermissibly extraterritorial because Fleming fails to plead a domestic transaction and because Fleming's claim is in any event predominantly foreign.  Br. at 5.  For the reasons set forth below, the Court finds that Fleming's section 10(b) claim, as pleaded, may be domestic but is so predominantly foreign as to be extraterritorial.

### 1. Domestic Transaction

As there is no claim that the securities at issue were listed on a U.S. exchange, the Court must determine whether Fleming adequately pleads that its purchase of JRG Re's shares constituted a domestic purchase or sale.  *Morrison* left unresolved the question of under what

circumstances a purchase or sale of a security that is not listed on a domestic exchange may nevertheless be deemed "domestic."  The Second Circuit took up the issue in *Absolute Activist*, explaining that, to sufficiently allege the existence of a domestic transaction, "plaintiffs must allege facts indicating that irrevocable liability was incurred or that title was transferred within the United States." *Absolute Activist,* 677 F.3d at 62; *see also Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018) (similar).  For the reasons set forth below, the Court finds that irrevocable liability was incurred in the United States and that Fleming's purchase of JRG Re's shares was therefore a domestic transaction.

"[I]n order to adequately allege the existence of a domestic transaction, it is sufficient for a plaintiff to allege facts leading to the plausible inference that the parties incurred irrevocable liability within the United States: that is, that the purchaser incurred irrevocable liability within the United States to take and pay for a security, *or* that the seller incurred irrevocable liability within the United States to deliver a security." *Absolute Activist*, 677 F.3d at 68 (emphasis added).  "Irrevocable liability attaches 'when the parties become bound to effectuate the transaction, that is when the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time.'" *Cavello Bay Reinsurance Ltd. v. Stein*, No. 18-cv-11362 (KMK), 2020 WL 1445713, at *7 (S.D.N.Y. Mar. 25, 2020) (quoting *Giunta*, 893 F.3d at 79), *aff'd*, 986 F.3d 161; *see also Williams v. Binance*, 96 F.4th 129, 136 (2d Cir. 2024) ("Irrevocable liability attaches when parties 'become bound to effectuate the transaction or enter into a binding contract to purchase or sell securities.'" (alterations adopted) (quoting *Mia. Grp. v. Vivendi S.A.* (*In re Vivendi, S.A. Sec. Litig.*), 838 F.3d 223, 265 (2d Cir. 2016))).  "To determine whether irrevocable liability was incurred within the United States, courts look to the terms, timing, and place of the parties' contracting and liabilities thereunder." *Giunta*, 893 F.3d at

79. "At the pleading stage, it is sufficient for the plaintiff 'to allege facts leading to the plausible inference' of a domestic transaction." *Id.* (quoting *Absolute Activist*, 677 F.3d at 68).

Fleming argues that irrevocable liability was incurred domestically because "James River is headquartered in North Carolina and its executives negotiated and entered into the Agreement while in New Jersey and North Carolina." Opp. at 16. Moreover, Fleming notes that "[t]he Agreement was negotiated by Fleming's general counsel in New Jersey, Fleming's directors in California, James River executives in New Jersey and North Carolina, and New York bankers who funded the transaction, with support from counsel in New York, Chicago, and Dallas." *Id.*

For purposes of determining when irrevocable liability attaches, courts should look to "the time when the parties to the transaction are committed to one another . . . in the classic contractual sense," that is, when "there was a meeting of the minds of the parties." *Absolute Activist*, 677 F.3d at 68 (quoting *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972)). The situs of a contract's formation and execution is therefore a highly relevant consideration. And, as noted above, under *Absolute Activist*, it is sufficient to show that *either* the seller *or* the buyer incurred liability domestically. *See id.* at 68; *see also Giunta*, 893 F.3d at 79-80 (similar). Fleming alleges that the SPA was negotiated in the United States, and, more importantly, that "the Agreement was entered into upon the electronic exchange of signature pages transmitted by counsel for the parties," "including a signature page executed in the United States by Frank D'Orazio on behalf of James River." AC ¶ 45. Therefore, the seller in this transaction — James River — incurred liability in the United States. Indeed, courts have found similar allegations as to contract formation and execution sufficient to allege irrevocable liability. *See, e.g.*, *VR Glob. Partners, L.P. v.*

*Petróleos de Venez.*, No. 23-cv-05604 (DLC), 2024 WL 1514982, at *3 (S.D.N.Y. Apr. 8, 2024) ("The FAC plausibly plead[ed] that the purchase of [the] 2020 Notes [was] a domestic transaction subject to § 10(b) and Rule 10b-5," including because the "Notes [were] governed by the Indenture and Pledge Agreement, which were negotiated and executed in New York and state that they are governed by New York law."), *aff'd sub nom. VR Glob. Partners, L.P. v. Petróleos de Venez., S.A.*, No. 24-1176, 2024 WL 4891271 (2d Cir. Nov. 26, 2024) (summary order); *In re iAnthus Cap. Holding*, 2022 WL 4539119, at *8 ("Hi-Med's claim that the Debenture was negotiated and executed by the parties at their respective offices in the United States . . . 'evinces contract formation' and gives rise to a plausible inference of a domestic transaction." (alteration adopted) (quoting *Cavello Bay*, 986 F.3d at 167)); *Arco Cap. Corp. v. Deutsche Bank AG*, 986 F. Supp. 2d 296, 301 (S.D.N.Y. 2013) ("Arco's agreement was executed in the United States, sent to Deutsche Bank's U.S. counsel, the securities were delivered in the United States, and the parties understood the transaction to close when funds and securities were delivered in New York."); *Liberty Media Corp. v. Vivendi Universal, S.A.*, 861 F. Supp. 2d 262, 269 (S.D.N.Y. 2012) ("Irrevocable liability was incurred when the Merger Agreement was executed on December 16, 2001.  The Merger Agreement was a binding agreement, not a preliminary agreement, and therefore satisfies the standard for irrevocable liability.")

James River, citing to the district court's decision in *Cavello Bay*, argues that "Fleming's allegation . . . that Defendant D'Orazio executed a signature page in the U.S. is . . . insufficient to establish a domestic transaction as Fleming fails to sufficiently allege that, under New York law, irrevocable liability was incurred at the time of that act rather than at the time of the 'delivery of [documents] to Plaintiff (in Bermuda).'"  Br. at 7 (alteration in original) (quoting *Cavello Bay*, 2020 WL 1445713, at *7).  But this argument is misplaced for

several reasons.  For one, the district court in *Cavello Bay* found that the underlying transaction was not consummated upon the execution of signature pages because under the terms of the parties' subscription agreement, the seller "reserve[d] the right, in its sole discretion, to accept or reject a subscription *for any reason whatsoever*."  *Cavello Bay*, 2020 WL 1445713, at *7 (further emphasis omitted).  There is no comparably broad, unilateral right to revoke the agreement in the parties' SPA.  Rather, the SPA sets forth conditions precedent to closing, *see* Dkt. 59-1 ("SPA") §§ 6.1, 6.2, and notes that, if such conditions are not satisfied, either party might revoke acceptance, *id.* § 7.1(d)-(e), but "district courts have held that the existence of" "conditions precedent to the closing of a deal do not render the transaction non-domestic," *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp. 3d 550, 561 (S.D.N.Y. 2014) (collecting cases), *aff'd*, 813 F.3d 98 (2d Cir. 2016); *see also Giunta*, 893 F.3d at 81 ("A number of district courts within this Circuit have similarly found that, under *Absolute Activist*, irrevocable liability may be incurred despite the existence of conditions necessary to closing the transaction abroad, including foreign approval.").  In any event, on appeal, the Second Circuit in *Cavello Bay* diverged from the district court's reasoning, finding that the parties' transaction, which involved an agreement signed in New York and received in Bermuda, "arguably took place in the United States."  986 F.3d at 165.  However, the Second Circuit ultimately concluded that the parties' transaction was predominantly foreign under *Parkcentral*, and "therefore assume[d], without deciding, that the parties' transaction was domestic under *Absolute Activist*."  *Id.*  The district court's decision with respect to the existence of a domestic transaction is therefore not persuasive.

For the foregoing reasons, the Court finds that Fleming has at least "allege[d] facts leading to [a] plausible inference . . . that the seller incurred irrevocable liability within the

United States to deliver a security." *Absolute Activist*, 677 F.3d at 68. At the pleading stage, that is enough to satisfy the threshold requirement of a "domestic" transaction.

### 2. Predominantly Foreign

That Fleming has adequately pleaded a domestic transaction does not, however, end the extraterritoriality inquiry. James River argues that, even if Fleming has adequately pleaded a domestic transaction, it still fails to state a claim under section 10(b) because "its claims involve conduct 'so predominantly foreign as to be impermissibly extraterritorial.'" Br. at 8 (quoting *Parkcentral*, 763 F.3d at 215). The Court agrees.

As noted above, the Second Circuit in *Parkcentral* held that the presence of a "domestic" securities transaction is a "necessary but not necessarily sufficient" predicate for invoking section 10(b). 763 F.3d at 216. "In certain cases, the facts may be so predominantly foreign as to render the application of section 10(b) impermissibly extraterritorial." *Giunta*, 893 F.3d at 82 (citing *Parkcentral*, 763 F.3d at 215). *Parkcentral* involved securities-based swap agreements executed in the United States but pegged to the price of German company Volkswagen AG's stock on foreign exchanges. 763 F.3d at 201. In affirming the dismissal of the complaint, the Second Circuit held that extending section 10(b) to "foreign defendants with no alleged involvement in plaintiffs' transactions, on the basis of the defendants' largely foreign conduct, for losses incurred by the plaintiffs in securities-based swap agreements based on the price movements of foreign securities," would constitute an "impermissibly extraterritorial" application of the statute, even if there was a domestic transaction. *Id.* at 201; *see id.* at 214-16. The Second Circuit also stressed *Morrison*'s emphasis on "[t]he potential for incompatibility between U.S. and foreign law," *id.* at 216-17, observing that "the fraudulent acts alleged in the complaint have been the subject of investigation by PCGerman regulatory authorities and adjudication in German courts," *id.* at 216. *Parkcentral* therefore

"use[d] *Morrison*'s focus on the transaction rather than surrounding circumstances, and flexibly consider[ed] whether a claim — in view of the security and the transaction as structured — [was] still predominantly foreign." *Cavello Bay*, 986 F.3d at 166-67 (describing *Parkcentral*).

Here, the underlying transaction involves foreign parties, a private agreement, and shares of a privately held Bermudan company not traded on any exchange. Those facts alone weigh in favor of finding that Fleming's claim is predominantly foreign. *See, e.g.*, *Cavello Bay*, 986 F.3d at 167 (finding that claim was predominantly foreign where the underlying transaction "implicate[d] only the interests of two foreign companies and Bermuda"). But more fundamentally, Fleming's Exchange Act claims are premised in substantial part upon alleged misrepresentations to the BMA and purported violations of Bermuda law. The entire transaction was conditioned on Bermuda regulatory approval. AC ¶ 82. Many of Fleming's alleged representations invoke Bermuda law, Bermuda regulations, or the BMA in some respect. While several of the alleged misrepresentations, including alleged misrepresentations pertaining to the parties' ordinary-course covenant, JRG Re's liquidity at closing, and JRG Re's risk-management policies, do not require this Court to actually engage with Bermuda law or regulations, others do. For instance, Fleming alleges that in section 2.13 of the SPA, James River mispresented that JRG Re has "been in compliance in all material respects and has not been and currently is not in violation of any Laws," SPA § 2.13(a), including because JRG Re violated Bermuda law by submitting false and outdated regulatory filings, AC ¶¶ 309-358, and by making illegal payments to James River, *id.* ¶¶ 127-185. Therefore, to find a material misrepresentation, the Court would first have to find a predicate violation of Bermuda's Insurance Act, Insurance Code, or Companies Act, such as that JRG Re violated Bermuda law before the SPA was signed when it submitted "false" regulatory filings to the

BMA in 2022; that it violated Bermuda law by failing to update those regulatory filings in 2023; or that it separately violated Bermuda law by making illegal payments to James River in February 2024. *See id.* ¶¶ 349-350.  Likewise, Fleming's assertion that James River misrepresented in section 2.4 of the SPA that BMA approval was not necessary to take $139 million from JRG Re turns on Bermuda's Insurance Act and what is required thereunder. *See id.* ¶¶ 536-537.  And Fleming's assertion that James River misrepresented that there had not been any event, occurrence, or condition that "would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect," SPA § 2.15, depends at least in part on finding that JRG Re violated Bermudan laws and regulations in a manner that had "a material adverse effect" on the company's operations and finances.  Indeed, Fleming's Complaint relies upon the fact that the BMA has "now expressly found" that JRG Re "repeatedly violated Bermudian law."  AC ¶ 503.  Moreover, Fleming represents that "JRG Re *continues* to work through these issues with its [Bermuda] regulator — including its inaccurate 2022 regulatory filings and the absence of required regulatory filings in 2023, as well as its illegal payments to James River — although the ultimate outcome of that ongoing process is not yet known at this time."  AC ¶ 368 (emphasis added).  There are therefore parallel foreign regulatory proceedings pertaining to the very conduct alleged herein.  This case introduces the very "potential for incompatibility between U.S. and foreign law" that the courts warned of in *Morrison*, and later, *Parkcentral.  Parkcentral*, 763 F.3d at 216-17.[3]

---

[3] At oral argument, Fleming argued that *Morrison's* concern was with respect to "potential incompatibility" with foreign *securities* laws, and not with respect to potential incompatibilities between regulatory regimes more generally.  Tr. at 101:9-25.  But where several of Fleming's securities fraud allegations depend upon violations of Bermuda insurance law and regulations, the same concerns as to "incompatibility with the applicable laws of other countries" (and with the decision-making of other countries' legal and regulatory bodies) are implicated herein as in *Morrison* and *Parkcentral.  Parkcentral*, 763 F.3d at 215 (quoting *Morrison*, 561 U.S. at 269)).

Fleming nevertheless contends that the alleged fraud is predominantly domestic because "the U.S. is where (i) James River is headquartered; (ii) D'Orazio and (iii) Doran acted; (iv) Fleming acted; (v) Altamont provided equity-financing; (vi) bankers provided debt-financing; (vii) the Agreement was negotiated; (viii) and entered (ix) subject to New York law; (x) James River made misrepresentations; (xi) payments (xii) and title transferred; and (xiii) the transaction closed." Opp. at 17 (citing AC ¶¶ 16, 39-52). Fleming's assertions can broadly be characterized as allegations that (i) company executives operated out of the United States; (ii) U.S.-based entities financed the transaction; and (iii) some of the negotiations occurred in the United States. These facts do not suffice, however, to overcome the substantial foreign connections set forth above; indeed, other material details of the transaction such as the parties to the transaction and the foreign nature of the security interests themselves are connected to Bermuda. *Cavello Bay*, 2020 WL 1445713, at *8 (finding relevant to the test for foreign predominance "[o]ther, material details, such as the identity of the entities and the foreign nature of the security interests themselves," which were "connected to Bermuda and not the United States").

The Second Circuit's binding decision in *Cavello Bay*, which invokes *Parkcentral*'s reasoning, guides the Court's findings given the close factual parallels to the case at hand. *Cavello Bay* involved a "private agreement for a private offering between a Bermudan investor . . . and a Bermudan issuer," whereby the investor purchased shares not listed on a U.S. exchange and "not otherwise traded in the United States." 986 F.3d at 167. There, as here, the complaint's allegations "ping-pong[ed] between New York and Bermuda." *Id.* at 164. In *Cavello Bay*, the Second Circuit assumed, without deciding, that the parties' transaction was a domestic transaction. *Id.* However, observing that the transaction ultimately involved foreign parties and foreign securities, the Second Circuit held that the

plaintiff "failed to plead a domestic application of § 10(b)" because the plaintiff's claims were so predominantly foreign, and thereby affirmed the dismissal of the case. *Id.* at 168. The Second Circuit acknowledged that the defendant had "solicited some U.S. investors," but concluded that this "means no more than that someone (else) might have an appropriately domestic claim." *Id.* at 167. Moreover, the Second Circuit observed that the plaintiff's remaining allegations — including that defendant "made the misstatement from New York"; "planned to use the funds to invest in U.S. insurance services"; "had its principal place of business and CEO and directors in New York"; and "was managed by a U.S. company" — were "vestiges from [the Second Circuit's] 'now-defunct conduct and effects test.'" *Id.* (quoting *Absolute Activist*, 677 F.3d at 70). As for the plaintiff's "allegations that the parties' communications executing the agreement were between New York and Bermuda," the Second Circuit underscored that "[s]uch considerations bear upon the threshold question whether the purchaser or seller incurred irrevocable liability in the United States," but "do not resolve the question whether the claims are nevertheless so predominantly foreign." *Id.* at 167-68. Thus, the Second Circuit affirmed the dismissal of the section 10(b) claim because it was "so predominantly foreign as to be impermissibly extraterritorial." *Cavello*, 986 F.3d at 165.

*Cavello Bay*'s reasoning applies with equal force here. Here, as in *Cavello Bay*, there is a private agreement governing the purchase of a foreign company whose shares are not listed on a U.S. exchange; a foreign seller; and a foreign buyer. Even if the Court assumes as true Fleming's allegation that James River's principal place of business is in the United States — rather than in Bermuda as the SEC filings indicate — the seller in *Cavello Bay* was also a Bermuda company with a principal place of business in the United States. *Id.* at 167. In attempting to distinguish *Cavello Bay*, Fleming glosses over many of the plaintiff's allegations in that case, which largely mirror Fleming's assertions here. *See, e.g.*, Opp. at 18.

Indeed, many of Fleming's arguments highlight facts found insufficient in *Cavello Bay*:
Fleming argues that executives were located in the United States, that negotiations took place
in the United States, that at least some fraudulent acts took place in the United States, and that
New York–based investors that financed the transaction were impacted by James River's
alleged misrepresentations.  These are remarkably similar to the allegations deemed
inadequate in *Cavello Bay*, where the Second Circuit stressed that "it is a rare case of
prohibited extraterritorial application that lacks *all* contact with the territory of the United
States."  *Id.* at 167 (quoting *Morrison*, 561 U.S. at 266).  As for Fleming's allegations that
U.S.-based investors helped finance the transaction, those parties are not now before the Court
and therefore do not inform the nature of the claims asserted in this litigation, which involve a
transaction "[that] implicates only the interests of two foreign companies and Bermuda."
*Cavello Bay*, 986 F.3d at 167; *see also Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620,
625-26 (S.D.N.Y. 2010) ("[R]ead as a whole, the *Morrison* opinions indicate that the Court
considered that under its new test § 10(b) would not extend to foreign securities trades
executed on foreign exchanges even if purchased or sold by American investors, and even if
some aspects of the transaction occurred in the United States.").  And, as explained in *Cavello
Bay*, Fleming's allegations pertaining to contract formation and execution bear on whether the
transaction was "domestic," but "do not resolve the question whether the claims are
nevertheless so predominantly foreign."  986 F.3d at 167-68.   Indeed, here, there are even
stronger foreign connections than in *Cavello Bay*.  As set forth above, the entire transaction
was approved by the BMA, AC ¶ 82; several of the contract's representations and warranties,
including James River's representation that JRG Re was "in compliance in all material
respects" with applicable laws, SPA § 2.13(a), invoke Bermuda law; and at least some of the
alleged misrepresentations involve JRG Re's compliance with Bermuda's Insurance Act,

Insurance Code, and Companies Act, *see, e.g.*, AC ¶¶ 127-185, 538-540.  *Cavello Bay*'s reasoning therefore necessarily compels this Court's conclusion given the additional foreign contacts in this case.

In arguing that section 10(b) extends to the underlying conduct alleged in the Amended Complaint, Fleming relies on inapposite cases that either involved U.S. parties or more attenuated foreign ties.  At oral argument, Fleming relied heavily on *Giunta v. Dingman* to argue that there are "substantial domestic contacts" here such that the invocation of section 10(b) is not impermissibly extraterritorial.  *Giunta*, 893 F.3d at 82; *see* Tr. at 105:11-18, 109:14-18, 117:19-22.  But Fleming highlights selective language from *Giunta* while overlooking the factual distinctions between that case and this action.  In *Giunta*, both parties to the underlying transaction were U.S. citizens.  893 F.3d at 82; *see also Cavello Bay*, 986 F.3d at 168 (distinguishing *Giunta* because "the plaintiff there was a U.S. citizen").  Moreover, although *Giunta* took note of "substantial domestic contacts," it weighed those contacts against the "foreign components" of the dispute: there, "[t]he *only* foreign component present in the formation of the [a]greement was the eventual registration of the shares with the appropriate Bahamian authorities, an act that [defendant] agreed to undertake per the [a]greement."  *Giunta*, 893 F.3d at 82-83 (emphasis added) (internal quotation marks omitted).  The foreign components of the parties' SPA here are not so sparse.  Among other things, there are foreign parties on both sides of the transaction, and the SPA incorporates James River's affirmative representations regarding JRG Re's compliance with Bermuda law and regulations.

Fleming's other cited authorities are likewise factually distinguishable and therefore unpersuasive.  *See, e.g.*, *VR Glob. Partners L.P.*, 2024 WL 1514982, at *3 (transaction involving Venezuelan company not predominantly foreign where, among other things, the

plaintiff was a "New York–based company" with minimal alleged foreign ties); *In re iAnthus Cap. Holdings, Inc. Sec. Litig.*, 2022 WL 4539119, at *1-2, *9 (claim arising out of transaction involving Canadian company not predominantly foreign where, among other things, company was U.S.-based and had significant operations in the United States, company's shares "traded . . . over-the-counter in the United States," and named plaintiffs were U.S. residents and U.S. entities).  At oral argument, Fleming identified various factors present here and deemed relevant to the extraterritoriality analysis by other courts, including the location of investors, the domestic execution of contracts, and the domestic processing of payments.  Tr. at 105-107.  But Fleming takes a piecemeal approach — pulling a particular factor from a case and applying it in isolation — that runs afoul of *Parkcentral*'s caution that, when determining whether "a particular invocation of § 10(b) will be deemed appropriately domestic or impermissibly extraterritorial," "courts must carefully make their way with careful attention to the facts of each case."  763 F.3d at 217.  Pointing to the fact, for instance, that domestic investors were found relevant in *United States v. Chang*, *see* Tr. at 106:14-25, a criminal prosecution where the defendant and his coconspirators affirmatively "used the U.S. financial system to seek and secure investors physically present in the United States," *United States v. Chang*, No. 18-cr-00681 (NGG), 2024 WL 2817494, at *2 (E.D.N.Y. May 31, 2024), says little about the probative weight to be accorded the presence of U.S.-investors in *this* case, where there are also foreign parties on either side of the transaction, a private agreement concerning securities not traded on any exchange, and Exchange Act claims premised at least in part on violations of Bermuda law and regulations.  Fleming effectively omits the broader

factual context of both the authorities it cites and this action.  Here, the facts alleged are such that the invocation of federal securities laws is impermissibly extraterritorial.[4]

As for Fleming's argument that this case includes the "*sui generis*" circumstance of a New York court compelling the closing of the transaction, Opp. at 17, the parties were before a New York court only because of the SPA's forum-selection clause.  As Fleming itself concedes, forum-selection and choice-of-law clauses do not render an otherwise predominantly foreign transaction substantially domestic such that the transaction falls within the scope of U.S. federal securities laws.  *See, e.g.*, Tr. at 110:10-15; *Arco Cap. Corps. Ltd.*, 949 F. Supp. 2d at 541 (deeming "irrelevant" to domestic-transaction inquiry the fact that contract was "governed by New York law").

For the aforementioned reasons, the Court finds that section 10(b)'s application to this case is extraterritorial, thereby requiring dismissal of Fleming's section 10(b) claim.

## II.    Section 20 Claim

"Section 20(a) of the Exchange Act provides that individual executives, as 'controlling person[s]' of a company, are secondarily liable for their company's violations of the Exchange Act.'"  *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (alteration in original) (quoting 15 U.S.C. § 78t(a)).  "To establish a prima facie case of

---

[4] At oral argument, Fleming also relied on a footnote in *Parkcentral* to argue that "in many instances, especially where the parties to the suit were the parties to the transaction, the fact that the transaction was domestic might well be deemed sufficient to compel the conclusion that the invocation of § 10(b) is also domestic." 763 F.3d at 216 n.12; *see* Tr. at 117:1-18. But *Parkcentral*'s dicta is contrary to the Second Circuit's subsequent guidance in *Cavello Bay*.  Notwithstanding that the parties in *Cavello Bay* were also the parties to the underlying transaction in that case, the Second Circuit underscored that allegations pertaining to contract formation "bear upon the threshold question whether the purchaser or seller incurred irrevocably liability in the United States," but "do not resolve the question whether the claims are nevertheless so predominantly foreign." 986 F.3d at 167-68.  *Cavello Bay* therefore reinforces that the "domestic transaction" and "predominantly foreign" inquiries are distinct, even when the parties to the transaction are the same as the parties to the suit.

control person liability in the Second Circuit, a plaintiff must show (1) a primary violation by a controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 597 (S.D.N.Y. 2010) (alteration adopted) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007)).

Because the Court has found that no viable section 10(b) claim exists, Fleming's control-person liability claims also fail. *See, e.g.*, *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 486 (S.D.N.Y. 2005) ("A plaintiff must first plead facts showing a primary violation of the securities laws by the allegedly controlled person."); *Morrison*, 561 U.S. at 253 n.2 (Section 20(a) liability is "derivative of liability under some other provision of the Exchange Act"); *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d at 561 ("Because Plaintiffs' claims under Sections 10(b) and 14(a) fail, their claims under Section 20(a) . . . necessarily fail as well.").

## III.    State Law Claims

The Court next turns to Fleming's state law claims for fraud and breach of contract. "A district court 'may decline to exercise supplemental jurisdiction over a claim' once it 'has dismissed all claims over which it has original jurisdiction.'" *Wu v. Bitfloor, Inc.*, 460 F. Supp. 3d 418, 429 (S.D.N.Y. 2020) (quoting 28 U.S.C. § 1367(c)).  "The Supreme Court has commented that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

The Court finds that the equities counsel in favor of declining supplemental jurisdiction over the remaining state law claims in this case. The case is at a relatively early stage. There are already pending state law proceedings, and therefore, holding parallel state and federal proceedings would not serve judicial economy or convenience. Accordingly, the Court dismisses Fleming's state law claims for fraud and breach of contract without prejudice.

## CONCLUSION

For the aforementioned reasons, James River's motion to dismiss the Amended Complaint is GRANTED. Fleming's federal Exchange Act claims (Counts I-III) are dismissed with prejudice. Fleming's state law claims (Counts IV-X) are dismissed without prejudice. The Clerk of Court is respectfully directed to terminate the motion at Dkt. 53.

Dated: July 17, 2025
New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge